IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, <u>ex</u> <u>rel</u>. SAL A. BARBERA, | ) ) ) ) | CASE NO. 97-6590-CIV-JORDAN |
| | ) | MAGISTRATE JUDGE BANDSTRA |
| Plaintiffs, | ) ) ) | **FIRST AMENDED COMPLAINT OF** |
| vs. | ) ) | **THE UNITED STATES** |
| AMISUB (NORTH RIDGE HOSPITAL), INC., d/b/a NORTH RIDGE MEDICAL CENTER; TENET HEALTHSYSTEMS MEDICAL, INC., f/k/a AMERICAN MEDICAL INTERNATIONAL, INC.; TENET HEALTHSYSTEM HOLDINGS, INC., f/k/a AMERICAN MEDICAL HOLDINGS, INC.; TENET HEALTHCARE CORPORATION, f/k/a NATIONAL MEDICAL ENTERPRISES, INC. | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____/ | | |

For its First Amended Complaint, the United States of
America alleges as follows:

## I.  NATURE OF ACTION

1.  The United States brings this action to recover
statutory damages and civil penalties under the False Claims Act,
31 U.S.C. §§ 3729-33, and to recover damages and other monetary
relief under the common law or equitable theories of fraud,
unjust enrichment, payment by mistake of fact, recoupment and
disgorgement of illegal profits.



2.   Defendants Tenet Healthcare Corporation, formerly known as National Medical Enterprises, Inc. (NME), Tenet Healthsystem Holdings, Inc. (Tenet Healthsystem Holdings), formerly known as American Medical Holdings, Inc. (AMH), Tenet Healthsystems Medical, Inc. (Tenet Healthsystems Medical), formerly known as American Medical International, Inc. (AMI), and AMISUB (North Ridge Hospital), Inc., d/b/a North Ridge Medical Center (AMISUB or North Ridge Medical Center), are corporate entities that owned and/or operated a hospital, also known as North Ridge Medical Center, at various times between 1993 and the present.  From at least April 1993 through the present, the defendants engaged in a scheme to pay compensation to physicians to induce them, illegally, to refer patients, including Medicare patients, to North Ridge Medical Center.  Previously, most of these physicians had been referring most of their patients to other hospitals. This compensation took the form of (1) salaries that were greater than fair market value; (2) forgiveness of loan payments; and (3) sham medical directorship contracts.  The defendants then submitted false or fraudulent claims to the United States for the patients so referred in order to obtain millions of dollars in Medicare reimbursement that they were not legally entitled to receive.

2

3.    Illegal compensation was provided under employment contracts entered into between the physicians and North Ridge Medical Center between 1993 and 1994.

4.    In 1993 North Ridge Medical Center was a wholly owned subsidiary of AMI which, in turn, was a wholly owned subsidiary of AMH.  Employees of AMI approved the contracts between the physicians and North Ridge Medical Center.

5.    In March 1995 Newco., Inc., a subsidiary of NME, acquired all of the stock of AMH.  Following this transaction, Newco. Inc, no longer existed and AMH became a wholly-owned subsidiary of NME.  As a result of its acquisition of AMH, NME acquired AMI and AMISUB as subsidiaries as well.

6.    In June 1995 NME changed its name to Tenet Healthcare Corporation.  At the same time, the name of AMH was changed to Tenet Healthsystem Holdings and the name of AMI was changed to Tenet Healthsystems Medical.

7.    Following the acquisition of North Ridge Medical Center by Tenet Healthcare Corporation, employees of Tenet Healthcare Corporation, Tenet Healthsystem Holdings and Tenet Healthsystems Medical failed to take timely action to terminate the contracts providing illegal compensation, to stop the hospital from improperly billing Medicare, or to notify the Government what was occurring.  This was true even though Tenet Healthcare Corporation was operating under a Corporate Integrity Agreement

3

with the United States Department of Health and Human Services
that required Tenet Healthcare Corporation to report any improper
conduct.

8.   The defendants submitted annual cost reports to the
United States that falsely certified that the services for which
North Ridge Medical Center received Medicare reimbursement had
been provided in compliance with applicable laws and regulations.

9.   The cost reports also improperly accounted for certain
costs incurred by the hospital.

## II.   JURISDICTION

10.   The Court has subject matter jurisdiction to entertain
this action under 28 U.S.C. §§ 1331 and 1345.   The Court may
exercise personal jurisdiction over the defendants pursuant to 31
U.S.C. § 3732(a).

## III. VENUE

11.   Venue is proper in the Southern District of Florida,
under 32 U.S.C. § 1391(b) and (c) because at least one of the
defendants transacts business in this District.

## IV. PARTIES

12.   The United States brings this action on behalf of the
Department of Health and Human Services (HHS), the Centers for
Medicare and Medicaid Services (CMS)[1], and the Medicare Program.

---

[1]   CMS was formerly known as the Health Care Financing
Administration (HCFA).

4

13.   Relator Sal A. Barbera is an individual residing in Parkland, Florida, in Broward County in the Southern District of Florida.  Pursuant to 31 U.S.C. § 3730(b)(1), Mr. Barbera brought this action against Tenet Healthcare Corporation and its predecessors, on behalf of himself and the United States.

14.   Defendant AMISUB (North Ridge Hospital), Inc., d/b/a North Ridge Medical Center is a Florida corporation.  From 1993 through the present North Ridge Medical Center has been a wholly-owned subsidiary of AMI and its successor corporation, Tenet Healthsystems Medical.

15.   Defendant Tenet Healthsystems Medical is a Delaware corporation with its principal place of business in Dallas, Texas, that owns, operates and manages numerous hospitals, including North Ridge Medical Center.  This entity, then called American Medical International, was acquired by Tenet Healthcare Corporation in March 1995.  In June 1995 the name of AMI was changed to Tenet Healthsystems Medical.  Tenet Healthsystems Medical assumed all of the liabilities of AMI.

16.   Defendant Tenet Healthsystem Holdings is a Delaware corporation with its principal place of business in Dallas, Texas.  This entity, then called American Medical Holdings, was acquired by Tenet Healthcare Corporation in March 1995.  In June 1995, the name of AMH was changed to Tenet Healthsystem Holdings.

5

Tenet Healthsystem Holdings assumed all of the liabilities of AMH.

17.   Defendant Tenet Healthcare Corporation is a Nevada corporation with its principal place of business in Santa Barbara, California.  Tenet Healthcare Corporation owns or operates more than 100 acute care hospitals and related businesses around the country.  On March 1, 1995, Tenet Healthcare Corporation, then called National Medical Enterprises, Inc., acquired AMH and its two subsidiaries, AMI and North Ridge Medical Center.  In June 1995 NME changed its name to Tenet Healthcare Corporation.

18.   Numerous officers of Tenet Healthcare Corporation are also officers of Tenet Healthsystem Holdings, Tenet Healthsystems Medical and AMISUB.  The Chief Executive Officer and Chairman of the Board of Tenet Healthcare Corporation,  Jeffrey Barbakow, is also Chief Executive Officer and Chairman of the Board of Tenet Healthsystem Holdings.  The Chief Financial Officer and Vice Chairman of the Board of Tenet Healthcare Corporation, David Dennis, is Chief Financial Officer and Executive Vice President of Tenet Healthsystem Holdings and Chief Executive Officer, Chief Financial Officer and Vice Chairman of the Board of Tenet Health Systems Medical.  The Executive Vice President for Human Resources of Tenet Healthcare Corporation, Alan Ewalt, is also Senior Vice President for Human Resources of Tenet Healthsystem

Holdings.  The President and Chief Operating Officer of Tenet Healthcare Corporation, Thomas Mackey, is also President and Chief Operating Officer of Tenet Healthsystem Holdings and President of Tenet Healthsystems Medical.  The Chief Accounting Officer of Tenet Healthcare Corporation, Ronald Mathiasen, is a Vice President of Tenet Healthsystem Holdings and an officer of both Tenet Healthsystems Medical and AMISUB.  The Executive Vice President of business development of Tenet Healthcare Corporation, David "Rusty" Mayeux, is also an officer of Tenet Healthsystems Medical.   The Assistant Treasurer of Tenet Healthcare Corporation, Dennis Dent, is an Assistant Treasurer of Tenet Healthsystem Holdings, an Assistant Treasurer of Tenet Healthsystems Medical and Treasurer of AMISUB.  The Senior Vice President of Tenet Healthcare Corporation in charge of Hospital Cost Reports, Stephen Dominguez, is also a Vice President of Tenet Healthsystem Holdings and a Vice President of Tenet Healthsystems Medical.  Lawrence Hixon, a Vice President for Accounting at Tenet Healthcare Corporation, is also an Assistant Vice President for Accounting at Tenet Healthsystem Holdings, an Officer of Tenet Healthsystems Medical, and an Officer of AMISUB. Caitlin Larsen, Senior Counsel of Tenet Healthcare Corporation, is also an Assistant Vice president of Tenet Healthsystem Holdings, an Assistant Vice President of Tenet Healthsystem Medical and Assistant Secretary of AMISUB.  Tim Pullen, Senior

7

Vice President and Controller of Tenet Healthcare Corporation, is also Senior Vice President and Controller of Tenet Healthsystem Medical. Douglas Rabe is Vice President for Taxation at Tenet Healthcare Corporation and an Officer of Tenet Healthsystems Medical. Richard Silver is Senior Vice President and Assistant General Counsel of Tenet Healthcare Corporation, a Director of Tenet Healthsystem Holdings, a Director of Tenet Healthsystems Medical, and Director, Vice President and Secretary of AMISUB. Steven Crosser is Assistant Treasurer of Tenet Healthsystem Holdings and Treasurer of Tenet Healthsystems Medical.

19.     Upon information and belief there are additional officers of Tenet Healthcare Corporation who are also officers of one or all of Tenet Healthcare Corporation's subsidiary companies, Tenet Healthsystem Holdings, Tenet Healthsystems Medical, and AMISUB.

20.     Tenet Healthcare Corporation and North Ridge Medical Center participate in a cash management system (alternatively known as the "cash concentration system") in which there is no distinction between the monies belonging to Tenet Healthcare Corporation and the monies received or disbursed by North Ridge Medical Center. At the end of each business day, all monies that have been deposited by North Ridge Medical Center into its local "depository" account are automatically transferred to a Tenet Healthcare Corporation account. These transactions are recorded

on the books of both North Ridge Medical Center and Tenet Healthcare Corporation as a loan from North Ridge Medical Center to Tenet Healthcare Corporation.  Similarly, all checks disbursed by North Ridge Medical Center, including payroll and capital expenditures, are drawn from a "disbursements" account that has a zero balance.  At the end of each business day, all of the checks that have come into North Ridge Medical Center's "disbursements" account are funded by an automatic loan from Tenet Healthcare Corporation to North Ridge Medical Center.

21.   All checks written by North Ridge Medical Center for an amount over $400,000 must be co-signed by an officer of Tenet Healthcare Corporation.

22.   Although Tenet Healthcare Corporation accountants periodically determine the balance of this revolving loan between Tenet Healthcare Corporation and North Ridge Medical Center, no payment is ever made in either direction solely for the purpose of reconciling the outstanding balance of the loan.  Instead, this "loan" is simply kept open as a constant source of revolving cash between Tenet Healthcare Corporation and North Ridge Medical Center.

23.   Tenet Healthcare Corporation raises capital for Tenet Healthsystem Holdings, Tenet Healthsystems Medical and AMISUB. Upon information and belief Tenet Healthcare Corporation is the only source of capital for all three of these companies.

24.  Tenet Healthcare Corporation provides legal services to Tenet Healthsystem Holdings, Tenet Healthsystems Medical and AMISUB.

25.  Tenet Healthsystem Holdings and Tenet Healthsystems Medical provide the following services to AMISUB: cost report preparation, payroll processing, tax return preparation, risk management and group purchasing.

26.  Upon information and belief, Tenet Healthcare Corporation is liable for the actions of Tenet Healthsystem Holdings, Tenet Healthsystems Medical, AMISUB and their predecessor corporations because these subsidiaries are not separate entities but rather are instrumentalities of the parent company, Tenet Healthcare Corporation.

27.  Tenet Healthcare Corporation is liable in this action (1) because of the actions of its own employees and agents, and (2) to the extent it has assumed liability for the actions of its subsidiaries and their predecessors.

<b>V.   THE LAW</b>

**A.  <u>The False Claims Act</u>**

28.  The False Claims Act provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or

10

or statement to get a false or fraudulent
claim paid or approved by the Government; (3)
conspires to defraud the Government by getting
a false or fraudulent claim paid or approved
by the Government; . . . or (7) knowingly
makes, uses or causes to be made or used, a
false record or statement to conceal, avoid,
Or decrease an obligation to pay or transmit
money or property to the Government,

* * *

is liable to the United States Government for
a civil penalty of not less than $5,000 and
not more than $10,000, plus 3 times the amount
of damages which the Government sustains because
of the act of that person. . . .
(b) For purposes of this section, the terms
"knowing" and "knowingly" mean that a person,
with respect to information (1) has actual
knowledge of the information; (2) acts in
deliberate ignorance of the truth or falsity
of the information; or (3) acts in reckless
disregard of the truth or falsity of the
information, and no proof of specific intent
to defraud is required.

31 U.S.C. § 3729.

**B.   The Stark Statute**

29.   A section of the Social Security Act, 42 U.S.C.

§ 1395nn (commonly known as the "Stark Statute") prohibits a

hospital (or other entity providing healthcare items or services)

from submitting Medicare claims for payment based on patient

referrals from physicians having an improper "financial

relationship" (as defined in the statute) with the hospital.  The

regulations implementing 42 U.S.C. § 1395nn require that any

entity collecting payment for a healthcare service "performed

under a prohibited referral must refund all collected amounts on a timely basis."   42 C.F.R. § 411.353.

30.   The Stark Statute establishes that the providers should not submit claims for items or services referred by physicians who have improper financial relationships with the providers of the items or services. In enacting the statute, Congress found that improper financial relationships between physicians and entities to whom they refer patients can compromise the physicians' professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality.   Congress relied upon various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those providers' services than similarly situated physicians who did not have such relationships.   The statute was designated specifically to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services.

31.   Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.   Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

12

32.  In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services.  *See* Omnibus Budget Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

33.  As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services.  *See* 42 U.S.C. § 1395nn(h)(6).

34.  In pertinent part, the Stark Statute provides:

(a) Prohibition of certain referrals

    (1) In general

    Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then --

        (A) <u>the physician may not make a referral to the entity</u> for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

> (B) <u>the entity may not present or
> cause to be presented a claim under
> this subchapter or bill</u> to any
> individual, third party payor, or
> other entity for designated health
> services furnished pursuant to a
> referral prohibited under
> subparagraph (A).

42 U.S.C. § 1395nn (emphasis added).

35. The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician. The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions.

36. An employment relationship may be considered proper under the Stark Statute, but only if the amount of the remuneration under the employment is consistent with the fair market value of the services, and is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician.

37. Compensation paid to a referring physician serving as a consultant to a hospital may fall within an exception to the statute but only if the contract specifies the services covered, covers all the services to be provided by the physician, and the aggregate of such services is reasonable and necessary for the legitimate business purposes of the hospital and is consistent with fair market value for services actually rendered, not taking into account the volume or value of the referrals or other

14

business generated between the parties.  42 U.S.C.

§ 1395nn(e)(3).

38.  Similarly, office space leased to a referring physician may fall within such an exception, but only if the rent over the term of the lease is consistent with fair market value and is not determined in a way that takes into account the volume or value of referrals or other business generated between the parties.  42 U.S.C. § 1395nn(e)(1)(A).

## VI.  THE MEDICARE PROGRAM

39.  In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, et seq.  Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care.  *See* 42 U.S.C. §§ 1395c-1395i-4.  Most hospitals, including North Ridge Medical Center, derive a substantial portion of their revenue from the Medicare Program.

40.  HHS is responsible for the administration and supervision of the Medicare Program.  CMS is an agency of HHS and is directly responsible for the administration of the Medicare Program.

41.  Under the Medicare Program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services.  Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare Program.  However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients.  Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

42.  To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries."  42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

43.  Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays.  42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments on a Form HCFA[2] UB-92.

44.  As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a Form HCFA-2552, more commonly

_____

    [2]    Although the name of HCFA has been changed to CMS (see footnote 1) the names of the forms referenced herein have not yet been changed to conform with the name of the agency.

16

known as the Hospital Cost Report.  Cost Reports are the final
claim that a provider submits to the fiscal intermediary for
items and services rendered to Medicare beneficiaries.

45.  After the end of each hospital's fiscal year, the
hospital files its Hospital Cost Report with the fiscal
intermediary, stating the amount of reimbursement the provider
believes it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42
C.F.R. § 413.20.  *See also* 42 C.F.R. § 405.1801(b)(1).  Hence,
Medicare relies upon the Hospital Cost Report to determine
whether the provider is entitled to more reimbursement than
already received through interim payments, or whether the
provider has been overpaid and must reimburse Medicare.  42
C.F.R. §§ 405.1803, 413.60 and  413.64(f)(1).

46.  Medicare payments for inpatient hospital services are
determined by the claims submitted by the provider for particular
patient discharges (specifically listed on UB-92s) during the
course of the fiscal year.  On the Hospital Cost Report, this
Medicare liability for inpatient services is then totaled with
any other Medicare liabilities to the provider.  This total
determines Medicare's true liability for services rendered to
Medicare beneficiaries during the course of a fiscal year.  From
this sum, the payments made to the provider during the year are
subtracted to determine the amount due the Medicare Program or
the amount due the provider.

47.  Under the rules applicable at all times relevant to
this Complaint, Medicare, has the right to make retroactive
adjustments to Hospital Cost Reports previously submitted by a
provider if any overpayments have been made.  42 C.F.R.
§ 413.64(f).

48.  Every Hospital Cost Report contains a "Certification"
that must be signed by the chief administrator of the provider or
a responsible designee of the administrator.

49.  For cost reporting periods prior to September 30, 1994,
the provider was required to certify, in pertinent part:

> to the best of my knowledge and belief, it
> [the Hospital Cost Report] is a true, correct
> and complete statement prepared from the
> books and records of the provider in
> accordance with applicable instructions,
> except as noted.

Form HCFA-2552-81.

50.  Thus, the provider was required to certify that the
filed Hospital Cost Report is (1) truthful, i.e., that the cost
information contained in the report is true and accurate,
(2) correct, i.e., that the provider is entitled to reimbursement
for the reported costs in accordance with applicable
instructions, and (3) complete, i.e., that the Hospital Cost
Report is based upon all information known to the provider.

51.  The applicable instructions contained in the pre-
September 1994 certification included the requirement that

services described in the cost report complied with Medicare Program requirements.

52.   The pre-September 1994 Hospital Cost Report form (Form HCFA-2552-81) reminded providers that "intentional misrepresentation or falsification of any information contained in this cost report may be punishable by fine and/or imprisonment under federal law."

53.   On September 30, 1994, Medicare revised the certification provision of the Hospital Cost Report to state:

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

54.   In or about 1996, the Hospital Cost Report form was revised again to state:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.  Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

55.   Once the Stark Statute became effective, providers certified on the Form HCFA 2552 that the services provided in the cost report were billed in compliance with the Stark Statute.

56.   A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary.   42 U.S.C. § 1320a-7b(a)(3) creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

### VII.   DEFENDANTS' SCHEME

### A.   Summary of the Defendants' Unlawful Conduct

57.   Defendant North Ridge Medical Center entered into employment contracts with fourteen physicians for annual compensation far in excess of fair market value.   Subsequently, these physicians greatly increased the number of patients, including Medicare patients, that they referred to North Ridge Medical Center for outpatient services and inpatient stays.   Most of these physicians switched from referring most of their patients to other hospitals to referring them to North Ridge Medical Center.   Medicare ultimately paid North Ridge Medical Center over $19 million for these referrals.

58.   The defendants awarded medical directorships to three physicians at compensation levels far above fair market value for duties performed.   Subsequently, these physicians referred a

substantial number of patients, including Medicare patients, to North Ridge Medical Center for outpatient services and inpatient stays.  Medicare ultimately paid North Ridge Medical Center millions of dollars for these referrals.

59.  The defendants amended employment contracts of physicians who referred a large number of patients for outpatient services and inpatient stays to the North Ridge Medical Center, in order to induce them to continue referring patients to the hospital.

60.  The defendants forgave loan payments to Dr. Martin Coleman, and provided free office space and personnel to Dr. Ali Ghahramani, both of whom referred a substantial number of patients for outpatient services and inpatient stays to North Ridge Medical Center, in order to induce them to continue referring patients to the hospital.

61.  The defendants knowingly submitted to Medicare patient claims on claims for interim payment and on eight annual Hospital Cost Reports for the medical services identified above, even though the defendants were on notice that the claims should not have been submitted under the applicable laws and regulations.

62.  The defendants submitted eight annual Hospital Cost Reports, covering Fiscal Year 1993 through Fiscal Year 2000, that falsely certified that the medical services identified therein had been provided in compliance with applicable laws and

regulations.  All eight Hospital Cost Reports were submitted on
behalf of North Ridge Medical Center by either Tenet Healthcare
Corporation or AMI and signed by an employee of either Tenet
Healthcare Corporation or AMI.  Upon information and belief
employees of American Medical Holdings participated in the
preparation of the Hospital Cost Reports covering Fiscal Years
1993 and 1994 and employees of Tenet Healthsystem Holdings
participated in the preparation of the Hospital Cost Reports
covering Fiscal Years 1995 through 2000.

    63.  The five Hospital Cost Reports that the defendants
submitted covering Fiscal Year 1993 through Fiscal Year 1997 were
also false in that they did not properly account for certain
costs incurred by North Ridge Medical Center, namely: general
service costs related to employee physician practices; reference
laboratory costs and charges related to employee physician
services; inpatient costs related to the diabetes treatment
program in an outpatient cost center, improperly allocated
general service costs to the home health care cost center, and
improper community relations and public relation costs.

    64.  Under a June 1994 Corporate Integrity Agreement entered
into with the United States as part of the resolution of a
previous False Claims Act case, Tenet Healthcare Corporation has
been required to submit annual Compliance Reports to the
Department of Health and Human Services identifying any unlawful

conduct at any of its facilities.  Upon information and belief,
Tenet Healthcare Corporation has not mentioned North Ridge
Medical Center's financial relationships with its referring
physicians in any of its annual Compliance Reports.

**B.   Illegal Employment Contracts**

65.   Between April 5, 1993, and August 8, 1994, North Ridge
Medical Center entered into employment contracts with fourteen
physicians (Drs. Gozansky, Dolchin, Copen, Mellin, Schwartz,
Shansky, Nigen, Yesner, Shapiro, Angelillo, Shook, Erdman,
Coleman and Perer) under which the physicians were paid well
above fair market value.  The North Ridge Medical Center
employees who developed and negotiated the offers of employment
included the Chief Executive Officer, Don Steigman; the Chief
Financial Officer, Gary Mervak; and the Comptroller, Ed Kipp.

66.   Upon information and belief, the contracts identified
in the previous paragraph were approved by AMI personnel,
including John Casey of AMI.

67.   Before North Ridge Medical Center hired the fourteen
physicians, North Ridge Medical Center employees obtained
documents relating to the physicians' practice levels, office
expenses and other related information.  The North Ridge Medical
Center Chief Financial Officer, Gary Mervak, and the Controller,
Ed Kipp, analyzed this data for each physician or physician group

to project estimated office revenues, physician compensation, and expenses for the employee physician practice.

68.   Each of the financial analyses indicated that the practices themselves would suffer significant annual losses at the compensation level projected for the employee physicians.

69.   As explained below, most of the financial analyses also showed the projected revenues that North Ridge Medical Center would receive from clinical laboratory outpatient referrals from the physicians once they were hired.  The statements showed that the anticipated laboratory referrals would greatly reduce or even eliminate the projected losses from the physicians' practices.

70.   As explained below, North Ridge Medical Center agreed to pay each of the fourteen physicians far more than his previous salary.

**(i)   Drs. Gozansky, Dolchin and Copen**

71.   Drs. David Gozansky, Michael Dolchin and Mark Copen practiced as a group before North Ridge Medical Center hired them.  According to their corporate federal income tax return, each physician reported wages of between $155,000 and $160,000 in the year prior to his employment by North Ridge Medical Center.

72.   Before North Ridge Medical Center hired Drs. Gozansky, Dolchin and Copen, it prepared a two-page financial analysis of their projected revenues and expenses for their first year of North Ridge Medical Center employment.  This August 30, 1993,

document showed that North Ridge Medical Center would lose an
estimated $380,223 on Drs. Gozansky, Dolchin and Copen's practice
if their laboratory referrals to North Ridge Medical Center were
not factored in.  However, the analysis also showed that the
hospital expected the three physicians to refer $272,310 worth of
laboratory referrals to it per year, reducing the hospital's
projected loss in the first year to roughly $108,000.  Projecting
alternative volumes of growth of 3 percent, 5 percent and 7
percent in the first year of employment, the financial analysis
concluded that North Ridge Medical Center would suffer an annual
loss on the practices of these three doctors of roughly $40,000
to $70,000.

73.  Drs. Gozansky, Dolchin and Copen sold the tangible
assets of their corporate practice to North Ridge Medical Center.
On September 3, 1993, they each executed a ten-year employment
contract with North Ridge Medical Center for a sign-on bonus of
$45,000 and an annual compensation of $275,000[3] (i.e., each was
guaranteed $320,000 the first year of employment).

74.  Also, Dr. Copen disputed North Ridge Medical Center's
computation of the contractual incentive bonus that he earned in
his first year of employment.  He asserted that he had earned a
bonus of $12,500 rather than the $5,000 offered by the hospital

---

[3]To be adjusted annually based on the percent change in the
consumer price index (CPI).

in that all patient encounters, consultations as well as office visits, should be counted.  Upon information and belief, Don Steigman, North Ridge Medical Center CEO, agreed to the higher bonus amount despite a staff memorandum stating that North Ridge Medical Center Chief Financial Officer Gary Mervak and Dr. Copen's contract supported the lower incentive bonus.

75.  For the first year, not considering incentive bonuses, their annual salaries exceeded their previous salaries by approximately $160,000 each.  In later years, excluding incentive bonuses, each of their salaries at North Ridge Medical Center exceeded their former salaries by more than $115,000 per year.

76.  From October 1992 through September 1993, before signing their employment contracts, Drs. Gozansky, Dolchin and Copen referred essentially none of their patients to North Ridge Medical Center for inpatient stays.[4]  By contrast, in their first year of employment at North Ridge Medical Center, of those patients referred for hospital inpatient stays, Dr. Copen referred 73% of his patients to North Ridge Medical Center; Dr. Dolchin referred 66% of his patients to North Ridge Medical Center; and Dr. Gozansky referred 42% of his patients to North Ridge Medical Center.  By 1995, when Stark II went into effect, Dr. Copen was referring 80% of those patients he referred for

---

[4]One of these three doctors referred 3% of his patients to North Ridge Medical Center; the other two referred none.

26

inpatient stays to North Ridge Medical Center, Dr. Dolchin was referring 78% and Dr. Gozansky was referring 70%.

77.   Upon information and belief, North Ridge Medical Center received from Medicare more than $5 million in revenue from the referrals of these physicians for outpatient claims beginning in 1994 and for inpatient claims beginning in 1995.

78.   Under the Stark Statute, the defendants were prohibited from billing Medicare for any of the claims identified in the previous paragraph.

79.   On January 28, 1999, Tenet Healthcare Corporation executed new contracts through a subsidiary with Drs. Gozansky, Dolchin and Copen under which the doctors received annual salaries of $225,000 each.   Also, Drs. Dolchin and Copen each received a "buyout" payment of $308,839, and Dr. Gozansky received a "buyout" payment of $310,988.

**(ii) Dr. Alan Yesner**

80.   Doctor Alan Yesner engaged in solo practice before he was hired by North Ridge Medical Center.   His offices remained on a nearby hospital's campus, before, during and after employment by North Ridge Medical Center.   Upon information and belief, his wages from his practice in the year prior to his employment by North Ridge Medical Center were $162,991.

81.   Before North Ridge Medical Center hired Dr. Yesner, it prepared a one-page financial analysis of his projected revenues

27

and expenses for his first year of North Ridge Medical Center employment.  This September 16, 1993, document showed that North Ridge Medical Center would lose an estimated $60,078 on Dr. Yesner's practice if his laboratory referrals to the hospital were not factored in.  However, the analysis also showed that the hospital expected Dr. Yesner to refer $64,991 worth of laboratory referrals to it per year, resulting in an anticipated annual profit of nearly $5,000.

82.  Dr. Yesner sold the tangible assets of his practice to North Ridge Medical Center after he executed a ten-year employment contract on November 29, 1993, with North Ridge Medical Center for a sign-on bonus of $25,000 and an annual compensation of $275,000.[5]

83.  Dr. Yesner's employment contract was also amended so that his baseline visits, which triggered his incentive bonus, would also include nursing home patient visits.

84.  Dr. Yesner's guaranteed annual salary at North Ridge Medical Center, not considering an incentive bonus, exceeded his previous salary by approximately $112,000.

85.  From October 1992 through September 1993, before signing his North Ridge Medical Center employment contract, Dr. Yesner referred 93% of those patients he referred for hospital

_____

[5] To be adjusted annually based on the percent change in the consumer price index (CPI).

28

inpatient stays to a nearby hospital and only 5% to North Ridge Medical Center.  In his first year of employment, Dr. Yesner referred 36% of those patients he referred for hospital inpatient stays to North Ridge Medical Center.  By 1995, 1996 and 1997, after the Stark II Statute became effective, he referred 65%, 62% and 81%, respectively, of those patients he referred for hospital inpatient stays to North Ridge Medical Center.

86.  Upon information and belief, North Ridge Medical Center received from Medicare more than $2 million in revenue from Dr. Yesner's referrals for outpatient Medicare claims beginning in 1994 and for inpatient Medicare claims beginning in 1995.

87.  Under the Stark Statute, the defendants were prohibited from billing Medicare for any of the claims identified in the preceding paragraph.

### (iii)  Drs. Schwartz and Mellin

88.  Dr. Alan Schwartz employed Dr. Harold Mellin as an associate until shortly before they were both hired by North Ridge Medical Center in February 1994.  Their offices were then moved from the campus of a nearby hospital to the North Ridge Medical Center campus.  According to their corporate federal income tax return, Dr. Mellin and Dr. Schwartz each reported wages of $125,000 and $122,000, respectively, in the year prior to their employment by North Ridge Medical Center.

89.  Before North Ridge Medical Center hired Drs. Mellin and Schwartz, it prepared a one-page analysis of their projected revenues and expenses for their first year of North Ridge Medical Center employment.  This December 17, 1993, document showed that North Ridge Medical Center would lose an estimated $353,514 on Drs. Mellin and Schwartz' practice if their laboratory referrals to North Ridge Medical Center were not factored in.  However, the analysis also showed that the hospital expected these physicians to refer $214,037 worth of laboratory referrals to it per year, reducing the hospital's projected loss to approximately $140,000.

90.  Drs. Mellin and Schwartz sold the tangible assets of their practices to North Ridge Medical Center after they each executed a ten-year employment contract on February 14, 1994 with North Ridge Medical Center for an annual salary of $225,000.[6]

91.  The guaranteed annual salaries of Drs. Mellin and Schwartz, not considering incentive bonuses, at North Ridge Medical Center exceeded their previous salaries by approximately $100,000 each.

92.  From January through December 1993, Drs. Mellin and Schwartz referred between 95% and 96% of those patients referred for inpatient stays to a nearby hospital and less than 5% to North Ridge Medical Center.  In their first year of employment,

---

[6]To be adjusted annually based on the percentage change in the consumer price index (CPI).

Dr. Schwartz referred 73% of those patients referred for inpatient stays to North Ridge Medical Center and Dr. Mellin referred 70% of his patients referred for inpatient stays to North Ridge Medical Center.  By 1995, when Stark II became effective, Dr. Schwartz referred 88% of those patients he referred for inpatient stays to North Ridge Medical Center and Dr. Mellin referred 95%.

93.  Upon information and belief, North Ridge Medical Center received more than $2 million from Medicare in revenue from Drs. Mellin's and Schwartz' referrals for outpatient Medicare claims beginning in 1994 and for inpatient Medicare claims beginning in 1995.

94.  Under the Stark Statute, the defendants were prohibited from billing Medicare for any of the claims identified in the preceding paragraph.

**(iv) Drs. Shapiro and Angelillo**

95.  Dr. Richard Shapiro employed Dr. Michael Angelillo as an associate until shortly before they were both hired by North Ridge Medical Center in April 1993.  Both before and after they were hired by North Ridge Medical Center, their offices were located near Wynmoor Retirement Community.  Upon information and belief, Dr. Shapiro's 1992 wages were $117,028 and Dr. Angelillo's 1992 wages were $109,697.

96.   Before North Ridge Medical Center hired Drs. Shapiro and Angelillo, it prepared an analysis of their projected revenues and expenses for their first and second year of North Ridge Medical Center employment.  The analysis, which was undated, showed that North Ridge Medical Center would lose an estimated $381,359 and $332,864 on Drs. Shapiro and Angelillo's practice in their first and second years of employment if their laboratory referrals to North Ridge Medical Center were not factored in.  However, the analysis also showed that the hospital expected these physicians to refer $233,587 worth of laboratory referrals to it in the first year and $248,375 in the second year, reducing the hospital's projected losses to roughly $148,000 in the first year and $85,000 in the second year. Subsequent financial analyses continued to show losses to North Ridge Medical Center at a reduced projected salary level.

97.   At the time of their employment by North Ridge Medical Center, Drs. Shapiro and Angelillo were practicing in an office facility owned by another hospital.  North Ridge Medical Center purchased the tangible assets from this hospital and assumed the lease of the space for the use of Drs. Shapiro and Angelillo as employees of North Ridge Medical Center.

98.   On April 5, 1993, Drs. Shapiro and Angelillo each executed a five-year employment contract with North Ridge Medical

Center for an annual salary of $185,000.[7]  Their guaranteed first year salaries at North Ridge Medical Center, not including incentive bonuses, exceeded their previous salaries by approximately $68,000 and $75,000, respectively.

99.  Upon information and belief, the incentive bonuses of Drs. Shapiro and Angelillo remained a source of controversy with North Ridge Medical Center throughout their years of employment. When it was concluded in 1994 that their incentive bonuses were triggered by collection amounts resulting from a number of office visits which "will never be achieved," North Ridge Medical Center agreed to amend the employment contract to lower the baseline trigger.

100.  From April 1992 through March 1993, prior to employment by North Ridge Medical Center, Drs. Shapiro and Angelillo referred their patients predominately to two hospitals near their offices.  In that period of time, Dr. Shapiro referred 3% of the patients he referred for inpatient stays to North Ridge Medical Center and Dr. Angelillo referred none of his patients for inpatient stays to North Ridge Medical Center.  Subsequent to employment, they referred between 21% and 31% of the patients they admitted for inpatient hospital stays to North Ridge Medical Center.  The improvement of this referral rate was the subject of discussions with these doctors.  Upon information and belief,

---

[7]Increased annually by five per cent.

Emil Miller, who succeeded Don Steigman as CEO of North Ridge Medical Center, spoke to Dr. Shapiro personally about referring more patients to North Ridge Medical Center.  The major referral hospital of Drs. Shapiro and Angelillo was significantly closer to Wynmoor and the doctors' offices, which, upon information and belief, served as a detriment to elderly patients agreeing to treatment at North Ridge Medical Center.

101.  Upon information and belief, North Ridge Medical Center received more than $1.3 million from Medicare in revenue from referrals of Drs. Shapiro and Angelillo from outpatient Medicare claims beginning in 1993 and from inpatient Medicare claims beginning in 1995.

102.  Under the Stark Statute, the defendants were prohibited from billing Medicare for any of the claims identified in the preceding paragraph.

**(v)  Drs. Shansky and Nigen**

103.  Drs. Martin Shansky and Alan Nigen practiced together prior to employment by North Ridge Medical Center.  On information and belief, they had annual wages of $181,000 and $208,000, respectively, before they were hired by North Ridge Medical Center.

104.  Before North Ridge Medical Center hired Drs. Shansky and Nigen, it prepared a two-page analysis of their projected revenues and expenses for their first year of North Ridge Medical

Center employment. This May 17, 1993, document showed that North Ridge Medical Center would lose an estimated $24,000 on Drs. Shansky and Nigen's practice and a profit if the doctors increased their volume of office visits by 12%.

105. On August 2, 1993, these physicians sold the tangible assets of their practice to North Ridge Medical Center. This transaction was, however, conducted differently than the purchase of tangible assets from the other employed physicians. The tangible asset evaluation company retained by North Ridge Medical Center used two methods to assess the value of tangible assets, MVOD (market value orderly disposal) or MVIP (market value in place). MVIP uniformly produces a significantly higher value. Twelve of the fourteen physicians on which this case focuses received MVOD value on their tangible assets but Drs. Shansky and Nigen received MVIP or $115,000 for their tangible assets which had a book value of approximately $24,000. The MVOD calculation produced a value of $50,450. Also, on August 2, 1993, Drs. Shansky and Nigen each executed employment contracts with North Ridge Medical Center for an annual compensation of $225,000.[8]

106. In August 1994, Dr. Shansky wrote Don Steigman, North Ridge Medical Center CEO, complaining that his incentive bonus program did not "recognize the amount of additional and serious

---

[8]To be adjusted annually based on the percentage change in the consume price index (CPI).

work that I have performed for your Corporation in the past year.
I need only point to the increase in outpatient utilization and
inpatient admissions over the previous year to date to
demonstrate the degree of commitment that I have demonstrated
over the past year." On July 21, 1995, Drs. Shansky and Nigen
each executed an amendment to his employment contract with North
Ridge Medical Center to lower the baseline trigger for incentive
bonuses.

107.  From July 1992, through September 1993, prior to
signing their employment contracts, Drs. Shansky and Nigen
referred approximately 65% of their patients referred for
inpatient stays to a nearby hospital and approximately 20% to
North Ridge Medical Center. After employment, these doctors
referred between 36% and 70% of the patients they admitted to a
hospital to North Ridge Medical Center.

108.  Upon information and belief, North Ridge Medical
Center received more than $2 million from Medicare in revenue
from the referrals of Drs. Shansky and Nigen from outpatient
Medicare claims beginning in 1994 and from inpatient Medicare
claims beginning in 1995.

109.  Under the Stark Statute, the defendants were
prohibited from billing Medicare for any of the claims identified
in the preceding paragraph.

110.   Upon information and belief, Tenet Healthcare
Corporation, acting through a subsidiary, executed a new contract
with Dr. Nigen in February 1999.

**(vi) Drs. Shook and Erdman**

111.   Drs. Leonard Erdman and John Shook practiced together
prior to employment by North Ridge Medical Center.  Upon
information and belief, they earned wages of approximately
$81,000 and $104,000, respectively, before they were hired by
North Ridge Medical Center.

112.   On September 9, 1994, Drs. Erdman and Shook sold the
tangible assets of their practice to North Ridge Medical Center.
Effective August 8, 1994, Dr. Erdman executed a five-year
employment contract with North Ridge Medical Center for an annual
salary of $140,000 under which he would not work more than 155
days per year.  On that same date, Dr. Shook executed a five-year
employment contract with North Ridge Medical Center for an annual
compensation of approximately $195,000.

113.   Before North Ridge Medical Center hired Drs. Erdman
and Shook, it prepared a one-page analysis of their projected
revenues and expenses for their first year of North Ridge Medical
Center employment.  The analysis, which was dated March 24, 1994,
showed that North Ridge Medical Center would lose approximately
$95,000 on Drs. Erdman and Shook's practice in their first year
of employment.

37

114.   Dr. Erdman entered employment at a compensation approximately $60,000 greater than his prior wages and Dr. Shook entered employment at a compensation approximately $90,000 greater than his prior wages.

115.   Before they were hired by North Ridge Medical Center in 1994, Drs. Erdman and Shook referred virtually no patients to North Ridge Medical Center.  By 1996, when Stark II was in effect, Dr. Erdman referred 79% of his patients admitted to a hospital for inpatient stays to North Ridge Medical Center and Dr. Shook referred 63% of his patients admitted to a hospital for inpatient stays to North Ridge Medical Center.

116.   Upon information and belief, North Ridge Medical Center received more than $1 million from Medicare from the referrals of Drs. Erdman and Shook in inpatient and outpatient revenues beginning in 1995.

117.   Under the Stark Statute, the defendants were prohibited from billing Medicare for any of the claims identified in the preceding paragraph.

### (vii)   Drs. Coleman and Perer

118.   Drs. Martin Coleman and Howard Perer practiced together prior to employment by North Ridge Medical Center in offices located near the North Ridge Medical Center campus.  They remained in those offices after they were hired by North Ridge

Medical Center.  Upon information and belief, their 1992 wages were $214,000 and $94,000, respectively.

119.  Before North Ridge Medical Center hired Dr. Coleman, it prepared a one-page analysis of his projected revenues and expenses for his first year of North Ridge Medical Center employment.  This August 19, 1993, document showed that North Ridge Medical Center would lose an estimated $145,595 on Dr. Coleman's practice if his laboratory referrals to North Ridge Medical Center were not factored in.  However, the analysis also showed that the hospital expected Dr. Coleman to refer $122,539 worth of laboratory referrals to it per year, reducing the hospital's projected loss to roughly $23,000.

120.  Before North Ridge Medical Center hired Dr. Perer, it prepared an one-page analysis of his projected revenues and expenses for his first year of North Ridge Medical Center employment.  The analysis, which was dated August 19, 1993, showed that North Ridge Medical Center would lose an estimated $119,320 on Dr. Perer's practice if his laboratory referrals to North Ridge Medical Center were not factored in.  However, the analysis also showed that the hospital expected Dr. Perer to refer $90,770 worth of laboratory referrals to it per year, reducing the hospital's projected loss to approximately $29,000.

121.  On October 29, 1993, Drs. Coleman and Perer sold the tangible assets of their practice to North Ridge Medical Center.

On October 25, 1993, Dr. Coleman executed a five-year employment contract with North Ridge Medical Center for an annual compensation of $275,000,[9] and, on that same date, Dr. Perer executed a five-year employment contract with North Ridge Medical Center for an annual compensation of $225.000.[10]

122.   Dr. Coleman's guaranteed annual salary at North Ridge Medical Center, not considering incentive bonuses, exceeded his previous wages by approximately $61,000; Dr. Perer's guaranteed annual salary at North Ridge Medical Center exceeded his previous wages by approximately $131,000.   Also, Dr. Coleman was forgiven twenty percent yearly on his future payments on a loan balance of $56,952 which he had been given earlier by North Ridge Medical Center so that he could complete the purchase of a practice.

123.   At some point, Tenet Healthcare Corporation decided to renegotiate its contracts with Drs. Coleman and Perer.   It offered them contracts paying $225,000 and $215,000, respectively, but they each demanded $25,000 in additional compensation.   In order to enhance their compensation packages, North Ridge Medical Center then agreed to pay each $25,000 for medical directorships.   Dr. Coleman was to serve as the Medical Director of International Marketing, an activity similar to which

---

[9]To be adjusted annually based on the percentage change in the consumer price index (CPI).

[10]To be adjusted annually based on the percentage change in the consumer price index (CPI).

he had engaged in previously for the hospital for no

compensation.   This previous activity consisted of marketing

duties to the Caribbean Islands.   Dr. Perer was to serve as the

Physician Advisor and Director of the Institutional Review Board

of North Ridge Medical Center, a duty performed for many years by

another physician for no compensation.   The contracts for medical

directorships were contingent upon their execution of their

employment contracts. Additionally, Dr. Coleman's loan

forgiveness was continued.   In March 1998, Drs. Coleman and Perer

signed new employment contracts with a Tenet Healthcare

Corporation subsidiary, National Medical Services, II, Inc.,

d/b/a Tenet Physician Group, and were made medical directors of

North Ridge Medical Center.

124.   From October 1992, through September 1993, Drs.
Coleman and Perer referred approximately 75% of the patients they
admitted to a hospital for inpatient stays to North Ridge Medical
Center.  After employment, they referred almost all of their
patients admitted to a hospital for inpatient stays to North
Ridge Medical Center.

125.   Upon information and belief, North Ridge Medical
Center received more than $4.8 million from Medicare in revenue
from the referrals of Drs. Coleman and Perer for outpatient
Medicare claims beginning in 1994 and from inpatient Medicare
claims beginning in 1995.

126.  Under the Stark Statute, the defendants were prohibited from billing Medicare for any of the claims identified in the preceding paragraph.

C.   **Medical Directorship of Dr. Ali Ghahramani**

127.  North Ridge Medical Center did not enter into an employment contract with Dr. Ali Ghahramani.  However, upon information and belief, Dr. Ali Ghahramani has been paid $13,333 a month and received office space, support personnel, and supplies at no cost to him as Medical Director of the Cardiology program at North Ridge Medical Center.  Upon information and belief, this compensation is far in excess of fair market value for his duties in this regard.  North Ridge Medical Center has received more than $22,000,000 in inpatient and outpatient revenue from Medicare claims from referrals from Dr. Ghahramani.

128.  Under the Stark Statute, the defendants were prohibited from charging Medicare for any of the claims identified in the preceding paragraph.

### VIII.   TENET HEALTHCARE CORPORATION'S CONTINUATION OF THE MISCHARGING

129.  Defendant Tenet Healthcare Corporation generated financial reports on a regular basis regarding the revenues and expenses of the practices and tracking the number of inpatient and outpatient referrals to hospitals by the employee physicians. An August 8, 1995, memorandum from Dean Danielson, Acting CEO, North Ridge Medical Center, was distributed to Don Steigman, then

Tenet Healthcare Corporation Regional Vice President, with copies to various hospital and physician services staff members, which highlighted those employee physicians who were referring the most patients to hospitals other than North Ridge Medical Center and the amount of "lost business" this represented.

130.  In 1996, Les Alt was hired as a consultant by Tenet Physician Services-Florida Region, a division of Tenet Healthcare Corporation, to evaluate the employment contracts of twenty-one North Ridge Medical Center physicians.  On July 12, 1996, Alt issued a preliminary report covering fifteen of the physicians. It concluded that these physicians' practices were losing substantial money; that their salaries were higher than the national averages; that their productivity, as measured by office visits, was below the national average; and that the employment contracts could be considered fraudulent and abusive.  Tenet Healthcare Corporation terminated Alt's contract before he could complete his review.

131.  In October 1996, Jon O'Sullivan, a management consultant employed by Value Management Group, conducted a preliminary review of the employment contracts of several physicians employed by North Ridge Medical Center.  In an October 28, 1996, letter to Dr. Norma Nickel of Tenet Physician Services, O'Sullivan expressed doubts about the legality of the employment contracts.

132.  On February 24, 1997, Tony Bennett, the Chief
Financial Officer of Tenet Physician Services-Florida Region,
sent a memorandum to Jeff Heinemann, Vice President of Tenet
Physician Services (Tenet Healthcare Corporation's national
office for management of physician practices).  In this
memorandum, Bennett quoted from the Stark II statute, using bold
face print on the language dealing with fair market value and
relationship of the compensation to referrals.  Bennett stated
that, in his view, the arrangements were not commercially
reasonable.  Shortly after sending his memo, Bennett also
presented his concerns in a meeting with Tenet Healthcare
Corporation counsel.

133.  Despite all of these warnings, Tenet Healthcare
Corporation continued to allow its subsidiaries to engage in
unlawful financial relationships with North Ridge Medical Center
physicians, it allowed North Ridge Medical Center to continue
billing Medicare for referrals generated by these physicians, it
continued to submit Hospital Cost Reports that falsely certified
that all of the services were rendered in compliance with
applicable laws and regulations, and it has failed to mention the
issue in any of the annual Compliance Reports that it submitted
to the Department of Health and Human Services.

### IX.   FALSE ALLOCATIONS AND CLASSIFICATIONS ON NORTH RIDGE MEDICAL CENTER HOSPITAL COST REPORTS

134.   Upon information and belief, the five Hospital Cost Reports submitted by defendants on behalf of North Ridge Medical Center for the fiscal years ending September 30, 1993, through September 30, 1997 were false because they falsely described as reimbursable costs over $1 million in costs that were actually non-reimbursable costs related solely to the North Ridge Medical Center physicians' private practices.   These costs included salaries and employee benefits associated with North Ridge Medical Center executives who negotiated the employment contracts, the human resource manager who managed the hiring and firing of the employee physicians' office staff, and the transportation department personnel who transported patients to the employee physicians' offices and mail and laboratory specimens to and from the physicians' offices and the hospital.

135.   Upon information and belief, the defendants falsely included reference lab costs and charges in the laboratory cost center to be reimbursed by Medicare on the North Ridge Medical Center Hospital Cost Reports submitted for fiscal years ending September 30, 1993, through September 30, 1997, resulting in a loss to the Medicare Program of over $100,000.   In fact, these costs included costs that were related solely to the physicians'

private practices, and should therefore have been treated as a non-reimbursable cost center.

136. Upon information and belief, the Hospital Cost Report submitted by Tenet Healthcare Corporation, Tenet Healthsystem Holdings and Tenet Healthsystems Medical on behalf of North Ridge Medical Center for the fiscal year ending September 30, 1995, falsely allocated the costs associated with a Diabetes Treatment Center of America (DTCA) contract related primarily to diabetes counseling to an outpatient cost center. In fact, the majority of these costs were related to inpatient care, and were therefore largely non-reimbursable.

137. Upon information and belief, the two Hospital Cost Reports submitted by Tenet Healthcare Corporation, Tenet Healthsystem Holdings and Tenet Healthsystems Medical on behalf of North Ridge Medical Center for the fiscal years ending September 30, 1996, and September 30, 1997, were false because they improperly allocated old capital related costs to the home health agency cost center.

138. Upon information and belief, the Hospital Cost Report submitted by Tenet Healthcare Corporation, Tenet Healthsystem Holdings and Tenet Healthsystems Medical on behalf of North Ridge Medical Center for the fiscal year ending September 30, 1996, was false because it improperly allocated new capital related costs to the home health agency cost center.

46

139.   Upon information and belief, the two Hospital Cost Reports that Tenet Healthcare Corporation, Tenet Healthsystem Holdings and Tenet Healthsystems Medical submitted on behalf of North Ridge Medical Center for fiscal years ending September 30, 1995, and September 30, 1997, were false in that they duplicated the employee benefit costs, including payroll taxes, pension, health and life insurance, employee education and other benefits of the hospital's home health agency.

140.   Upon information and belief, the three Hospital Cost Reports that Tenet Healthcare Corporation, Tenet Healthsystem Holdings and Tenet Healthsystems Medical submitted on behalf of North Ridge Medical Center for fiscal years ending September 30, 1995, through September 30, 1997 were false in that they falsely allocated operation of plant expense of the hospital to the home health agency.

141.   Upon information and belief, the two Hospital Cost Reports that Tenet Healthcare Corporation, Tenet Healthsystem Holdings and Tenet Healthsystems Medical submitted on behalf of North Ridge Medical Center for fiscal years ending September 30, 1995, and September 30, 1996, were false in that they falsely allocated nursing administration expenses of the hospital to the home health agency.

142.   Upon information and belief, the two Hospital Cost Reports that were submitted on behalf of North Ridge Medical

47

Center by AMI for the fiscal years ending September 30, 1993, and September 30, 1994, and the three Hospital Cost Reports that were submitted on behalf of North Ridge Medical Center by Tenet Healthcare Corporation, Tenet Healthsystem Holdings and Tenet Healthsystems Medical for the fiscal years ending September 30, 1995, through September 30, 1997, were false in that they falsely described marketing expenses as an allowable cost.

143.  The Medicare Program has suffered a loss of over $2,600,000 as a result of the misstatements described in paragraphs 134-142 above.

## X.  DAMAGES

144. The United States was injured and suffered damages because of the acts of defendants in submitting, causing to be submitted, or conspiring to submit false claims, in that it paid North Ridge Medical Center for items and services for which the defendants were not entitled to seek reimbursement.

145. Defendants profited unlawfully from the payment of illegal remuneration to physicians and from the improper allocation of costs on their Hospital Cost Reports.

## FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

146. Plaintiff repeats and realleges ¶¶ 1 through 145 as if fully set forth herein.

147. Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

148. By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus civil penalties.

### SECOND CAUSE OF ACTION

(False Claims Act:  Making or Using False Record
or Statement to Cause False Claim to be Presented)
(31 U.S.C. § 3729(a)(2))

149. Plaintiff repeats and realleges ¶¶ 1 through 145 as if fully set forth herein.

150. Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

151. By virtue of the false records or false statements made by the defendants in support of false or fraudulent claims, the United States suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus civil penalties.

## THIRD CAUSE OF ACTION

(False Claims Act; Making or Using False Record
or Statement to Avoid an Obligation to Refund)
(31 U.S.C. § 3729(a)(7))

152. Plaintiff repeats and realleges ¶¶ 1 through 145 as if fully set forth herein.

153. Defendants knowingly made, used or caused to be made or used false records or false statements to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

154. By virtue of the false records or false statements made by the defendants to avoid an obligation, the United States suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus civil penalties.

## FOURTH CAUSE OF ACTION

(False Claims Act; Conspiring to Submit False Claims)
(31 U.S.C. § 3729(a)(3))

155. Plaintiff repeats and realleges ¶¶ 1 through 145 as if fully set forth herein.

156. Defendants entered into agreements with certain physicians and conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3).

157. By virtue of defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus civil penalties.

### FIFTH CAUSE OF ACTION

(Payment by Mistake of Fact)

158. Plaintiff repeats and realleges ¶¶ 1 through 145 as if fully set forth herein.

159. This is a claim for the recovery of monies paid by the United States to the defendants as a result of mistaken understandings of fact.

160. The false claims which defendants submitted to the United States' agents were paid by the United States based upon mistaken or erroneous understandings of material fact.

161. The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of defendants' certifications and representations, paid defendants certain sums of money to which they were not entitled, and defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

### SIXTH CAUSE OF ACTION

(Unjust Enrichment)

162. Plaintiff repeats and realleges ¶¶ 1 through 145 as if fully set forth herein.

163. This is a claim for the recovery of monies by which all defendants have been unjustly enriched.

164. By directly or indirectly obtaining Government funds to which they were not entitled, defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## SEVENTH CAUSE OF ACTION

(Disgorgement of Illegal Profits,
For Imposition of a Constructive Trust and an Accounting)

165. Plaintiff repeats and realleges  ¶¶ 1 through 145 as if fully set forth herein.

166. This is a claim for disgorgement of profits earned by the defendants through the misconduct identified above.

167. Defendants concealed their illegal activity through false statements, claims and records, and failed to abide by their duty to disclose such information to the United States in accordance with the Corporate Integrity Agreement to which they were subject.

168. The United States did not detect defendants' illegal conduct.

169. This Court has the equitable power to order the defendants to disgorge the entire profit North Ridge Medical Center earned from business generated as a result of their violations of the Stark Statute and the False Claims Act.

52

170. By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by the Defendants on referrals from physicians to whom they paid illegal remuneration, disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits, and by misallocating costs on their Hospital Cost Reports.

### EIGHTH CAUSE OF ACTION

(Recoupment of Overpayments)

171. Plaintiff repeats and realleges ¶¶ 1 through 145 as if fully set forth herein.

172. This is a claim for recoupment, for the recovery of monies unlawfully paid by the United States to defendants contrary to statute or regulation.

173. The United States paid defendants certain sums of money to which they were not entitled, and defendants are thus liable under the law of recoupment to account and return such amounts, which are to be determined at trial, to the United States.

### NINTH CAUSE OF ACTION

(Common Law Fraud)

174. Plaintiff repeats and realleges ¶¶ 1 through 145 as if fully set forth herein.

175. Defendants made material and false representations in their initial requests for interim payments and in their Hospital

Cost Reports with knowledge of their falsity or reckless disregard for their truth, with the intention that the United States act upon the misrepresentations to its detriment.  The United States acted in justifiable reliance upon defendants' misrepresentations by making interim payments on the false claims and then by settling the cost reports at inflated amounts.

176. Had the true facts been known to the United States, defendants would not have received the interim payments or the inflated amounts on the cost reports.

177. By reason of these interim payments and the inflated amounts on the Hospital Cost Reports, the United States has been damaged in an as yet undetermined amount.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, the United States demands and prays that judgment be entered in its favor against defendants, jointly and severally, as follows:

1.   On the First, Second, Third and Fourth Causes of Action under the False Claims Act, as amended, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.   On the Fifth, Sixth and Eighth Causes of Action, for payment by mistake, unjust enrichment, and recoupment, for the damages sustained and/or amounts by which the defendants were

unjustly enriched or by which defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.   On the Seventh Cause of Action, for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by defendants and such further equitable relief as may be just and proper.

4.   On the Ninth Cause of Action, for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

                    Respectfully submitted,

                    ROBERT D. McCALLUM, JR.
                    Assistant Attorney General
                    Civil Division

                    GUY A. LEWIS
                    United States Attorney for the
                    Southern District of Florida

                    _Barbara K. Bisno_____
                    BARBARA K. BISNO
                    Assistant United States Attorney
                    99 N.E. 4th Street
                    Miami, Florida 33132
                    Fla. Bar 746533
                    Tel: 305 961 9304
                    Fax: 304 536 4101

*Barbara K Breno, AUSA, for*

MICHAEL F. HERTZ
DAVID T. COHEN
DAVID B. WISEMAN
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, DC  20044
Tel:  (202) 307-0136
Fax:  (202) 616-3085

December 20, 2001

**Certificate of Service**

I HEREBY CERTIFY that a true and correct copy of the foregoing and the proposed order was served by U.S. Mail this 20th day of December, 2001 to the following:

Gary E. Sherman, Esq.
Gary E. Sherman, P.A.
440 South Andrews Avenue
Ft. Lauderdale, FL 333012-4726

Allan J. Sullivan, Esq.
Sullivan and Rivero, P.A.
201 S. Biscayne Boulevard
Miami, FL 33131

Thomas Holliday, Esq.
Rodney Stone, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Suite 4600
Los Angeles, California 90017-3197

Barbara K. Bisno
Assistant U.S. Attorney

57