IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 97-6590-CIV-JORDAN/BROWN



| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| *ex rel.* SAL A. BARBERA, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| AMISUB (NORTH RIDGE HOSPITAL), | ) |
| INC., d/b/a NORTH RIDGE MEDICAL | ) |
| CENTER, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## UNITED STATES' MEMORANDUM IN SUPPORT OF REVISED MOTION TO COMPEL

### INTRODUCTION

This case centers on allegations that the defendants (collectively "Tenet") knowingly and fraudulently billed Medicare for referrals from employee physicians, even though they knew that doing so violated the Stark Statute, 42 U.S.C. § 1395nn. Tenet has argued that its employees' awareness and interpretation of the Stark Statute is central to this case, but it has used claims of attorney-client and attorney work product privilege to effectively prevent the Government from conducting discovery on these issues. As explained below, the Government believes that Tenet has forfeited its normal privileges (1) under the doctrine of "waiver by implication," by making its employees' understanding and interpretation of the Stark Statute a central issue in the case, and (2) under the "crime-fraud" exception, because its attorneys appear to have participated directly in the conduct at issue.

The Government respectfully asks the Court to compel Tenet to produce all responsive documents generated prior to May 1998[1] discussing or relating to the Stark Statute or the contracts at issue in this case that it has withheld pursuant to attorney-client or attorney work product privilege, and to allow the Government to conduct depositions regarding attorney-client communications that occurred before then. In the alternative, the Government respectfully asks that the Court conduct *in camera* review of the documents identified in Exhibit 1 to determine whether the crime-fraud exception applies.

In its original motion to compel, the Government also challenged the privilege logs produced by Tenet in this case. These privilege logs are over 2,400 pages long and cover almost 17,000 documents, roughly one of every four responsive documents in Tenet's possession. Based on the Government's analysis, thousands of these documents do not appear to be privileged at all. Following this Court's July 8, 2003 order directing the parties to meet and confer further regarding the Government's motion, Tenet has agreed to review its privilege logs and produce a revised privilege log to the Government as soon as possible. Tenet has also agreed to make a good faith effort to complete this process by August 1, 2003. Based on these assurances, the Government has agreed to withdraw for the moment its challenge of Tenet's privilege logs.

The parties have also met and conferred with respect to the two issues discussed in this brief, and have been unable to reach any agreement on these issues. Therefore, the Government

---

[1] The Government first informed Tenet of its investigation of this case in May 1998. Although Tenet's misconduct appears to have continued after that date, the Government is not seeking to discover privileged documents generated after that date at this time. Thus, the Government is not seeking discovery of communications or work product regarding the litigation itself.

respectfully submits that these issues are ripe for briefing and consideration by the Court.

## STATEMENT OF FACTS

The Stark Statute generally prohibits a hospital from billing Medicare for "designated health services" rendered to patients referred to the hospital by a doctor with whom the hospital has certain types of financial relationships. One type of prohibited financial relationship is an employment contract that "takes into account (directly or indirectly) the volume or value of referrals by the referring physician" when determining the physician's remuneration. 42 U.S.C. § 1395nn(e)(2)(B)(ii). In this case, the Government has alleged that Tenet knowingly submitted tens of millions of dollars in claims to Medicare based on referrals from doctors with whom the defendants had prohibited financial relationships.

The Government's complaint alleged that in early 1997, a Tenet executive named Tony Bennett warned Tenet counsel that defendant North Ridge Medical Center ("North Ridge"), a subsidiary of defendant Tenet Healthcare Corp., might be violating the Stark Statute. First Amended Complaint, ¶ 131. The Complaint alleged that despite this warning, Tenet continued to bill Medicare unlawfully and to refuse to disclose its past misconduct. Id., ¶ 132.

Discovery and motion practice in this case have highlighted the role of Tenet counsel in the conduct at issue. Tenet's witnesses have repeatedly testified that they relied on counsel to interpret the Stark Statute and to ensure that the specific contracts at issue were legal. Also, Tenet has produced two privilege logs in this case, covering almost 17,000 documents. Tenet's privilege logs indicate that a number of its attorneys were concerned about the propriety of the contracts and repeatedly examined the question of whether they violated the Stark Statute, but failed to correct the violations. For example, the privilege logs indicate that Tenet counsel

investigated possible Stark violations at North Ridge in late 1995, and even issued a memo regarding "Stark II Corrective Action" at North Ridge in January 1996. Tenet appears to have received at least four reports about this issue from outside law firms in 1996 and 1997. The logs, as well as the deposition testimony of Mr. Bennett and his supervisor, have confirmed that several Tenet attorneys were made aware of Mr. Bennett's concerns in 1997. Still, Tenet's attorneys took no action to alter Tenet's practices or even to notify the government.

## ARGUMENT

I. TENET HAS WAIVED ATTORNEY-CLIENT AND ATTORNEY WORK PRODUCT PRIVILEGE BY MAKING ITS EMPLOYEES' GOOD FAITH INTERPRETATION OF THE STARK STATUTE AND THE ADVICE THEY RECEIVED FROM COUNSEL CENTRAL ISSUES IN THIS CASE

In its brief opposing the Government's motion for partial summary judgment, Tenet argued that the Government cannot prevail in this case without proving that Tenet "knew" that its conduct violated the Stark Statute. At the same time, Tenet has invoked attorney-client and attorney work product privilege and refused to produce the documents in its possession that address the subject. Meanwhile, Tenet's executives have testified in their depositions that they relied entirely on legal counsel to tell them what the Stark Statute required and whether the contracts at issue were legal. The Government respectfully submits that by its conduct, Tenet has waived its attorney-client and attorney work product privileges for a number of communications.

A. The Legal Doctrine of Waiver By Implication

Under the doctrine of waiver by implication, a party can waive its privileges by asserting

-4-

a claim or defense that makes its attorney-client communications a material issue in a case.² In particular, parties can waive their privileges by making an issue of their subjective understanding of applicable laws, rules, or contract provisions.

Thus, in United States v. Woodall, 438 F.2d 1317, 1324-26 (5th Cir. 1971)(en banc), the defendant waived his attorney-client privilege by claiming that he had been unaware of the sentencing consequences of his guilty plea. Similarly, in Pitney-Bowes, Inc. v. Mestre, 86 F.R.D. 444 (S.D. Fl. 1980), the plaintiff waived its privilege by introducing the issue of its intent regarding the construction of a contract.

In United States v. Exxon Corp., 94 F.R.D. 246 (D.D.C. 1981), the defendant waived its attorney-client privilege by claiming that it had relied in good faith on applicable government regulations and communications. The court stated, "Most courts considering the matter have concluded that a party waives the protection of the attorney-client privilege when he voluntarily injects into the suit the question of his state of mind." Id., 94 F.R.D. at 248.

In United States v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991), cert. denied, 502 U.S. 813, the defendant wanted to testify that he had tried in good faith to comply with the securities laws. The court held that this would have waived his attorney-client privilege:

> Bilzerian's testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required

---

² United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991); cert. denied, 502 U.S. 813 ("the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications"); Conkling v. Turner, 883 F.2d 431, 434 (5th Cir. 1989) ("[w]hen confidential communications are made a material issue in a judicial proceeding, fairness demands treating the defense as a waiver of the privilege")(quoting United States v. Mierzwicki, 500 F. Supp. 1331, 1335 (D. Md. 1980)); see also 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, §503.41[1] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 1997).

>in issue. His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent.

Id., 926 F.2d at 1292; see also Chevron v. Pennzoil, 974 F.2d 1156, 1162-63 (9th Cir. 1992) (plaintiff waived privilege by arguing that its position on a tax issue was reasonable according to advice of counsel); Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D. Wash. 1975)(defendants waived privilege by asserting an affirmative defense of qualified immunity that placed their "good faith" at issue).

It is also well established that a defendant can waive its attorney-client privilege by invoking advice of counsel as a defense. See United States v. Workman, 138 F.3d 1261, 1263 (8th Cir. 1998); Glenmede Trust Co. v. Thompson, 56 F.3d 476, 486 (3d Cir. 1995).

In applying the doctrine of waiver by implication, courts are guided by fundamental fairness concerns, including the question of whether allowing the withholding party to pursue its claim or defense without disclosing its privileged communications would unfairly prejudice the party seeking discovery. Cox v. Administrator United States Steel & Carnegie, 17 F.3d 1386, 1417-18 (11th Cir. 1994); Conkling, 883 F.2d at 434.

B. Tenet's Actions in This Case Have Waived Its Privilege

Tenet has placed its corporate state of mind at issue by arguing to this Court that the Government cannot prevail in this case unless it proves that Tenet employees were aware that their conduct violated the Stark Statute. The Government respectfully submits that it would be unfair to allow Tenet to present this defense to the Court while hiding the internal communications and documents that show how its employees actually interpreted the statute. Moreover, Tenet's witnesses have repeatedly testified in depositions that they based their actions

on the advice of counsel. It would be manifestly unfair to allow them to present this testimony to the Court without allowing the Government to discover what advice they actually received.

In its brief opposing the Government's motion for summary judgment in this case, Tenet argued that its understanding and interpretation of the Stark Statute is a central issue in this case:

> An innocent (or even negligent) violation of a Medicare payment rule like Stark cannot form the basis of a False Claims Act violation. Moreover, in light of Stark's evolution and the lack of any meaningful regulatory guidance about the statute's meaning, there is no way that the government could ever prove knowing non-compliance with the statute. . . . The government has not offered any evidence sufficient to show that North Ridge **knew** it was in violation of Stark.

Defendants' February 26, 2002 Memorandum in Opposition to the United States' Motion For Partial Summary Judgment, p. 19 (emphasis in original, citation omitted).

Tenet's privilege logs suggest that its boast that "there is no way that the government could ever prove knowing non-compliance with the [Stark] statute" is based on the fact that it has been hiding all evidence on the subject behind the screen of attorney-client privilege. A small sample of entries from Tenet's privilege logs that appear directly relevant to this topic are listed in Exhibit 1. They include (1) an August 1995 letter entitled "Stark II Compliance, North Ridge Medical Center," (2) a January 1996 memo entitled, "North Ridge JCAHO; Stark II Corrective Action," (3) a May 1996 memo sent by the CEO of North Ridge to "Florida Region CEOs" regarding "Update Re Administrative Write-Off Policy for Physicians and Potential Referral Sources," and (4) several legal compliance audits of North Ridge by outside law firms.

These document descriptions suggest that between 1995 and 1997, Tenet's lawyers were concerned about whether North Ridge was complying with the Stark Statute. In 1998-99, Tenet terminated or renegotiated all of the physician employment contracts at issue in this case,

-7-

apparently in an attempt to bring them into Stark compliance. But Tenet never disclosed its past mischarging to the Government, and it continued to bill for services unlawfully and submit false cost reports and compliance reports long after the documents listed in Exhibit 1 were generated.

Tenet has also injected advice of counsel as an issue in this case through the deposition testimony of its employees, who have repeatedly used advice of counsel to justify their actions. Last January, for example, the Government deposed Don Steigman, the North Ridge CEO who approved the physician employment contracts at issue. When asked what he did to make sure that these contracts were legal, he responded, "All of our agreements, first of all, went through our attorneys and we always made sure that we met the law and any transactions that we do we always wanted to make sure were done in an ethical manner." Ex. 2 at 696. When asked whose approval he needed to authorize the physician compensation arrangements at issue in this case, he stated, "All of our agreements went through legal counsel." Id. at 106-107.

When asked if he had ever discussed with anyone concerns about the legality of the contracts at issue in this case, Mr. Steigman replied, "I don't recall any specific discussions, unless counsel was present or with counsel." Id. at 488-9. When asked specifically if he had discussed Tony Bennett's concerns about possible Stark violations with anyone, he testified, "The only discussions that I've had are with counsel, that I recall." Id. at 637-8.

When asked about his understanding of the Stark Statute, Mr. Steigman prefaced his answer by saying, "Well, obviously, I rely on legal counsel any time we're looking at anything relating to physician agreements..." Id. at 88. When asked what training North Ridge employees received about the Stark Statute, he responded, "Again, you know, all of our hospitals, as well as myself, rely on our legal counsel for interpretation." Id. at 89-90. When asked what employees

were supposed to do if they thought there was a problem with billing, he testified that they were encouraged to consult with counsel. Id. at 94-95.

Similarly, when the Government asked Emil Miller, Mr. Steigman's successor, what he did to address concerns about fraud and abuse at North Ridge, he replied, "Utilize legal counsel to review," and said that he would have legal counsel review any "arrangement or, you know, relationship that you might be entering into that's a potential referral source to assure that there's, you know, not a conflict." Ex. 3 at 56-58.

As mentioned above, in February 1997, a Tenet executive named Tony Bennett wrote a memo to his boss, Jeffrey Heinemann, expressing a concern that the contracts at issue in this case violated the Stark Statute. Ex. 4. At Mr. Bennett's deposition, he testified that two Tenet attorneys, Christi Sulzbach (now General Counsel of Tenet Healthcare Corp.) and Tom Holliday (the defendants' lead outside counsel in this case) met with him to discuss his concerns a few weeks later, and that based on his communications with them, he felt comfortable that his concerns were being addressed. Ex. 5 at 268-73.

Mr. Heinemann confirmed Mr. Bennett's account at his March 2003 deposition. When asked what he did in response to Mr. Bennett's memo, he replied, "I sent it to our legal, Christi." Ex. 6 at 162-63. When asked if he took any other action, he said, "No, I did not because I wasn't aware if it was a compliance issue or not. That's why I sent it to Christi to see if it was." Ibid..

Mr. Heinemann admitted that when he joined Tenet in 1997, there were members of his staff who "were concerned as to the legality" of some of the contracts at issue in this case. He explained: "[W]hen people would do that, I would ask them, again, to put it in writing, and then I would forward it to Legal. I used Legal a lot." Id. at 58.

Mr. Heinemann also volunteered that he had been concerned about the legality of Tenet's contract with Dr. Alan Yesner, one of the contracts at issue in this case:

> If I had something like a Yesner, which I thought was really maybe a compliance issue, Christi was in charge of compliance, so I would take it to Christi and would inform Debbie [McCormick].[3]

Id. at 62.

Monica Bowman, another Tenet executive who helped renegotiate the contracts at issue, testified in April 2003 that her only source of information regarding the Stark Statute was legal counsel. Ex. 7 at 356-57.

The deposition testimony of Tenet's executives indicates that they intend to testify at trial that when questions arose about the Stark Statute in general or about the legality of the contracts at issue in particular, they relied on the advice of counsel to ensure their actions were legal and proper. Tenet's brief opposing the Government's summary judgment motion indicates that Tenet counsel intends to argue to the Court that if these executives violated the Stark Statute, they did so only because they had a good faith misunderstanding about what the statute required, and thus did not violate the False Claims Act. In fact, however, Tenet's privilege logs and other discovery to date suggest that Tenet counsel were concerned about the propriety of the contracts. In any case, given that Tenet has put the advice of its attorneys at issue, if the Government is not allowed to conduct discovery on how Tenet's attorneys interpreted the Stark Statute at the time, what they thought about the contracts at issue, and what advice they gave to the responsible executives, the Government will be forced to respond to Tenet's scienter defense

---

[3] Debbie McCormick was in-house counsel at Tenet Physician Services, the Tenet subsidiary that was responsible for managing physician practices.

with both hands tied behind its back. This would be manifestly unfair, and inconsistent with the case law regarding waiver by implication.[4]

II. THE ATTORNEY-CLIENT AND ATTORNEY WORK PRODUCT PRIVILEGES DO NOT PROTECT COMMUNICATIONS MADE IN FURTHERANCE OF FRAUD

It is well established that "[t]he attorney-client privilege does not protect communications made in furtherance of a crime or fraud." In re Federal Grand Jury Proceedings, 938 F.2d 1578, 1581 (11th Cir. 1991)(quoting In re Grand Jury Investigation (Schroeder), 842 F.2d 1223, 1226 (11th Cir. 1987). This so-called "crime-fraud exception" applies to civil cases as well as criminal cases. Schroeder, 842 F.2d at 1224; Gutter v. E.I. Dupont De Nemours, 124 F. Supp.2d 1291, 1305 (S.D. Fla. 2000); United States v. Witmer, 835 F. Supp. 208, 222-23 (M.D. Pa. 1993), aff'd 30 F.3d 1489 (3d Cir. 1994) (applying crime-fraud exception in False Claims Act case). It also applies to attorney work product privilege. Schroeder, 842 F.2d at 1224; Gutter, 124 F. Supp.2d at 1298.

The Eleventh Circuit employs a two-part test to determine whether the crime-fraud exception applies:

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or

---

[4] Tenet also appears to have used attorney-client privilege as a pretext to withhold hundreds of e-mails between non-attorneys about the contracts at issue in this case. A sample of five hundred entries from the middle of Tenet's second privilege log, produced in January 2003, revealed 226 such entries. Ex. 8. Almost all of these e-mails were either sent or received by key witnesses in this case. Nothing on Tenet's privilege log indicates that these e-mails were sent, received, or even reviewed by an attorney. Tenet's withholding of these documents has further limited the Government's ability to learn what Tenet's executives really thought about these contracts at the time.

fraudulent activity or was closely related to it.

Schroeder, 842 F.2d at 1226. (Citations omitted.)

Once the party seeking disclosure presents evidence to support a reasonable belief that *in camera* review may yield evidence that the crime-fraud exception applies to particular communications, the Court may conduct in camera review of the communications to determine whether their disclosure should be ordered. United States v. Zolin, 491 U.S. 554, 574-5 (1989).

In this case, the Government has alleged that Tenet violated the False Claims Act and committed common law fraud by knowingly submitting false and fraudulent claims to Medicare for tens of millions of dollars in violation of the Stark Statute. See First Amended Complaint, ¶¶ 146-48, 174-77. This Court has ruled that the Government's contention that Tenet improperly took referrals into account when setting the compensation of the physicians at issue "appears correct," and that the evidence presented by the Government "certainly create[s] a strong inference that referrals were taken into account." February 19, 2003 Order, p. 7. In effect, the Court has ruled that the Government has already made a prima facie showing that the contracts at issue were unlawful.

The deposition testimony of Tenet's executives, combined with Tenet's own privilege logs, shows that Tenet counsel participated directly in the decisions at issue in this case. For example, Don Steigman, the North Ridge CEO who approved the physician employment contracts at issue, testified repeatedly that these contracts were personally approved by Tenet counsel. Ex. 2 at 106-7, 696. He also testified that he and his fellow executives relied on company counsel to advise them about the Stark Statute and about the

legality of physician contracts. Id. at 88-90, 94-95.

Tenet's privilege logs indicate that several Tenet lawyers exchanged correspondence regarding Stark compliance at North Ridge in 1995, and that one attorney prepared a memo regarding Stark corrective actions at North Ridge in 1996. Ex. 1, FLAPP 502519, 532902-532903, 509012-509018. The logs also show that Tenet lawyers conducted periodic legal audits of compliance issues at North Ridge and at Tenet Physician Services, the Tenet subsidiary that managed the contracts at issue. Id., FLAPP 523364-523812, 502531-502568, 534761-534799, 551850-552014, 520805, 503490.

Two Tenet executives, Tony Bennett and Jeffrey Heinemann, testified that in early 1997, when Bennett expressed concerns to Heinemann that the contracts at issue in this case might violate the Stark Statute, those concerns were presented to two Tenet lawyers, and that Bennett and Heinemann both relied on these lawyers to ensure that the contracts were legal. Ex. 4 at 268-73; Ex. 5 at 58, 62, 162-63. Tenet's privilege log includes a March 1997 memo from a third Tenet attorney to Bennett and Heinemann regarding "Legal Concerns Related to LCS [Lauderdale Clinical Services] Practices." Ex. 1, FLAPP 516262.

In short, the record indicates that (1) Tenet counsel personally approved the specific contracts at issue, (2) Tenet counsel were concerned about legal compliance at North Ridge, and knew by January 1996 that some corrective actions were needed to bring North Ridge into compliance with the Stark Statute, (3) senior Tenet attorneys were expressly warned in early 1997 that the contracts at issue in this case might be illegal under the Stark Statute, and (4) Tenet's executives relied on its attorneys to ensure that their actions complied with the Stark Statute. Although Tenet terminated or renegotiated all of these contracts in

1998-99, it never reported its past misconduct to the Government or offered to reimburse the Government for payments that it had received improperly, despite the fact that it was operating under a Corporate Integrity Agreement that expressly required it to report any unlawful conduct at its facilities to the Government. Since Tenet's attorneys participated directly and personally in these decisions, they are not entitled to use attorney-client privilege to shield their communications or work product.

Therefore, the Government respectfully asks the Court to conduct *in camera* review of the twenty documents identified in Exhibit 1. We believe these documents will show that Tenet counsel knew that the contracts at issue in this case violated the Stark Statute, but that counsel nevertheless did not take any action to immediately stop payment under these contracts, to stop billing medicare for referrals from the doctors with whom Tenet had these improper financial relationships, or to report to the government Tenet's past illegal billings to Medicare based on referrals from these doctors.

## CONCLUSION

For the foregoing reasons, the Government respectfully asks the Court to find that Tenet has implicitly waived its attorney-client and attorney work product privileges. Alternatively, the Government asks the Court to conduct *in camera* review of the twenty documents identified in Exhibit 1 to this brief, to determine whether the crime-fraud exception applies in this case.

If the court finds either that Tenet has implicitly waived its attorney-client and attorney work product privileges or that the crime-fraud exception applies, then the Government asks the Court to (1) order Tenet to produce all privileged documents

generated prior to May 1998 that discuss or relate to the Stark Statute or the contracts at issue in this case, and (2) allow the Government to depose the applicable Tenet attorneys about their communications with Tenet's employees about the legality of the contracts at issue.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

MARCOS DANIEL JIMENEZ
United States Attorney for the
Southern District of Florida

ANA MARIA MARTINEZ
Assistant United States Attorney
99 N.E. 4th Street
Miami, Florida 33132
Fla. Bar No. 0735167
Tel: 305 961 9431
Fax: 304 536 4101

Dated: 7/22/03

_____
MICHAEL F. HERTZ
MICHAEL D. GRANSTON
DAVID B. WISEMAN, A5500647
DAVID T. COHEN, A5500682
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, DC 20044
Tel: (202) 514-0132
Fax: (202) 514-0280

Attorneys for United States of America