IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 97-6590-CIV-JORDAN/BROWN

UNITED STATES OF AMERICA,                )
*ex rel.* SAL A. BARBERA,                  )
                                         )
        Plaintiffs,                       )
                                         )
vs.                                      )
                                         )
AMISUB (NORTH RIDGE HOSPITAL),           )
INC., d/b/a NORTH RIDGE MEDICAL          )
CENTER, *et al.*,                          )
                                         )
        Defendants.                       )
_____  )

**EXHIBITS TO MEMORANDUM IN SUPPORT
OF UNITED STATES' REVISED MOTION TO COMPEL**

# EXHIBIT 1

## DOCUMENTS FOR IN CAMERA REVIEW UNDER CRIME-FRAUD EXCEPTION

| DOCUMENT ID No | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/502519 [aka 592519] | 08/08/1995 | Goldman, Donald A., Esq. | To/Prepared for: McKay, Milt, Esq. Copied to: Brown, Scott, Esq. Sulzbach, Christi, Esq. Wagonhurst, Cheryl, Esq. | Letter(s) Re Title Stark II Compliance, North Ridge Medical Center | AC |
| FLAPP/532902-FLAPP/532903 | 08/10/1995 | McKay, Milton E., Esq. | Steigman, Donald S.   Brown, Scott M., Esq.   Sulzbach, Christi R., Esq. Wagonhurst, Cheryl, Esq. | Letter   Re Review of North Ridge Medical Center compensation arrangements | AC WP |
| FLAPP/523364-FLAPP/523812 | 08/25/1995 | Tenet Internal Audit Department | To/Prepared for: Erb, Donna E., Esq. Goldman, Don | Report(s) Re/Title Report on Legal Compliance Audit North Ridge Medical Center 08/25/95 | AC |
| FLAPP/509012-FLAPP/509018 | 01/05/1996 | Goldman, Donald A., Esq.   (Don) | To/Prepared for: Miller, Emil P. | Memo(s) Re/Title North Ridge JCAHO, Stark II Corrective ACtion (with attachments) | AC |
| FLAPP/525010 | 01/11/1996 | Fulbright & Jaworski, LLP Drummy, Kathleen H., Esq. Goldman, Donald A., Esq. McDermott, Will & Emery West, Ann H., | To/Prepared for: McKay, Milton E., Esq. | Letter(s) Re/Title Physician Compensation | AC |
| FLAPP/502531-FLAPP/502568 | 02/08/1996 | | | Report(s) Re Title Report on Legal Review of North Ridge Medical Center, Fort Lauderdale, FL | AC |
| FLAPP/549516-FLAPP/549569 | 04/09/1996 | Rappaport, Ira, Esq. | To/Prepared for: Brown, Scott M., Esq. Erb, Donna E., Esq.   Goldman, Donald A., Esq.   Titialii, Jacinta, Esq. | Report from outside counsel re physician agreements | AC |
| FLAPP/524978 | 05/22/1996 | Steigman, Don S | To/Prepared for: Florida Region CEOs Copied to: Bryan, Mark Jensen, Michael McKay, Milton E., Esq Smith, Randy | Memo(s) Re/Title Update Re Administrative Write-Off Policy for Physicians and Potential Referral Sources | AC |
| FLAPP/524977 | 06/05/1996 | McKay, Milt, Esq. | To/Prepared for: Jensen, Michael Copied to: Branaman, Amy Steigman, Don S. | Memo(s) Re Title Update Re: Administrative Write-Off Policy for Physicians and Potential Referral Sources Code/Law/Regulation Expert Opinion | AC |
| FLAPP/515211-FLAPP/515213 | 08/19/1996 | Nelson, Thomas C., Esq. | To/Prepared for: Tenet Physician Services File | Letter(s) Re/Title Physician Employment Under Federal SelfReferral Laws | AC |
| FLAPP/534761-FLAPP/534799 | 10/07/1996 | Erb, Donna E., Esq. | McKay, Milton E., Esq.   Layne, David W., Esq | Report Facility Compliance Audit Report of North Ridge Hospital and attached report prepared by McDermott, Will, and Emery | AC  SCA WP |

DOCUMENTS FOR *IN CAMERA* REVIEW UNDER CRIME-FRAUD EXCEPTION

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/537000 | 01/11/1997 | McKay, Milton E., Esq. | Bennett, Tony      Steigman, Donald S. | Memo Re: Lab Charges for Lauderdale Clinical Services | AC WP |
| FLAPP/535361-FLAPP/535364 | 01/24/1997 | Bennett, Tony | Steigman, Donald S.      Brown, Dennis | Memo Re:  Regulations on lab collections with handwritten communications to Milt McKay, Esq. and attached memo from Kimberly Elting, Esq. to Tony Bennett re the same | AC WP |
| FLAPP/516262 | 03/04/1997 | Layne, David W. | To/Prepared for: Bennett, Anthony N. (Tony) Copied to: Heinemann, Jeff | Memo(s) Re/Title Legal Concerns Related to LCS Practices | AC |
| FLAPP/551850-FLAPP/552014 | 06/23/1997 | McDermott, Will & Emery | N/A | Report Re: Review of Tenet Physician Services physician practices | AC, WP |
| FLAPP/520805 | 07/17/1997 | McKay, Milton E., Assistant General Counsel | To/Prepared for: Gregory, Mary Jo Copied to: Layne, David Steigman, Don S. | Memo(s) Re/Title McDermott, Will & Emery Audit Report Dated 05/28/97 | AC |
| FLAPP/503490 | 07/31/1997 | Sulzbach, Christi, Esq Heinemann, Jeff | To/Prepared for: Heinemann, Jeff Copied to: MacDonnell, Cori, Esq. Schochet, Barry P. Smith, Randy Steigman, Don S. | Memo (s) Re Title Compliance Reviews of Tenet Physician Services by McDermott, Will & Emery | AC |
| FLAPP/508381 | 07/31/1997 | Schochet, Barry P. | To/Prepared for: Sulzbach, Christi, Esq. | Memo(s) Re/Title Florida Restructuring | AC |
| PLAPP/517971 | 08/29/1997 | Heinemann, Jeff | To/Prepared for: Dykes, Carolyn MacDonnell, Cori, Esq. Sulzbach, Christi, Esq. | E-Mail / Telex Re/Title Lab Issue | AC |
| FLAPP/535733-FLAPP/535752 | no date | Saucier, George | N/A | Financial Summary Sheets and analysis re:  lab services for Tenet Physician Services prepared at the direction of legal counsel | AC WP |

**EXHIBIT 2**

Page 85

1    A. I don't recall how the actual
2  dollars were developed.
3    Q. Okay.   You can put this document
4  aside.
5       Mr. Steigman, I'm going to hand you
6  another document which I'll ask the court
7  reporter to mark as Exhibit 3.
8       (Thereupon, Exhibit No. 3 was
9       marked for Identification,
10      and is attached hereto.)
11 BY MR. WISEMAN:
12   Q. Just based on looking at the cover
13 page of this document, do you recall this
14 document?
15   A. I do not.
16   Q. Is that your handwriting on the --
17 in the note on the right-hand side?
18   A. Yes.
19   Q. And it appears to me, and correct me
20 if I'm wrong, to say "copy to" and it lists a
21 number of initials?
22   A. Yes.
23   Q. Do you have any idea who these
24 initials would stand for?
25   A. Yes.

Page 87

1  the actual page numbers on the original
2  document.
3       If you'll notice in the lower
4  right-hand corner, there's a date of October
5  13, 1993.  Do you recall if it was around that
6  time that you saw this document?
7    A. I don't recall when I saw this
8  document.
9    Q. Do you recall at all the context in
10 which you might have seen it?
11   A. Sorry, I don't.
12   Q. Going back to Page 4, if you would,
13 take a minute and read the paragraph at the
14 bottom of that page and then the -- that
15 carries over onto the next page.
16      Have you had a chance to review that
17 paragraph?
18   A. Yes.
19   Q. This paragraph refers to a law which
20 is known colloquially, excuse me, as the Stark
21 Statute and I'm wondering if you recall when
22 you first became aware of the Stark Statute.
23   A. I -- again, I have an overview of
24 what the Stark Statute was, you know, back, I
25 believe, in the early '90s it was -- started

Page 86

1    Q. Who is DD?
2    A. Dean Danielson.
3    Q. And is that GM below that?
4    A. Yes.
5    Q. And is that Gary Mervak?
6    A. Yes.
7    Q. And then DF?
8    A. Don Freeman.
9    Q. And then, correct me if I'm wrong,
10 is your note say: FYI it looks like we're on
11 the right path?
12   A. Yes.
13   Q. Do you recall what that note
14 referred to?
15   A. No, I haven't seen this document for
16 a long time.
17   Q. I actually have some fairly targeted
18 questions about this document.  If you don't
19 mind, maybe I'll ask you the questions and if
20 in answering them if you want to review more of
21 the document, you're welcome to, but rather
22 than -- going through the whole thing may not
23 be necessary.
24   A. All right.
25   Q. If you would turn to the Page 4 of

Page 88

1  out to be a lab statute and then broadened in
2  the early to mid-'90s.
3    Q. What is your understanding of the
4  Stark -- what the Stark Statute -- what the
5  terms of the Statute are?
6    A. Well, obviously, I rely on legal
7  counsel any time we're looking at anything
8  relating to physician agreements, but basically
9  Medicare won't pay for services if there are
10 certain exceptions that are not met and
11 criteria.
12   Q. And do you have sense of what those
13 criteria?
14   A. For instance, if you take a look at,
15 you know, on the criteria, you know, a
16 physician agreement would need to be in
17 writing, needs to be for a period of more than
18 a year, you know, there's a whole bunch of
19 criteria the way I understand it.
20   Q. Is it your understanding that
21 Medicare won't pay -- who is it that Medicare
22 won't pay in your understanding that you
23 articulated?
24   A. The provider.  If they don't meet
25 the certain, you know, if they don't meet the

Page 89

1 exceptions and/or the criteria.
2    Q. The provider meaning the hospital?
3    A. Yes.
4    Q. When you were at AMI in the early
5 1990's did you receive any training on the
6 terms of the Stark Statute?
7    A. I don't recall.
8    Q. Don't recall.
9       Do you recall ever receiving any
10 sort of training or education by either AMI or
11 Tenet on the Stark Statute?
12    A. I do recall that Tenet did some
13 training sessions.
14    Q. What type of training sessions?
15    A. It was basically done in an overall
16 context of compliance and did they touch upon
17 the Anti-kickback and Stark Statutes.
18    Q. And what form was -- did that
19 training take, was there -- were there seminars
20 or --
21    A. It was a seminar, basically.
22    Q. Do you recall where it -- I'm
23 sorry. Do you recall where it took place?
24    A. I believe one of them actually was
25 at this hotel way back.

Page 90

1    Q. Approximately -- do you have an
2 approximate time frame?
3    A. Well, Tenet does periodic updates on
4 compliance training but for -- I believe there
5 was one probably, you know '97, '96, something
6 like that.
7    Q. And what do those periodic updates
8 consist of?
9    A. Basically just to refresh
10 management's understanding of what the statutes
11 are. Again, you know, all of our hospitals, as
12 well as myself, rely on our legal counsel for
13 interpretation.
14       MR. WISEMAN: Let's go off the
15 record for a second.
16       MR. KRAKOW: This will be the
17 end of Videotape Number 1. The time
18 is 11:29 a.m. We're going off the
19 video record.
20       (Thereupon, a recess was taken.)
21       THE VIDEOGRAPHER: We're back on
22 the video record. This is Videotape
23 Number 2. The time is 11:30 a.m.
24 BY MR. WISEMAN:
25    Q. Mr. Steigman, I think you were

Page 91

1 saying that Tenet periodically did things to
2 kind of refresh management's understanding of
3 the legal context, is that an accurate
4 paraphrase?
5    A. It would be discussing whether there
6 are any changes in any of the statutes, but
7 really as a refresher that there are those
8 statutes out there and also just compliance as
9 a whole, you know, within the company.
10    Q. How often would those sorts of -- I
11 guess would they be seminars?
12    A. Well, compliance training is done
13 yearly.
14    Q. And what does the compliance
15 training consist of?
16    A. It's basically a meeting to go
17 through our compliance program which would
18 include how to report issues that pop up or
19 discussions about different situations that
20 should be reported or how to handle different
21 situations within your hospital.
22       Again, not all related to Stark and
23 Anti-kickback, but what would you do if an
24 employee did this.
25    Q. So is it -- is this necessarily a

Page 92

1 legal issue or can it be nonlegal issues as
2 well?
3    A. Some of it can be nonlegal issues.
4    Q. Like what type of nonlegal issues?
5    A. An employee walks out of the
6 hospital with equipment, what do you do.
7       A doctor walks out with scopes from
8 the operating room, what would you do about it,
9 how would you handle that situation.
10    Q. Those are legal issues, I guess,
11 inasmuch as they involve theft, is that --
12    A. Yes. Yes.
13    Q. And what does the compliance program
14 consist of?
15    A. I'm not sure I can answer that.
16    Q. Well, if you -- if you as a Tenet
17 employee observe something or see something
18 that you think is legally problematic, what are
19 you supposed to do?
20    A. There are different avenues to
21 address the issue. You can go ahead and,
22 obviously, speak to one of your attorneys. We
23 have an ethics hot-line that's anonymous that
24 anyone can call up. There's also some other
25 reporting requirements that are hospital's

USA vs. AMISUB   ⎺CondenseIt™   DON STEIGMAN - VOL. 1

Page 93

1 report to the chief compliance officer.
2  Q. What are those reporting
3 requirements?
4  A. Basically there's a whole policy
5 within Tenet on areas that should be reported
6 if there's any issues that you may believe
7 there is, and the hospital would report those,
8 as well.
9  Q. Can you tell me what some of those
10 areas are that you're supposed to report?
11  A. If there are any issues relating to
12 billing matters, any issues relating to
13 physician matters, any issues that may result
14 in an issue that the hospital doesn't feel
15 comfortable with. Again, it doesn't always
16 have to be do we think there was an issue
17 related to the law. It may be they're not
18 comfortable with what transpired.
19  And it's a way to list -- and again,
20 the policy has all of the items and -- it
21 actually has examples of what should be
22 reported.
23  And then, obviously, you know,
24 there's also the access to the attorneys, just
25 call the attorneys directly.

Page 94

1  Q. Let's just take the billing example,
2 what are you supposed to do if you think
3 there's a problem with billing?
4  A. If the hospital believes that
5 there's a problem with the billing, they
6 typically will end up putting it on their
7 monthly compliance report that then gets
8 submitted to the attorneys in our compliance
9 department and there'll be a conversation
10 between the hospital and the compliance
11 officers. They may call their attorney, as
12 well, saying, we've just identified this; we
13 think may be an issue or may not be an issue.
14 What do you think.
15  So, you know, we encourage the
16 hospitals to put as much down on there and then
17 let them consult with counsel if there's an
18 issue or not.
19  Q. What about in the situation where
20 you as an employee thought that there was a
21 problem with billing; but it wasn't like the
22 hospital as an entity thing, there's a
23 problem. You're concerned about something
24 going on that you think is wrong?
25  A. So an employee in the hospital?

Page 95

1  Q. Yes.
2  A. Basically, what the hospital
3 employees are instructed to do, and they do go
4 through ethics training once a year, and they
5 basically go through sessions relating to
6 different role playing, actually role playing
7 on what could transpire, such as billing or
8 someone being seen walking out of the hospital,
9 you know, with equipment, etcetera.
10  Q. Uh-huh.
11  A. What they're instructed to do is
12 they immediately should talk to their
13 supervisor about it and if they don't get any
14 answers, go to the supervisor's supervisor
15 about it. They can write a letter to the
16 ethics line or they can go ahead and call the
17 ethics line anonymously and that would be
18 handled. If they wanted to, they would have
19 access to call our legal counsel.
20  So there's several avenues that have
21 been put in place to get these issues
22 identified and handled.
23  Q. Going back for a minute to when AMI
24 was your employer before the merger. Do you
25 recall receiving any training from AMI related

Page 96

1 to the Stark Statute?
2  A. I just don't recall that time
3 period. It goes back a fair amount of time.
4  Q. Sure.
5  Did AMI provide any kind of
6 compliance refreshers or training on an annual
7 basis?
8  A. I don't believe it was a structured
9 program but, you know, there were periodic
10 discussions about it. You know, there was some
11 of this, as you pointed out, in this manual in
12 '94, but I don't believe there was a formal
13 program to the extent we have them today.
14  Q. I'm not asking for the content of
15 these discussions, but in your preparation for
16 this deposition, did you discuss the Stark
17 Statute with your attorneys?
18  MR. KRAKOW: Objection.
19  Instruct the witness not to answer.
20  You are asking for the content of the
21 discussions.
22 BY MR. WISEMAN:
23  Q. Mr. Steigman, I'm going to hand you
24 another document.
25  A. Thank you.

USA vs. AMISUB                     ~CondenseIt™                  DON STEIGMAN - VOL. I

Page 105

1    A. I'm sure shortly prior to
2  submission.
3    Q. Did you review any documents in
4  connection with signing this document, I mean,
5  other than this document?
6    A. I don't recall that.
7    Q. In the -- back on the first page in
8  Paragraph 3, you state: While I was CEO, I was
9  personally involved in acquiring the practices
10  of and negotiating employment contracts with
11  various physicians, and then it goes on to name
12  the physicians.
13    Can you tell me what you mean by
14  personally involved?
15    A. Yes. I had discussions with the
16  physicians in the group or there were others
17  within the organization that reported to me
18  that were involved with the acquisitions of the
19  practices.
20    Q. And when you say also here that you
21  were personally involved in negotiating the
22  employment contracts with, what does that mean
23  in practical terms?
24    A. Basically that I had discussions
25  with the physicians talking about the different

Page 106

1  terms and conditions of the agreements.
2    Q. And in the fourth paragraph you
3  say: I was -- as CEO, I was directly involved
4  in making the decisions about the amount of
5  compensation the doctors would be paid under
6  the employment agreements.
7    Can you tell me what that means?
8    A. Yes. Whether I, myself, spoke to
9  the physicians about it or someone within my
10  organization did that, I was involved in that
11  process.
12    Q. Was -- did you make the final
13  decision about the amount of compensation?
14    A. Yes.
15    Q. Did you have to get approval from
16  anyone above you in your chain of command for
17  that decision?
18    A. Yes.
19    Q. Who was that?
20    A. All of our agreements went through
21  legal counsel.
22    Q. And do you -- I'm sorry, go ahead.
23    A. I'm sorry.
24    Q. Do you recall which legal counsel?
25    A. I believe the majority of the

Page 107

1  agreements went through counsel Bill Barrett.
2    Q. One more question about this
3  declaration, when you received it from counsel
4  did you make any revisions in it before you
5  signed it?
6    A. I don't recall. I know we had a
7  discussion about, you know --
8    MR. KRAKOW: Don't talk about
9    the discussions that you had.
10    THE WITNESS: Right.
11  BY MR. WISEMAN:
12    Q. I'm sorry, so do you recall if you
13  made any revisions?
14    A. I don't recall.
15    Q. But you simply recall the fact of
16  the discussion about the document?
17    A. Yes.
18    MR. KRAKOW: He may recall more
19    but what he would recall about the
20    discussion would be privileged.
21    MR. WISEMAN: Understood.
22    Understood.
23  BY MR. WISEMAN:
24    Q. And do you recall who you had those
25  discussions with?

Page 108

1    A. As I said earlier, I don't recall.
2    Q. Are you familiar with Dr. Yesner?
3    A. Yes.
4    Q. And was Dr. Yesner one of the
5  doctors that you were involved in in acquiring
6  his practice?
7    A. Yes.
8    Q. What was Dr. Yesner's employment
9  setup before his practice was acquired by North
10  Ridge?
11    A. He was an independent practitioner.
12    Q. And does that mean that he owned his
13  own equipment and paid rent at his place of
14  practice?
15    A. Yes.
16    Q. Is that typically -- and then he
17  billed for his patients directly?
18    A. Correct.
19    Q. What type of doctor was Dr. Yesner
20  -- is Dr. Yesner?
21    A. Internal medicine.
22    Q. And prior to the acquisition of his
23  practice by North Ridge, did he admit a lot of
24  patients to North Ridge?
25    A. I'm not sure of his breakdown of

Case 0:97-cv-06590-AJ   Document 289   Entered on FLSD Docket 07/23/2003   Page 10 of 57

USA vs. AMISUB                          ~CondenseIt™                    DON STEIGMAN - VOL.II

Page 486

1    THE VIDEOGRAPHER: Going off the
2   video record. The time is 3:27 p.m.
3       (Thereupon, a recess was taken.)
4       THE VIDEOGRAPHER: We're back on
5   ·video record. The time is 3:43 p.m.
6   BY MR. WISEMAN:
7    Q. Mr. Steigman, I will hand you
8   Exhibit 54.
9       (Thereupon, Exhibit No. 54 was
10      marked for Identification,
11      and is attached hereto.)
12      MR. WISEMAN: We may want to
13   mark on this exhibit, it was
14   established by testimony at a previous
15   deposition that the actual original
16   date of this memo was February 24,
17   1997. This was the -- the date on
18   there was the day it was printed out.
19      THE WITNESS: Excuse me, what
20   was the date?
21      MR. WISEMAN: February 24, 1997.
22   BY MR. WISEMAN:
23    Q. Are you familiar with this document,
24   Mr. Steigman?
25    A. In preparation for this depo.

Page 487

1    Q. You reviewed it in preparation?
2    A. Yes.
3    Q. Are you familiar with Tony Bennett,
4   the author of this memorandum?
5    A. Yes.
6    Q. Can you tell me who Mr. Bennett is?
7    A. Mr. Bennett was the, I believe, the
8   CFO of TPS at one point in time.
9    Q. Do you remember the approximate
10   dates that he was the CFO of TPS?
11    A. I don't.
12    Q. Did Mr. Bennett ever discuss the
13   concerns that he expresses in this memorandum
14   with you?
15    A. I don't recall having a discussion
16   with him on it.
17    Q. Do you recall anyone else, exclusive
18   of, you know, the -- your meetings with counsel
19   related to this lawsuit, discussing the
20   concerns that Mr. Bennett raises here with you?
21    A. I don't recall specific discussions
22   on this.
23    Q. Do you recall Mr. Heinemann raising
24   concerns with you about the legality of the
25   Lauderdale clinical Services contracts?

Page 488

1    A. Mr. Heinemann and myself really
2   didn't discuss the legal issues. If he had any
3   legal concerns he would go to counsel that
4   represented TPS.
5    Q. And who is the counsel that
6   represented TPS?
7    A. I don't know which attorney he was
8   using at that time.
9    Q. One of the corporate counsel?
10    A. Yes, one of the Tenet attorneys
11   assigned to --
12    Q. To TPS?
13    A. -- to TPS matters.
14    Q. Do you recall anyone telling you
15   about the existence of this memorandum from Mr.
16   Bennett in the winter of 1997?
17    A. No, I believe the first time I saw
18   this was in preparation for this depo.
19    Q. I understand that's the first time
20   you saw it, but my question was: Do you recall
21   anyone telling you about its existence--
22    A. I don't recall --
23    Q. -- prior--
24    A. -- anyone telling me about it.
25    Q. Exclusive of any discussions of this

Page 489

1   lawsuit, did you have -- ever have discussions
2   with anyone about legal concerns related to the
3   LCS contracts?
4    A. I don't recall any specific
5   discussions, unless counsel was present or with
6   counsel.
7    Q. None of your fellow employees ever
8   came to you and said, I think there's a legal
9   problem with the LCS contracts?
10    A. I don't recall having that
11   discussion.
12    Q. Do you know if Mr. Bennett took any
13   steps to go through the Tenet compliance system
14   to express his concerns, the concerns that he
15   expresses in this memorandum?
16    A. I do not know what Mr. Bennett did.
17    Q. Do you know if Mr. Bennett was aware
18   of the plan to create an integrated delivery
19   system?
20    A. I don't know what his understanding
21   was. I certainly didn't spend time with Mr.
22   Bennett talking about the integrated delivery
23   system.
24    Q. What was the nature of your contact
25   with Mr. Bennett?

Page 636

1  did you ever give that particular advice or
2  instruction to a Tenet employee?
3    A. Yes.
4    Q. Who?
5    A. I just don't recall.. Again, I deal
6  with hundreds of people on a daily basis.
7      And we, also, on a proactive basis
8  talk to the hospitals and we do tell them what
9  I just mentioned to you.
10   Q. Did you ever talk to Tony Bennett
11 about any concerns he had regarding acquiring
12 physician practices for beyond fair market
13 value?
14   A. I don't recall any discussions with
15 Tony.
16   Q. Did you hear through the grapevine
17 about Tony Bennett's belief, beliefs or
18 opinions as stated in the memorandum you looked
19 at earlier yesterday or the day before, did you
20 ever talk to anyone about that?
21   A. I don't recall those discussions
22 with Tony Bennett, as I said yesterday.
23   Q. To anyone about them, not just Tony
24 Bennett.
25   A. And Tony under that structure did

Page 637

1  not report directly to me so if Tony had
2  concerns, you know, he had the vehicles that we
3  allow all of our employees to access, you know,
4  whether it's the ethics hot-line, whether it's
5  putting it on the compliance report or talking
6  to your superior, and if you don't get results
7  from your superior you go to your superior's --
8    Q. You're misunderstanding my
9  question.
10   MR. KRAKOW: Counsel, please
11 don't cut off his answer before he's
12 done.
13 BY MR. SHERMAN:
14   Q. Did I cut off your answer?
15   A. Yes.
16   Q. I'm sorry. Go ahead.
17   A. But that's all right.
18   Q. Okay. I'm not asking you if you had
19 those conversations with Tony Bennett in
20 particular. I'm asking if you had
21 conversations with anyone about the issues
22 raised by Tony Bennett.
23   A. The only discussions that I've had
24 are with counsel, that I recall.
25   Q. And have you ever had -- you said

Page 638

1  earlier, in fact I think this morning, that you
2  don't recall whether or not you had discussions
3  with anyone about the statement made by Jeff
4  Heinemann to Drs. Biederman, Nassberg and
5  Goscin about -- when he said, your contracts
6  are illegal.
7    A. I believe I indicated the only
8  discussions I had were with my attorneys.
9    Q. But you don't recall having
10 discussions with anyone else inside Tenet about
11 that?
12   A. I don't recall.
13   Q. Do you recall hearing about that
14 inside Tenet, about the fact that Jeff
15 Heinemann --
16   A. (Unintelligible).
17   Q. And I guess it goes two ways, I'll
18 try not to --
19   A. Sorry.
20   Q. -- run over your answers if you can
21 try not to run over my questions. It'll be
22 easier. It's not easy not to do that.
23     You don't remember having any
24 discussions with anyone about that?
25   A. As I said, I don't recall having any

Page 639

1  discussions about it.
2    Q. If that took place, wouldn't that be
3  something you would remember, if someone said
4  -- made a statement to doctors that their
5  contracts are illegal, wouldn't that be
6  something you would remember?
7    MR. KRAKOW: Objection; form.
8    THE WITNESS: I believe we're
9  talking about a period about six years
10 ago and, you know, if someone
11 mentioned something like that to me I
12 would have passed it on to the
13 appropriate attorneys within the
14 organization, and that's been my
15 actual method of operation.
16 BY MR. SHERMAN:
17   Q. That's a fairly serious statement to
18 make by a relatively high-level executive at
19 Tenet; isn't it, to tell doctors that their
20 contracts are illegal; is that correct?
21   A. I'm not sure if that individual said
22 that or not.
23   Q. Well, whether he did or not, the
24 statement certainly appears in quotation marks
25 in some sort of memo so, at the very least,

USA vs. AMISUB                    CondenseIt™                    DON STEIGMAN - VOL.III

Page 696

1    Did you have any involvement with
2  making sure all arrangements entered into were
3  legal and ethical?
4        MR. KRAKOW: Objection; form.
5        THE WITNESS: I'm not sure I
6  understand the question.
7  BY MR. SHERMAN:
8    Q. During the time that you were
9  dealing with physician practice acquisitions
10  was that one of your goals, to make sure all
11  arrangements entered into were legal and
12  ethical?
13    A. Yes.
14    Q. And how did you make sure that that
15  was the case?
16    A. All of our agreements, first of all,
17  went through our attorneys and we always made
18  sure that we met the law and any transactions
19  that we do we always wanted to make sure were
20  done in an ethical manner.
21    Q. But you testified earlier that you
22  really don't have any expertise in
23  understanding how to value medical practices;
24  correct?
25        MR. KRAKOW: Objection; form.

Page 697

1        THE WITNESS: Is that a separate
2  question from what we're talking about
3  here?
4  BY MR. SHERMAN:
5    Q. I'm referring to testimony that you
6  stated earlier, I want to make sure I
7  understood it correct.
8    A. Did I answer your other question?
9    Q. Yes.
10    A. I want to make sure I understand.
11    Q. Yeah, you answered the other one.
12    A. Thank you.
13    What is the question, I'm sorry?
14        MR. SHERMAN: Will you read the
15  question back, please.
16        (Thereupon, the question was
17  read by the reporter.)
18        MR. KRAKOW: Objection; form.
19        THE WITNESS: Okay. I indicated
20  earlier that the industry was in its
21  early stages and knowledge was very
22  limited and certainly my knowledge was
23  equal to what other executives of my
24  standing had for the physician
25  practices.

Page 698

1  BY MR. SHERMAN:
2    Q. Now, when Mr. Barbera came into the
3  Tenet organization as an employee in January of
4  1996 you're aware that he sort of inherited
5  these LCS practices as practices that he was
6  now supervising or to be in charge of in some
7  way; correct?
8    A. Yes.
9    Q. And what were his duties with regard
10  to LCS and with regard to physician practice
11  acquisitions?
12    A. Sal didn't --
13        MR. KRAKOW: Objection; form.
14        THE WITNESS: -- didn't report
15  directly to me.
16  BY MR. SHERMAN:
17    Q. Did he ever report to you at all,
18  though?
19    A. I don't believe he did.
20    Q. You had dealings with him as
21  employee of Tenet, though; didn't you?
22        MR. KRAKOW: Objection; form.
23        THE WITNESS: Yes.
24  BY MR. SHERMAN:
25    Q. Were you aware -- were you aware of

Page 699

1  what his job duties were?
2    A. I wasn't -- I don't believe I've
3  seen his job description.
4    Q. Were you aware of what his job
5  duties were?
6    A. I had a general understanding.
7    Q. And what were they?
8    A. He was responsible for overseeing
9  the physician practices in Florida from a
10  business perspective and from a financial
11  perspective.
12    Q. And was part of his job to look at
13  the possibility of acquiring other practices
14  within the appropriate legal guidelines?
15    A. Yes.
16    Q. Okay.
17    Now, underneath Goal 5 one of the
18  strategies and I represent to you that Mr.
19  Barbera -- this document was attached, I
20  believe, to Mr. Barbera's deposition as a
21  document that he prepared, this business plan,
22  and Strategy Number 2 was: Review all existing
23  physician contracts for legal soundness.
24    Did you hear of any issues regarding
25  his belief that the existing physician

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 97-6590-CIV-JORDAN/BROWN


UNITED STATES OF AMERICA, EX. REL.,
SAL A. BARBERA,
      PLAINTIFF,
V.
AMISUB (NORTH RIDGE HOSPITAL), INC.,
ET AL.

      DEFENDANTS.
_____/


DEPOSITION OF:      EMIL MILLER

DATE:      OCTOBER 10, 2002

TIME:      9:06 A.M.

PLACE:      80 NORTH HUGHEY AVENUE
      ORLANDO, FLORIDA

REPORTED BY:      SHIRLEY A. HILL-DELISCO, C.S.R
      AND NOTARY PUBLIC

Page 54

```
 1   RENEGOTIATIONS WITH THE LCS DOCTORS; ISN'T THAT RIGHT?
 2       A.   NO.
 3       Q.   BUT YOU WERE AT LEAST INVOLVED IN
 4   DISCUSSIONS WITH OTHER PEOPLE ABOUT THOSE SALARIES?
 5       A.   NO. YOU KNOW, ALL THESE FUNCTIONS WERE
 6   TPS FUNCTIONS. THEY WERE NOT NORTH RIDGE FUNCTIONS.
 7       Q.   OKAY. THE STATEMENT IN THIS LES ALT
 8   REPORT THAT I READ, "LCS PHYSICIAN COMPENSATION IS A
 9   FUNCTION OF THE HISTORICAL VOLUME OF THE PRACTICE,
10   INCLUDING ANCILLARY REVENUE," DID YOU EVER HAVE ANY
11   DISCUSSION OF THIS, JUST THE CONCEPT EXPRESSED HERE
12   WITH ANYONE?
13       A.   NO.
14       Q.   YOU CAN TURN TO THE NEXT PAGE, PAGE NO.
15   021307, AND AT THE TOP THE FIRST BULLET POINT THERE IT
16   SAYS "MANY LCS PHYSICIANS BELIEVE NORTH RIDGE'S
17   REPUTATION IS ERODING PRIMARILY DUE TO ENVIRONMENTAL
18   ISSUES (HOUSEKEEPING, PHYSICAL PLANT, FOOD SERVICE)."
19            DID YOU EVER HAVE DISCUSSIONS WITH LCS
20   PHYSICIANS ALONG THE LINES THAT ARE DESCRIBED HERE?
21       A.   I CAN ONLY ATTRIBUTE THAT COMMENT TO THE
22   DOCUMENT THAT'S THERE.
23       Q.   NONE OF THE OTHER DOCTORS SAID ANYTHING TO
24   YOU ABOUT ANY OF THE ISSUES THAT ARE OUTLINED HERE?
25       A.   NO. ACTUALLY, NORTH RIDGE IN ITS
```

Page 55

```
 1   PHYSICIAN SURVEYS RANKED CONSISTENTLY AS NO. 1 OR NO.
 2   2 IN PHYSICIANS' LEVEL OF SATISFACTION WITH SERVICES
 3   CONSISTENTLY.
 4       Q.   AND WAS THAT TRUE FOR THE RESPONSES FROM
 5   THE LCS DOCTORS AS WELL?
 6       A.   WE DIDN'T FOLLOW IT ON AN INDIVIDUAL --
 7   BECAUSE IT WAS ANONYMOUS IN MANY CASES. YOU KNOW, IF
 8   THE DOCTOR CHOSE TO PUT THEIR NAME ON IT -- AGAIN, I
 9   WOULDN'T GET THAT INFORMATION DIRECTLY, JUST THE
10   ACTUAL STATISTICS.
11       Q.   TAKE A LOOK AT THE THIRD BULLET POINT
12   HERE, STILL ON THE SAME PAGE. IT SAYS "LCS PHYSICIAN
13   PRODUCTIVITY REQUIREMENTS PER CONTRACT ARE WELL BELOW
14   NATIONAL STANDARDS OF PERFORMANCE."
15            FIRST OF ALL, IF YOU CAN EDUCATE ME, WHAT
16   IS A PHYSICIAN PRODUCTIVITY REQUIREMENT?
17       A.   I HAVE NO IDEA.
18       Q.   AND IS THIS AN ISSUE THAT YOU EVER
19   DISCUSSED WITH ANYONE, THE ISSUE THAT'S STATED?
20       A.   I WASN'T INVOLVED IN DOCTOR CONTRACTING,
21   DOCTOR SALARIES.
22       Q.   OKAY.
23            MR. WISEMAN: WHY DON'T WE TAKE A
24   FIVE-MINUTE BREAK.
25            (WHEREUPON, A BRIEF RECESS WAS HAD, AFTER
```

Page 56

```
 1   WHICH THE FOLLOWING PROCEEDINGS WERE HAD :
 2   BY MR. WISEMAN:
 3       Q.   MR. MILLER, YOU STILL HAVE THIS DOCUMENT,
 4   LAUDERDALE CLINICAL SERVICES OPERATIONS ASSESSMENTS BY
 5   LES ALT IN FRONT OF YOU?
 6       A.   YES.
 7       Q.   WOULD YOU TURN TO THE PAGE WITH THE
 8   NUMBER -- BATE NO. 021329? IT'S ABOUT SIX OR SEVEN
 9   PAGES FROM THE BACK.
10       A.   OKAY.
11       Q.   IT'S TITLED CONCLUSIONS/RECOMMENDATIONS.
12       A.   I'M THERE.
13       Q.   OKAY. I WANT TO ASK YOU TO TAKE A LOOK AT
14   THE -- LET'S START AT THE BOTTOM, THE FIFTH BULLET
15   POINT UP FROM THE BOTTOM. IT SAYS -- BEGINS WITH THE
16   WORD ADDRESS.
17       A.   YES.
18       Q.   DO YOU SEE WHERE I AM? OKAY. IN HIS
19   CONCLUSION MR. ALT SAYS "ADDRESS POTENTIAL FRAUD AND
20   ABUSE ISSUES OF CURRENT PHYSICIAN COMPENSATION
21   FORMULAS WHERE SALARY AND BONUS ARE EXCESSIVE RELATIVE
22   TO THE GROSS OR NET REVENUE OF THE PRACTICE."
23            DO YOU RECALL SEEING THIS WHEN YOU LOOKED
24   AT THE REPORT THE FIRST TIME?
25       A.   NOT IN SPECIFIC DETAIL, NO.
```

Page 57

```
 1       Q.   HAVE YOU EVER DISCUSSED THE ISSUES RAISED
 2   HERE WITH ANYONE?
 3       A.   NO. I MEAN, I DON'T KNOW THAT FRAUD AND
 4   ABUSE IS AN ISSUE. I MEAN, IN MY MIND, AS IN, YOU
 5   KNOW, ANY RELATIONSHIP THAT AN ORGANIZATION DOES, YOU
 6   ALWAYS WANT TO ASSURE THAT YOU ARE COMPLIANT AND
 7   CONSISTENT WITH, YOU KNOW, CURRENT LAW. AND
 8   CONSEQUENTLY POTENTIAL FRAUD AND ABUSE ISSUES -- A
 9   REVIEW OF THAT MEANS ESSENTIALLY, YOU KNOW, ASSURING
10   THAT LEGAL COUNSEL LOOKS AT IT TO MAKE SURE THAT IT'S
11   CONSISTENT.
12       Q.   WHAT KIND OF STEPS DID YOU TAKE ON A
13   REGULAR BASIS TO MAKE SURE THAT THESE SORTS OF ISSUES
14   WERE ADDRESSED?
15            MR. HOLLIDAY: OBJECTION. IT'S AMBIGUOUS.
16   BY MR. WISEMAN:
17       Q.   LET ME BACK UP. YOU SAID IN ANSWERING THE
18   QUESTION THAT YOU'RE ALWAYS CONCERNED ABOUT THESE
19   TYPES OF ISSUES, IS THAT FAIR?
20       A.   YES.
21       Q.   AS CEO WHAT DID YOU DO TO ADDRESS YOUR OWN
22   CONCERNS?
23       A.   UTILIZE LEGAL COUNSEL TO REVIEW.
24       Q.   TO REVIEW WHAT?
25       A.   ANY DOCUMENT THAT YOU -- OR ARRANGEMENT
```

15 (Pages 54 to 57)

Page 58

1 OR, YOU KNOW, RELATIONSHIP THAT YOU MIGHT BE ENTERING
2 INTO THAT'S A POTENTIAL REFERRAL SOURCE TO ASSURE THAT
3 THERE'S, YOU KNOW, NOT A CONFLICT.
4   Q.   WHEN YOU WERE -- DURING THE PERIOD THAT
5 YOU WERE CEO AT NORTH RIDGE, WAS THERE ANY KIND OF AN
6 ETHICS HOTLINE OR ANYTHING ALONG THOSE LINES THAT
7 SOMEONE COULD CALL IF THEY HAD A CONCERN?
8   A.   YES.
9   Q.   DID YOU EVER UTILIZE THAT?
10   A.   NO.
11   Q.   WERE YOU AWARE WHILE YOU WERE THE CEO THAT
12 TENET HAD ENTERED INTO A CORPORATE INTEGRITY AGREEMENT
13 WITH THE UNITED STATES GOVERNMENT?
14   A.   YES.
15   Q.   AND DID YOU EVER REPORT ANY ISSUES THAT
16 YOU SAW UNDER THAT CORPORATE INTEGRITY AGREEMENT?
17   A.   I NEVER SAW ANY, SO I NEVER REPORTED ANY.
18   Q.   GOING BACK TO THIS STATEMENT IN MR. ALT'S
19 REPORT WHERE HE SAYS "WHERE SALARY AND BONUS ARE
20 EXCESSIVE." DO YOU BELIEVE THAT THE SALARY AND BONUS
21 OF ANY OF THE LCS DOCTORS WERE EXCESSIVE?
22   A.   I DON'T KNOW IF THEY WERE EXCESSIVE OR
23 NOT.
24   Q.   HOW WOULD YOU KNOW?
25   A.   I WOULDN'T.

Page 59

1   Q.   BUT HOW WOULD SOMEONE MAKE THAT KIND OF A
2 JUDGMENT --
3   A.   I WOULD --
4   Q.   -- HYPOTHETICALLY SPEAKING?
5   A.   I WOULD ASSUME THAT THEY WOULD DO AN
6 ANALYSIS OF THE MARKET, LOOK AT MARKET PAYMENT RATES.
7 YOU KNOW, YOU CAN GET ACCESS TO PHYSICIAN COMPENSATION
8 TABLES THAT ARE, YOU KNOW, BASED UPON, YOU KNOW,
9 GEOGRAPHIC LOCATIONS AROUND THE COUNTRY. BUT THE
10 BIGGEST DRIVER IN ANY MARKET IS THE MARKET ITSELF AND
11 WHERE COMPENSATION RATES ARE BASED
12   Q.   SO -- AND WHEN YOU SAY THAT, DOES THAT
13 MEAN YOU LOOK AT WHAT A PHYSICIAN WHO DOES THE SAME
14 THING IS BEING PAID IN THAT MARKET?
15     MR. HOLLIDAY: IF THIS IS A HYPOTHETICAL,
16 I'LL OBJECT AS INCOMPLETE.
17     MR. WISEMAN: OKAY THIS IS A
18 HYPOTHETICAL. I'M ASKING YOU IF YOU WERE -- IF YOU'RE
19 DECIDING TO EMPLOY A PHYSICIAN, ARE YOU SAYING THAT
20 THE WAY YOU WOULD DECIDE WHAT TO PAY HIM OR HER IS TO
21 LOOK AT WHAT A PERSON OF THE SAME STATURE IS BEING
22 PAID IN THAT MARKET?
23     THE WITNESS: YES.
24 BY MR. WISEMAN:
25   Q.   WHAT ELSE WOULD YOU TAKE INTO

Page 60

1 CONSIDERATION?
2   A.   THE PHYSICAL PLANT THAT THEY'RE IN, WOULD
3 IT ALLOW FOR EXPANSION, IS IT POSITIONED -- YOU KNOW,
4 IN OTHER WORDS, WHERE THEIR OFFICE IS, IS THEIR OFFICE
5 IN A GROWING AREA, IS IT IN AN AREA THAT IS
6 EXCLUSIVELY MEDICARE, IS IT NOT GOING TO BE CONDUCIVE
7 TO, YOU KNOW, PUTTING MANAGED CARE PATIENTS INTO THAT
8 PRACTICE BECAUSE THERE AREN'T ANY REASONABLE, YOU
9 KNOW, DRIVING DISTANCE TO COME IN AND BE PATIENTS OF
10 THAT DOCTOR'S PRACTICE, YOU KNOW, THE ACTUAL CAPACITY
11 OF THE OFFICE, CAN WE PUT A PA OR A NURSE PRACTITIONER
12 INTO THAT OFFICE TO INCREASE VOLUME AND REALIZE SOME
13 EFFICIENCIES?
14   Q.   WHAT IS THE -- HOW WAS THE POSSIBILITY OF
15 EXPANSION RELEVANT TO SETTING COMPENSATION?
16   A.   IF YOU ARE ABLE TO EXPAND AND DRIVE MORE
17 VOLUME INTO THE PRACTICE, THE COMPENSATION WOULD BE AN
18 INCENTIVE FOR THE PHYSICIAN; WOULDN'T IT?
19   Q.   I --
20   A.   THE INCREASED COMPENSATION WOULD BE AN
21 INCENTIVE FOR THE DOCTOR.
22   Q.   AND IT WOULD MAKE SENSE FINANCIALLY FOR
23 THE HOSPITAL TO INCREASE THEIR COMPENSATION BECAUSE
24 IT'S GOING -- WITH EXPANSION THERE ARE GOING TO BE
25 GREATER REVENUES; IS THAT RIGHT?

Page 61

1   A.   FOR THE PRACTICE, YES.
2   Q.   FOR THE PRACTICE. BUT IN THE CASE OF AN
3 EMPLOYED PHYSICIAN, THE REVENUES FROM THE PRACTICE ARE
4 REVENUES TO THE HOSPITAL, IS THAT RIGHT?
5   A.   IT DEPENDS UPON THE ARRANGEMENT OF THE
6 PRACTICE.
7   Q.   OKAY. COULD YOU GIVE ME SOME -- CAN YOU
8 EXPAND ON THAT A LITTLE BIT AND . . .
9   A.   I'VE SEEN COMPENSATION ARRANGEMENTS WHERE
10 DOCTORS ARE INCENTIVIZED TO SEE MORE PATIENTS AND, YOU
11 KNOW, ARE PAID ADDITIONAL DOLLARS OR THEY'RE PAID A
12 PERCENTAGE OF REVENUES GENERATED OF, YOU KNOW,
13 DIFFERENT FORMULAS.
14   Q.   AND NOW, AGAIN, STILL HYPOTHETICALLY, WHAT
15 ABOUT THE ANCILLARY REVENUES THAT A PHYSICIAN IS GOING
16 TO GENERATE; IS THAT TAKEN INTO CONSIDERATION?
17     MR. HOLLIDAY: HYPOTHETICALLY?
18     MR. WISEMAN: HYPOTHETICALLY. WOULD
19 YOU -- WOULD YOU TAKE THAT INTO CONSIDERATION IF YOU
20 HAVE A DOCTOR AND YOU KNOW HE OR SHE IS GOING TO
21 GENERATE A LOT OF ANCILLARY REVENUES FOR THE HOSPITAL?
22     THE WITNESS: NO.
23 BY MR. WISEMAN:
24   Q   AND WHY NOT?
25   A.   WHAT DO YOU MEAN FOR THE HOSPITAL?

16 (Pages 58 to 61)

REALTIME REPORTERS, INC.

**EXHIBIT 4**

# Tenet Physician Services

Tenet HealthSystem

*2/24/97 mb*

# MEMORANDUM

**Date:** April 5, 2000

**To:** Jeff Heinemann

**From:** Tony Bennett

**Subject:** Legal Concerns related to LCS practices

**Additional Distribution:**

**\*\*\* Personal and Confidential \*\*\***

As per our conversation on Friday, I am concerned that Tenet may have some legal exposure related to some of the LCS deals. I have reviewed the files, and I am familiar with the "Stark-II"(Physician Self Referral) law. Based on my review, I have a couple of issues that perhaps you could help me to resolve.

Under Stark II the law **prohibits the referral of patients or the submission of claims for "designated services" if the referring physician has a "financial relationship" with the entity that provides the services.**

The "designated services" include (among others) clinical laboratory services, and inpatient and outpatient hospital services.

A "financial relationship" includes a compensation arrangement between the physician and the entity.

An exception to the compensation prohibition includes a bona fide employment relationship. However, **an** employment relationship is only excluded if the employment is for identifiable services, **consistent with fair market value, does not take into account the volume of referrals, and is for payment that would be commercially reasonable if there were no referrals.**

My concerns are as follows:

1) **"Compensation consistent with fair market value, and commercially reasonable":** In every case the physicians salary and benefits were increased above their current levels (in some cases by more than 50%). In every case the salary was raised to a level greater than MGMA mean compensation for Internal Medicine. In every case the proforma indicated a substantial loss on the clinic, even on the combined income of the clinic and the lab referral income to be obtained from the clinic. It would certainly be difficult to defend that if not for the referrals this arrangement would not be made.

2) **"does not take into account the volume of referrals":** In most of the files I reviewed, the workpapers supporting the employment arrangement utilized the amount of lab



EXHIBIT
21
5-10-00

FLAPP 084190

currently being performed in the doctors office as a basis for determining the level of compensation for the physician. In other words the amount of increase from the existing level to the new level under the employment agreement, had a direct correlation to the volume of anticipated lab referral.

3) **"does not take into account the volume of referrals"**: In at least one case, the physician did not perform lab services in his office, but instead used an outside referral lab. In this instance the hospital estimated the value of the referrals that would, as a result of the employment arrangement, be redirected to the hospital in determining the compensation for the physician. And, just lake all of the other agreements, indicated that the entire arrangement would operate at a loss.

The aforementioned issues related to the LCS practices are not entirely unique, but are the most conspicuous. There are similar issues related to the few physician employment arrangements associated with the former AMI hospitals in the Tampa area. Primarily, the arrangements do not appear to be commercially reasonable because the agreements do not allow for any profit to be returned to the employer, and furthermore provide for discretionary bonuses on top of the operating deficits.

These issues were pointed out previously, and were addressed by my superiors. However, no one has shared directly with me the legal opinions upon which any conclusions were based. Therefore I am requesting that you help me to gain the comfort I need to move on with other, more pressing matters.

FLAPP 084191

TENET

**EXHIBIT 5**

184

IN RE:  North Ridge Medical Center

99 N.E. 4th Street
Miami, Florida
May 10, 2000
9:00 a.m. - 2:30 p.m.

DEPOSITION OF TONY BENNETT
VOLUME II

Taken before Mary Ann Collier, a Registered
Professional Reporter and Notary Public for the
state of Florida at Large, pursuant to Notice of
Taking Deposition filed in the above cause.

185

APPEARANCES

ON BEHALF OF THE UNITED STATES:

U.S. ATTORNEY'S OFFICE
99 N.E. 4th Street, Third Floor
Miami, FL
By:    Barbara Bisno, AUSA
       and
       Laurie Oberembt (via telephone)
U.S. Department of Justice

ON BEHALF OF THE WITNESS:

GIBSON, DUNN & CRUTCHER, LLP
333 South Grand Avenue
Los Angeles, CA 90071-3191
By:    Thomas E. Holliday, Esq.
       and
       Myla Reizen, Esq.
       Tenet Physician Services

ALSO PRESENT:

Special Agent Joseph Birdsong

EXAMINATION BY                          PAGE

MS. BISNO                               186, 310
MS. OBEREMBT                            309

E X H I B I T S

FOR THE GOVERNMENT                      FOR I.D.

No. 21                                  198
No. 22                                  205
No. 23                                  224
No. 24                                  250
No. 25                                  254
No. 26                                  311
No. 27                                  323

186

1   Thereupon--
2               TONY BENNETT
3   was called as a witness by the Government and,
4   having been previously sworn, testified as follows:
5           CONTINUED DIRECT EXAMINATION
6   BY MS. BISNO:
7       Q. Are you ready, Mr. Bennett?
8       A. Yes, I am.
9       Q. Had a nice rest, ready to go?
10      A. Pretty good.  Dreamed about this.
11          MR. HOLLIDAY:   She is just going to ask
12  you about them.
13  BY MS. BISNO:
14      Q. I will not ask you about your dreams, Mr.
15  Bennett, you have my promise.
16      A. Okay.
17      Q. As we were pulling ourselves out of this
18  deposition last night we had begun to talk about Les
19  Alt's report, and I, too, gave it some thought after
20  you left.
21          It's hard for me to understand how it is
22  that you had no contact, did not get a copy of, or
23  have any discussions about Mr. Alt's report.
24          Let me make sure I understand the setting
25  of this thing.  This is in the middle of 1996.  The

187

1   report, see if you disagree with me, was primarily
2   about the financial operations of the Lauderdale
3   Clinical Services.  You were chief financial
4   officer.
5           How is it that you did not get a copy of
6   the report, and wouldn't have reviewed the report?
7       A. It was initiated by Sal Barbera, to the
8   best of my knowledge.
9       Q. Yes, sir.
10      A. And the report came back to Sal.
11      Q. Was Sal there when the report came back in
12  July of 1996?
13      A. I think so.  And the rest of it is if he
14  wasn't there, then, again, that was Alt's contact
15  person was Sal, not me, so...
16          MR. HOLLIDAY:   Barbara, just so it is
17  clear, otherwise you may have a misimpression, I
18  showed him this report last night in anticipation of
19  your asking questions about it.  I think he still
20  does not remember the report.
21          But when you said, for example, it is about
22  financial information, he knows that now, because he
23  looked at the report last night.
24          MS. BISNO:  I see.
25  BY MS. BISNO:

268

1  what it is you are talking about so we can address
2  them directly and give it to me.
3      I said okay, I will do that. And that is
4  why I pulled this memorandum together.
5      Q. And after you pulled the memorandum
6  together, did you speak with Mr. Heinemann about the
7  issues again?
8      A. I don't really recall any conversation with
9  Mr. Heinemann after that related to this topic.
10     Q. Did you ever hear him express the opinion
11 that the contracts were legal?
12     A. I didn't hear him address it to me one way
13 or the other. He did tell me — he did assure me
14 when he got this, he confirmed that he received it,
15 and that he would pass it on to the appropriate
16 people, whoever that might be.
17     Q. What response did you receive?
18     A. I didn't receive like a written response to
19 this, per se. I did, however, get a phone call one
20 day, within, I don't know, within two or three weeks
21 of preparing it, I got a phone call from Christy
22 Sulzbach, and she asked if I could arrange a time to
23 meet with her to go through my concerns.
24     At that point I was kind of scared, but I
25 also was pleased to know that it was definitely

270

1  Ross Nelle or whatever, I think at the time I
2  remember thinking, although not knowing for sure,
3  that there was a connection; that my preparing this
4  document, Exhibit 21, and having my discussion with
5  Christy Sulzbach and Tom Holliday, and then within,
6  I don't know, a short time frame, a week or two,
7  getting a request to pull information together,
8  pretty much isolated to the physicians with LCS,
9  putting two and two together I made the assumption I
10 believe at that time that they were somehow related.
11     So I felt comfortable that it was being
12 addressed. I didn't receive anything directly, but
13 I felt things were moving along.
14     Q. I can't seem to put my hands on my exhibit
15 list right this moment, but I believe I know what
16 you are referring to, and let's just get it into the
17 record.
18     I believe Exhibit 9 and Exhibit 10.
19 Exhibit 9 is a multi-page exhibit, which includes a
20 memorandum from Ross Nelle to Mark Bryan. It is
21 FLAPP 79953.
22     Is that correct, sir?
23     A. That's correct.
24     Q. And that is the memorandum, and eventually
25 that request for data is sent to you by e-mail, I

269

1  going to get the attention, probably a little beyond
2  what I was asking for, but that I would have an
3  opportunity to discuss what I was putting down, to
4  explain it, as we are doing.
5      Q. Did you, in fact, meet with Ms. Sulzbach?
6      A. Yes. I met with Ms. Sulzbach, and also
7  with Tom Holliday in Fort Lauderdale for several
8  hours.
9      Q. After that meeting, was there anything in
10 writing that you could put into your files, as you
11 had requested?
12     A. No. But based on the timing that
13 transpired, I believe that I left before they really
14 had an opportunity to complete their work.
15     One of the exhibits that you showed me,
16 actually a couple of the exhibits you showed me, in
17 looking at this, and thinking about the timing —
18     Q. Looking at?
19     A. Looking at Exhibit 21, and thinking about
20 the question you asked me about whether it was
21 addressed or not, and then thinking back to a couple
22 of the exhibits that I saw yesterday, and I would be
23 glad to look through them in a minute and point them
24 out directly, I think that one of the documents that
25 said a request from internal audit, and a memo from

271

1  believe.
2      A. That is correct, right there (pointing).
3      Q. On FLAPP 79949.
4      And then Exhibit 10 is a document that we
5  discussed, and it consists of statistics for the LCS
6  doctors for fiscal year 1995, 1996 and 1997 year to
7  date of inpatient admissions and outpatient visits,
8  and the revenue generated by both of those
9  categories of referrals for all of the LCS
10 physicians, including the ones that were hired on
11 your watch, Dr. Bratt and Dr. Brot.
12     A. That's correct.
13     Q. And that occurred in — well, the e-mail
14 was April 15. April 14 was the memo, 1997. We
15 don't have a date on the internal audit, because it
16 was generated from your materials.
17     A. That's correct.
18     Q. And it was not provided to us originally by
19 Tenet Health Care Corp. It is dated 4/4/2000, but
20 that we know that is the date it was generated from
21 your computer and not the date it was actually
22 prepared. Is that correct?
23     A. That's correct.
24     Q. And your testimony is that now we know
25 that, you feel comfortable that Exhibit 10 is

272

1 related to Exhibit 9. It is the information that
2 was prepared, that you got together, after being
3 requested for it; and that you felt it was related
4 to your memo in February of 1997.
5 A. With reservation that I may be wrong, that
6 fairly summarizes a point that I was making, yes.
7 Q. Without going into the details of your
8 discussions with the counsel for Tenet Health Care,
9 you asked that you want to gain some comfort on
10 these issues in your memorandum, the last sentence.
11 A. What is the question?
12 Q. You asked me not to speak to you while you
13 are reading, so I am trying to give you a chance to
14 gather your thoughts.
15 Did you gain the comfort that you had
16 requested?
17 A. A different kind of comfort. I did gain
18 the comfort that somebody whom I had a great deal of
19 respect for, which was Christy Sulzbach, and my
20 knowledge of her as being our general counsel, or
21 whatever position she was in, whether general
22 counsel is the right word or not, I felt that I had
23 properly handed off the issue, and I had every
24 reason to believe that it would be appropriately
25 addressed, and that I would eventually receive some

273

1 feedback.
2 And if I didn't, she made me feel
3 comfortable enough that I felt like I could have
4 picked up the phone and called her at her office and
5 said, hey, when we discussed this, this is one of
6 the issues, and could you send me something. Or can
7 we work on trying to make these files more complete.
8 I wouldn't have had any reservation from that.
9 So I received that comfort. I didn't
10 exactly receive it, because of the time frame, I
11 felt like they were probably still working on it by
12 the time I left.
13 Q. How long after your memo was written did
14 you have an opportunity to meet with Ms. Sulzbach
15 and Mr. Holliday?
16 A. I don't know precisely. But I would
17 surmise from the dates and so forth that it was
18 probably about three weeks maybe.
19 Q. And exactly how would a request for a
20 schedule of the inpatient and outpatient, the
21 inpatient admissions and the outpatient visits and
22 the revenues generated therefrom, how would that
23 request in your mind be related to the issues that
24 you raised in your memorandum that is marked Exhibit
25 21?

274

1 A. Because of the focus of my concerns related
2 to LCS, and because I rarely received requests for
3 information about a group of physicians from anyone
4 other than inside of TPS, and the fact that this is
5 a request coming from internal audit to Mark Bryan,
6 the division CFO, or the regional CFO, and then
7 coming to me, that that is not the normal route of
8 how requests get made from our office.
9 They usually came from my CFO in Dallas, or
10 locally just from the CEO of my organization, or
11 not through that route.
12 So it was different, and I presumed them to
13 be related to each other.
14 Q. The files that you reviewed, you indicated
15 that though they were more complete than the files
16 you had had in 1996, they were still incomplete. Is
17 that a correct statement that you said that?
18 A. Yes, I said that.
19 Q. What would they have needed to be made
20 complete?
21 A. Well, obviously, if there were any other
22 files that anyone had, you know, that they should be
23 produced and put into these files. For instance, an
24 example might be, you showed me an exhibit of the
25 Yesner proforma.

275

1 Most of the proformas I reviewed not only
2 had a front sheet, but it also had a five year
3 projection of how that practice was going to become
4 profitable.
5 When you showed me the Yesner one, it only
6 had one page. I would presume if there were two
7 pages, they would have been turned over. That is an
8 example of where I know somewhere, sometime, someone
9 did a second page which would have shown that over
10 the course of five years it was anticipated when
11 Yesner came on that eventually his practice would
12 become profitable.
13 The other ones showed that. So I would
14 like to see, you know, that put in there as a way to
15 complete the record.
16 The other is that I'm looking at the
17 commercial reasonableness as it stands today, and
18 I'm looking back to documents that were based on
19 information back in 1992 and 1993. Because things
20 have changed I felt like we had an opportunity
21 to add to the file information that would clarify
22 more of the thought process. Because documentation
23 of that thought process was not very conspicuous, if
24 it was there.
25 So those are the kinds of things I was

**EXHIBIT 6**

DEPOSITION OF JEFFREY S. HEINEMANN

SHEET 1   PAGE 1

Page1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF ARIZONA
 3  UNITED STATES OF AMERICA,  )
    ex rel                     )
 4  SAL A BARBERA,             )
                  Plaintffs,   )
 5                             )
       -vs-                    )  No. 97-6590-CIV-JORDAN
 6  AMISUB (NORTH RIDGE        )
    HOSPITAL), INC., et al.,   )
 7                             )
                  Defendants.) )
 8
 9
       VIDEOTAPE DEPOSITION OF JEFFREY HEINEMANN
10
11              Phoenix, Arizona
12               March 13, 2003
13               8:20 o'clock a.m.
14
15
16
17
18
19
20
21
22
23
24
25
```

PAGE 2

Page 2

```
 1              I N D E X
 2  WITNESS
 3       Heinemann, Jeffrey S.
 4
 5  EXAMINATION                        PAGE
 6       By Mr. Wiseman                6-320
 7       By Mr. Krakow               320-327
 8
 9            E X H I B I T S
10
11  No. 1 (agenda, 1-30-1997)          46
12  No. 2 (memo, 10-29-1996)           53
13  No. 3 (E-mail, 2-8-97)             64
14  No. 4 (E-mail, 2-10-97)           101
15  No. 5 (LCS operations assessment) 102
16  No. 6 (memo, 2-10-97)             103
17  No. 7 (memo, 2-24-97)             154
18  No. 8 (practice contract analysis) 164
19  No. 9 (memo, 4-14-97)             165
20  No. 10 (spreadsheet)              166
21  No. 11 (memo, 3-19-1997)          172
22  No. 12 (memo, 3-30-1997)          175
23  No. 13 (E-mail, 4-10-1997)        178
24  No. 14 (E-mail, 4-13-1997)        200
25  No. 15 (E-mail, 5-19-97)          206
```

PAGE 3

Page 3

```
 1  No. 16 (E-mail, 6-19-97)          ...
 2  No. 17 (E-mail, 6-26-1997)        ...
 3  No. 18 (memo, 7-9-97)             ...
 4  No. 19 (handwritten notes         ...
 5  No. 20 (letter to E. Miller, 10-27-97) 256
 6  No. 21 (memo, 9-3-97)             267
 7  No. 22 (multiple E-mails)         278
 8  No. 23 (multiple E-mails & replies) 295
 9  No. 24 (memo, 1-13-98)            296
10  No. 25 (E-mails, 1-23-98)         298
11  No. 26 (letter, 1-30-97)          300
12  No. 27 (E-mail, 2-02-1998)        302
13  No. 28 (memo, 3-2-1998)           316
14  No. 29 (memo, 5-1-1997)           316
15  No. 30 (handwritten note)         319
16
17
18
19
20
21
22
23
24
25
```

PAGE 4

Page 4

```
 1  VIDEOTAPED DEPOSITION OF JEFFREY S. HEINEMANN
 2
 3  Taken at 8:20 o'clock a.m., March 13, 2003, in the
 4  law offices of the United State Attorney's Office, 40
 5  North Central Avenue, Suite 1200, Phoenix, Arizona
 6  before Christopher J. White, R.P.R., a Certified
 7  Court Reporter, No. 50183, pursuant to the Rules of
 8  Civil Procedure.
 9
10       The Plaintiff was represented by its
11  attorneys:  United States Department of Justice, by
12  Mr. David B. Wiseman, and also telephonically by
13  Mr. Gary E. Sherman, Attorney-at-Law.
14
15       The Defendants were represented by their
16  attorneys:  Gibson, Dunn & Crutcher, by Mr. Robert B.
17  Krakow, and also by Schleier, Jellison & Schleier, by
18  Mr. Bradley H. Schleier.
19
20       The Videographer was Mr. William Marinakis
21  of the firm VideoDep, Inc.
22
23       Also present telephonically during the
24  deposition was Mr. Joe Birdsong, an agent with the
25  Department of Health and Human Services.
```

DEPOSITION OF JEFFREY S. HEINEMANN

SHEET 15   PAGE 57

**Page 57**

1 his business, or something like that. I remember I
2 wrote the quote down on one of my papers, so I can't
3 quote it to you right now.
4     Q.   Do you have a sense of what he meant by "to
5 get his business"?
6     A.   I --
7         MR. KRAKOW:  Objection, form.
8         THE WITNESS:  I can't tell you what he was
9 thinking.
10    Q    BY MR. WISEMAN:  I mean, does that -- do you
11 think he was referring to his inpatient and
12 outpatient referrals?
13    A.   Whenever I hear anything that I think is a
14 bit controversial, I try to write down the quote.
15 Then what I do is send it to the lawyers and let them
16 figure out what they meant.
17    Q.   Fair enough.  I suppose that is one of our
18 functions.
19         Take a look, if you would, at the next
20 page of the Jon O'Sullivan letter.
21    A.   (Witness complies.)
22    Q.   And specifically the third paragraph, the
23 large paragraph in the middle of that page, where
24 Mr. O'Sullivan states, "At that point in the
25 conversation I expressed my belief that Tenet may not

PAGE 58

**Page 58**

1 have a choice but to restructure the contracts due to
2 the possibility that going forward the contracts
3 could be interpreted negatively by Tenet's legal
4 counsel."
5         When you first arrived at Tenet, within
6 that first year or so when you were familiarizing
7 yourself with the Florida issues, did anyone ever say
8 to you that they thought there might be a legal issue
9 with regard to the Lauderdale Clinical Services
10 employment contracts?
11    A.   Did anybody from the standpoint of a
12 consultant or -- would you just define "anybody."
13 I'm sorry.
14    Q.   As broadly as -- I mean anybody.
15    A.   There was -- in the TPS staff there were
16 some people that were concerned as to the legality.
17 And when people would do that, I would ask them,
18 again, to put it in writing, and then I would forward
19 it to legal.  I used legal a lot.
20    Q.   Do you recall who it was on the TPS staff
21 that were concerned?
22    A.   I do recall Tony Bennett was real alarmed,
23 and I believe Tony Dattilo also was at one point.
24    Q.   Do you recall what Tony Bennett was alarmed
25 about?

PAGE 59

**Page 59**

1    A.   I know he felt it was -- it was either Stark
2 or fraud abuse issues; I don't recall which one.  But
3 he felt that there were some issues with that, so I
4 asked him to write it down.
5    Q.   He felt that there were issues -- when you
6 say "with that," Tony Bennett felt there were issues
7 with the Lauderdale Clinical Services' employment
8 agreements?
9    A.   I don't know that they were specific to LCS,
10 but TPS physicians.  I think the market was -- my
11 recollection is it was more of us losing money on
12 virtually everybody.
13    Q.   Right.  But how -- do you recall how Tony
14 Bennett translated or believed losing money on
15 everybody created a legal concern, I guess is my
16 question.
17    A.   You know, I would assume you have that
18 letter somewhere.  If I read it again, I'm sure it
19 would come back to me.
20    Q.   We'll get to it.
21         And how about Tony Dattilo, do you
22 recall what he said?
23    A.   Again, just vaguely I remember Tony
24 expressing some concern.  And again, I think it
25 was -- at one point we had -- I don't recall if it

PAGE 60

**Page 60**

1 was an internal audit or something come in.  And
2 again, from a financial perspective.
3         As I recall, it was during that time
4 that he raised some issues.  And I don't even recall
5 if he ever put it in writing or not, to be honest.
6    Q.   Do you recall what the issues he raised
7 were?
8    A.   I just know it had something to do with
9 potential Stark or fraud and abuse issues, but I
10 don't remember the specifics.
11    Q.   And do you remember the doctors that he was
12 concerned about?
13    A.   No, I don't.
14    Q.   When you say that you used legal a lot, what
15 did you mean by that?
16    A.   If -- I instructed all of my staff, all of
17 our management staff, all the way down to the line
18 level, that if they ever had any concerns from a
19 legal perspective, they were to either talk to
20 their -- certain people on my team had the authority
21 to go directly to legal.
22         We had our own in-house legal; we, of
23 course, had corporate legal; and then we had outside
24 legal.  And if I had any doubt on anything, I took it
25 to legal.

DEPOSITION OF JEFFREY S. HEINEMANN

Page 61

```
 1      Q.  Which of those three legals did you take it
 2  to?
 3      A.  It depended on the situation.
 4      Q.  Okay.  When you say "in-house," what are you
 5  referring to?
 6      A.  When I joined, I got approval to bring over
 7  Debbie McCormick from OrNda, and she was my appointed
 8  attorney in-house.  And Debbie and I just really, I
 9  think, appreciated each other's talents in our own
10  areas.  So I was very comfortable working with
11  Debbie.
12      Q.  So she was an attorney for Tenet Physician
13  Services?
14      A.  She was assigned to TPS.
15      Q.  And then the next level would be in-house
16  attorneys for Tenet Health Care Corporation, when you
17  say "corporate"?  I'm just trying to get a sense
18  of --
19      A.  Right.  Christi's group, Myla, Christi, and
20  that group.
21      Q.  And I guess when you say, "I used legal a
22  lot," I guess I'm trying get a sense of the frequency
23  with which people came to you with concerns that you
24  thought should be referred to legal.
25      A.  Not frequent.  It didn't happen a lot.  I
```

Page 62

```
 1  took things more on my own.  And it was really more
 2  to if we were looking at an acquisition, we got
 3  everything blessed before we would go the next steps,
 4  to make sure that everything was kosher.
 5      Q.  And how did you decide whether to go to
 6  Debbie McCormick or to go to the Christi-Myla
 7  corporate group?
 8      A.  It just was my judgment.  If I had something
 9  like a Yesner, which I thought was really maybe a
10  potential compliance issue, Christi was in charge of
11  compliance, so I would take it to Christi and I would
12  inform Debbie.
13      Q.  What was the issue regarding Dr. Yesner?
14      A.  I just didn't like the comment that he made,
15  and it just sounded -- it just didn't sit well with
16  me.  And I just -- Debbie was a contracted attorney,
17  whereas Christi was an employee of Tenet Health Care
18  in charge of compliance.
19          So anything that I thought was just
20  really important for Christi to know -- Christi and I
21  communicated an awful lot.
22      Q.  So when you refer to Yesner, it's the
23  comment that he made about Tenet paid him more than
24  Holy Cross to get his business?
25      A.  Something to that effect.
```

Page 63

```
 1      Q.  I'm not trying to pin you to those words.
 2      A.  Right.
 3      Q.  But I'm just trying to identify the
 4  comment.
 5          And what's the form in which you would
 6  take a issue like that to Christi?
 7      A.  I might call Christi on the phone.  I might
 8  E-mail Christi.  I might send her a privileged
 9  letter.
10      Q.  Did you have any kind of regular compliance
11  obligations, anything you had to do on a monthly or
12  annual basis in terms of compliance reports?
13      A.  Our staff, our CEO's had monthly compliance
14  reports they filled out.  I personally did not fill
15  out a monthly compliance report, but our staffs did.
16  And I often wouldn't see them.
17      Q.  When you stay your staff, you who are
18  referring to?
19      A.  My CEO's and COO's of each region.
20      Q.  But you yourself didn't have any monthly
21  compliance --
22      A.  No.  I did it on an as-needed basis.
23      MR. WISEMAN:  Why don't we take a short
24  break.
25      THE VIDEOGRAPHER:  We're going off the
```

Page 64

```
 1  record.  The time is approximately 9:37 a.m.  This is
 2  the end of video cassette number one in the
 3  deposition, excuse me, of Jeffrey Heinemann.
 4          (Whereupon a short recess was taken.)
 5      THE VIDEOGRAPHER:  We're back on the record
 6  to continue the videotape deposition of Jeffrey
 7  Heinemann.  The time is approximately 9:45 a.m.  This
 8  is the beginning of video cassette number two.
 9      MR. WISEMAN:  You can put that previous
10  exhibit aside.
11          (Witness complies.)
12      MR. WISEMAN:  I'm going to hand you another
13  document which I'll ask the court reporter to mark as
14  Exhibit 3.
15          (Whereupon Exhibit No. 3 was marked.)
16      Q.  BY MR. WISEMAN:  I'll just ask you briefly
17  to look this over and tell me when you are done.
18      A.  Okay.
19      Q.  The first page of this document is an E-mail
20  from you to Carolyn Dykes regarding LCS Florida.
21          Can you tell me who Carolyn Dykes is?
22      A.  Carolyn was our reimbursement specialist.
23  She is a certified procedural coder, probably one of
24  the best in the country, and she basically ran -- had
25  overall responsibility for coding and our billing
```

DEPOSITION OF JEFFREY S. HEINEMANN

Page 161

1    Q.   Tell me a little more what you mean by
2  that.
3    A.   MGMA statistics are great if I have a
4  physician coming in a market, and I want to know what
5  is the market -- what's the market rate. MGMA
6  statistics are good if I need to know what average
7  overheads are and things like that.
8         But I have -- first of all, I had a lot
9  of experience. And second of all, I had a group of
10 doctors that have years of track history here.
11        So even if MGMA says you should be
12 doing X, I know they either have or haven't.
13        What's relevant to me is what are they
14 doing now, where do I think I can logically get them,
15 what can I do with overhead, and what kind of
16 compensation can I pay them from a restructuring
17 standpoint.
18        MGMA really didn't offer me a lot in
19 these situations.
20   Q.   Did you look at all at what other primary
21 care physicians were being paid in this market?
22   A.   No, again that's not relevant for this
23 situation, in my opinion.
24   Q.   Okay. And it's not relevant because you
25 have so much historical data on the practices?

Page 162

1    A.   Right, sure. It's like I gave you the
2  example before that if I have someone that's bringing
3  in 800,000, MGMA may say that you pay them between
4  200,000 and 300,000.
5         Well, I know I can pay this guy
6  probably 400,000 and be very justified in doing
7  that.
8         ... So it's really on the individual
9  situation.
10   Q.   But you're justified in doing that because
11 of the revenues that the practice is going to
12 generate, right?
13   A.   Revenues, expenses, sure, the whole picture.
14   Q.   So when you looked at these LCS contracts,
15 and you saw that the compensation was out of whack
16 with the revenue requirements, did it ever occur to
17 you this may be a problem because these are not
18 consistent with what I would expect to see a doctor
19 paid with this kind of productivity requirements?
20   A.   The only problem that I foresaw is that when
21 we could escape from these contracts, whether it be
22 renewal, whether it be some sort of buy out,
23 whatever, then I knew that based on the volumes that
24 I'm seeing, the historical volumes, I need to make
25 certain changes.

Page 163

1         I didn't really concern myself with why
2  are they there as much as what is there.
3    Q.   On the second page of his memorandum,
4  actually the very last paragraph, Mr. Bennett states,
5  "These issues were pointed out previously, and were
6  addressed by my superiors. However, no one has
7  shared directly with me their opinions upon which
8  any conclusions were based. Therefore, I am
9  requesting that you help me to gain the comfort I
10 need to move on with other, more pressing matters."
11        What steps did you take to help
12 Mr. Bennett -- to respond to this request on
13 Mr. Bennett's part?
14   A.   I sent it to our legal, Christi.
15   Q.   Did you tell Mr. Bennett that you had done
16 that?
17   A.   Oh, yes.
18   Q.   Did you take any other steps, other than
19 sending this to Christi, and maybe it would have been
20 redundant to do anything else, but did you take any
21 steps to report this as a compliance matter or a
22 compliance issue?
23   A.   No, I did not because I wasn't aware if it
24 was a compliance issue or not. That's why I sent it
25 to Christi to see if it was.

Page 164

1    Q.   If you had felt that it was a compliance
2  issue, would you have taken any steps other than
3  sending it to Christi?
4    A.   I may have wrote a cover memo.
5         As I recall, I don't know if I sent her
6  an E-mail or phone call, but I may have voiced my
7  opinion, but I didn't because, again, I didn't really
8  have an opinion. I didn't have enough background or
9  knowledge.
10   Q.   Bear with me for one second.
11   A.   Sure.
12   Q.   I'm going to hand you a document that I'll
13 ask the court reporter to mark as Exhibit 8.
14        (Whereupon Exhibit 8 was marked.)
15        THE WITNESS: Okay.
16   Q.   BY MR. WISEMAN: Have you ever seen this
17 document before, Mr. Heinemann?
18   A.   I believe I saw it yesterday.
19   Q.   But you don't recall ever seeing it before
20 that?
21   A.   I don't, no.
22   Q.   This is a document entitled, "North Ridge
23 Medical Center Practice Contract Analysis," and then
24 it states "16 September, 1993, Tesner."
25        Do you know if this was a document that

**EXHIBIT 7**

# COPY OF TRANSCRIPT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

UNITED STATES OF AMERICA, ex. rel.,
SAL A. BARBERA,

                              PLAINTIFF(s),

V.

                           **CASE NO. 97-6590-CIV-JORDAN/BROWN**

AMISUB (NORTH RIDGE HOSPITAL), INC.,
et al.,

                              DEFENDANT(s).

---

### VIDEO DEPOSITION FOR THE PLAINTIFF,
### UNITED STATES OF AMERICA:

The Video Deposition of **Monica Lynn Bowman**, taken in the above-styled matter at the U.S. Attorney's Office, 510 West Broadway, Eighth Floor, Louisville, Kentucky, on the 1st day of April, 2003, beginning at 8:52 a.m.

# Court Reporting Services, Inc.

## At Your Fingertips



502.899.1663                         888.430.1521

FAX 502.899.7976
6011 Brownsboro Park Boulevard, Suite G, Louisville, Kentucky 40207

admin@CourtReportingKY.com                       www.CourtReportingKY.com

1    Q.   And to be clear about that e-mail you were

2    referring to, is that the March 31, 1998 e-mail

3    dated -- or it's part of Exhibit 21?

4    A.   Let me look very quickly.  Yes.

5    Q.   So is it fair to say that at least in your

6    experience Dr. Yesner did not always accurately

7    recall or reflect discussions that took place in

8    contract negotiations?

9    A.   In this particular circumstance, I would

10   agree with that; yes.

11   Q.   And you don't have any way of knowing

12   whether he was accurately reflecting what he and

13   Don Steigman had spoken about four years earlier

14   when he says he was offered 300,000 to convert his

15   patients?

16   A.   No, I have no way of knowing that.

17   Q.   You -- in an answer to a question of Mr.

18   Wiseman you say that you don't recall having Stark

19   resources available to you when you arrived at your

20   job in 1997.  By that statement I assume you were

21   excluding the availability of legal counsel?

22   A.   As I recall, the question he asked was if

23   there were any resources in the Tenet Physician

24   Services office at the time that I joined.  And my

25   response was no.  And you're correct, we did have



1    legal counsel as a resource. I was referring to

2    paper resources or reference materials.

3        Q.    What was your impression of the

4    reputation that the LCS physicians had in the

5    community?

6        A.    Personal reputations, clinical reputations?

7        Q.    Both.

8        A.    Personal reputations I don't know. I don't

9    have a good feel and didn't have a lot of knowledge

10   related to that. From a clinical perspective, most

11   of the LCS physicians had very good reputations as

12   clinical physicians.

13       Q.    And when you went forward in your job to

14   try to acquire managed care contracts, was the

15   reputation of the LCS physicians of benefit to you

16   in any of those discussions?

17       A.    I'm not sure whether it was the reputation

18   of the physicians, the geographic location of the

19   physicians. But definitely when we were in

20   negotiations, specifically with the Humana contract

21   for some of the physicians in the other portions of

22   the Florida market, specifically in the Miami and

23   Hollywood area, Humana was very interested in

24   talking with us as long as we were willing to

25   discuss with them contracting the LCS physicians

**Court Reporting Services, Inc.**
At Your Fingertips

582.899.1663          888.430.1521

FAX 502.899.7576
6011 Brownsboro Park Boulevard · Suite G · Louisville, Kentucky 40207

admin@CourtReportingKY.com                    www.CourtReportingKY.com

**EXHIBIT 8**

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECEPIENT (S) | DOCUMENT TYPE & SUBJECT MATTER | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|
| FLAPP/548482 | 06/17/1998 | Bowman, Monica L. | Miller, Emil P. | E-Mail | AC |
| | | | Steigman, Donald S. | Re: Dr. Nigen agreements | WP |
| FLAPP/548482.001 | 06/17/1998 | Miller, Emil P. | Bowman, Monica L. | E-Mail | AC |
| | | | Steigman, Donald S. | Re: Dr. Nigen agreements | WP |
| FLAPP/548482.002 | 06/17/1998 | Bowman, Monica L. | Simon, Richard | E-Mail | AC |
| | | | Colasacco, Julie | Re: Dr. Nigen agreements | WP |
| | | | Miller, Emil P. | | |
| | | | Young, Steve | | |
| FLAPP/548482.003-FLAPP/548484 | 06/10/1998 | Simon, Richard | Bowman, Monica | E-Mail | AC |
| | | | Colasacco, Julie | Re: Dr. Nigen agreements | WP |
| | | | Miller, Emil P. | | |
| | | | Young, Steve | | |
| FLAPP/548485 | 06/17/1998 | Miller, Emil P. | Bowman, Monica L. | E-Mail | AC |
| | | | Steigman, Donald S. | Re: Dr. Nigen agreements | WP |
| FLAPP/548485.001 | 06/17/1998 | Bowman, Monica L. | Simon, Richard | E-Mail | AC |
| | | | Colasacco, Julie | Re: Dr. Nigen agreements | WP |
| | | | Miller, Emil P. | | |
| | | | Young, Steve | | |
| FLAPP/548486-FLAPP/548488 | 06/10/1998 | Simon, Richard | Bowman, Monica | E-Mail | AC |
| | | | Colasacco, Julie | Re: Dr. Nigen agreements | WP |
| | | | Miller, Emil P. | | |
| | | | Young, Steve | | |
| FLAPP/548489 | 04/06/1998 | Bowman, Monica L. | Miller, Emil P. | E-Mail | AC |
| | | | Heinemann, Jeff | Re: Copen, Dolchin & Gozansky | |
| | | | Steigman, Donald S. | agreements | |
| FLAPP/548489.001 | 04/06/1998 | Miller, Emil P. | Bowman, Monica L. | E-Mail | AC |
| | | | Heinemann, Jeff | Re: Copen, Dolchin & Gozansky | |
| | | | Steigman, Donald S. | agreements | |
| FLAPP/548489.002 | 04/05/1998 | Bowman, Monica L. | Miller, Emil P. | E-Mail | AC |
| | | | Heinemann, Jeff | Re: Copen, Dolchin & Gozansky | |
| | | | Steigman, Donald S. | agreements | |
| FLAPP/548490 | 04/06/1998 | Miller, Emil P. | Bowman, Monica L. | E-Mail | AC |
| | | | Heinemann, Jeff | Re: Copen, Dolchin & Gozansky | |
| | | | Steigman, Donald S. | agreements | |

# 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECEPIENT (S) | DOCUMENT TYPE & SUBJECT MATTER | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|
| FLAPP/548514.001 | 11/07/1997 | Heinemann, Jeff | Bowman, Monica L. Bryan, Mark H. Miller, Emil P. Steigman, Donald S. Summers, Carol | E-Mail Re[2]: Homer / Bloom / Guida agreements | AC |
| FLAPP/548514.002 | 11/07/1997 | Steigman, Donald S. | N/A | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548514.003 | 11/07/1997 | Bowman, Monica L. | Miller, Emil P. Steigman, Donald S. | E-Mail RE: Homer / Bloom / Guida agreements | AC |
| FLAPP/548515 | 11/06/1997 | Steigman, Donald S. | Miller, Emil P. Bowman, Monica L. Heinemann, Jeff | E-Mail RE: Homer / Bloom / Guida agreements | AC |
| FLAPP/548515.001-FLAPP/548516 | 11/06/1997 | Miller, Emil P. | Steigman, Donald S. | E-Mail Homer / Bloom / Guida agreements | AC |
| FLAPP/548517.001 | 10/18/1997 | Steigman, Donald S. | N/A | E-Mail RE: Re[2]: Drs. Homer, Bloom, Bloom & Guida agreements | AC |
| FLAPP/548517.002 | 10/18/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Bryan, Mark Miller, Emil P. Schochet, Barry P. | E-Mail Re[2]: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548518 | 10/17/1997 | Steigman, Donald S. | N/A | E-Mail RE: Drs. Homer. Bloom & Guida agreements | AC |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECEPIENT (S) | DOCUMENT TYPE & SUBJECT MATTER | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|
| FLAPP/548518.001 | 10/15/1997 | Heinemann, Jeff | Bowman, Monica L. Bryan, Mark Miller, Emil P. Steigman, Donald S. Schochet, Barry P. | E-Mail Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548519 | 10/18/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Bryan, Mark Miller, Emil P. Schochet, Barry P. | E-Mail Re[2]: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548519.001 | 10/17/1997 | Steigman, Donald S. | N/A | E-Mail RE: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548519.002 | 10/15/1997 | Heinemann, Jeff | Bowman, Monica L. Bryan, Mark Miller, Emil P. Steigman, Donald S. Schochet, Barry P. | E-Mail Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548520 | 09/23/1997 | Miller, Emil P. | Bryan, Mark H. | E-Mail RE: Drs. Homer, Bloom and Guida agreement | AC |
| FLAPP/548520.001 | 09/23/1997 | Miller, Emil P. | Bryan, Mark | E-Mail Fw: Drs. Homer, Bloom and Guida agreements | AC |
| FLAPP/548521 | 11/10/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Bryan, Mark H. Schochet, Barry P. Smith, W. Randolph (Randy) Summers, Carol | E-Mail Re[6]: Homer / Bloom / Guida agreements | AC |
| FLAPP/548521.001 | 11/09/1997 | Steigman, Donald S. | N/A | E-Mail RE: RE[4]: Homer / Bloom / Guida agreements | AC |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT (S) | DOCUMENT TYPE & SUBJECT MATTER | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|
| FLAPP/548521.002 | 11/08/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Schochet, Barry P. Smith, Randy Summers, Carol | E-Mail Re[4]: Homer / Bloom / Guida agreements | AC |
| FLAPP/548522 | 11/08/1997 | Steigman, Donald S. | N/A | E-Mail Re: Re[2]: Homer / Bloom / Guida agreements | AC |
| FLAPP/548523 | 11/07/1997 | Heinemann, Jeff | Bowman, Monica L. Bryan, Mark H. Miller, Emil P. Steigman, Donald S. Summers, Carol | E-Mail Re[2]: Homer / Bloom / Guida agreements | AC |
| FLAPP/548523.001 | 11/07/1997 | Steigman, Donald S. | N/A | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548523.002 | 11/07/1997 | Bowman, Monica L. | Miller, Emil P. Steigman, Donald S. | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548524 | 11/06/1997 | Steigman, Donald S. | Miller, Emil P. Bowman, Monica L. Heinemann, Jeff | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548524.001 | 11/06/1997 | Miller, Emil P. | Steigman, Donald S. | E-Mail Homer / Bloom / Guida agreements | AC |
| FLAPP/548525 | 07/10/1998 | Steigman, Donald S. | Bryan, Mark Bowman, Monica L. | E-Mail FW: Shapiro / Angelillo agreement | AC WP |
| FLAPP/548526 | 07/10/1998 | Bryan, Mark | Miller, Emil P. | E-Mail Re: Shapiro / Angelillo agreement | AC WP |
| FLAPP/548526.001 | 07/10/1998 | Bryan, Mark | Miller, Emil P. Steigman, Donald S. | E-Mail FW: Shapiro / Angelillo agreement | AC WP |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECEPIENT (S) | DOCUMENT TYPE & SUBJECT MATTER | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|
| FLAPP/548526.002 | 07/09/1998 | Steigman, Donald S. | Bryan, Mark; Miller, Emil P.; Mirarchi, Bert | E-Mail FW: Shapiro / Angelillo agreement | AC WP |
| FLAPP/548528 | 11/21/1997 | Bryan, Mark | | E-Mail Re: physician agreements | AC |
| FLAPP/548528.002 | 11/17/1997 | Bowman, Monica L. | Miller, Emil P.; Heinemann, Jeff; Paparestam Stephanie; Steigman, Donald S.; Stern, Joseph R. | E-Mail Re: physician agreements | AC |
| FLAPP/548528.003 | 09/25/1997 | Bowman, Monica L. | Miller, Emil P.; Paparesta, Stephanie; Steigman, Donald S. | E-Mail Re: physician agreements | AC |
| FLAPP/548529 | 07/09/1998 | Steigman, Donald S. | Bryan, Mark; Miller, Emil P. | E-Mail FW: Shapiro / Angelillo agreements | AC WP |
| FLAPP/548530.001 | 11/17/1997 | Bowman, Monica L. | Miller, Emil P.; Heinemann, Jeff; Paparesta, Stephanie; Steigman, Donald S.; Stern, Joseph R. | E-Mail FW: Physician agreements | AC |
| FLAPP/548530.002 | 09/25/1997 | Bowman, Monica L. | Miller, Emil P.; Paparesta, Stephanie; Steigman, Donald S. | E-Mail Physician Agreements | AC |
| FLAPP/548531 | 07/07/1998 | Bryan, Mark | Miller, Emil P. | E-Mail Re: Lauderdale Clinical Services agreements | AC WP |
| FLAPP/548531.001 | 07/07/1998 | Miller, Emil P. | Bryan, Mark; Steigman, Donald S. | E-Mail Re: Lauderdale Clinical Services agreements | AC WP |
| FLAPP/548531.002 | 07/10/1998 | Bryan, Mark | Miller, Emil P.; Steigman, Donald S. | E-Mail FW: Shapiro / Angelillo agreements | AC WP |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECEPIENT (S) | DOCUMENT TYPE & SUBJECT MATTER | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|
| FLAPP/548531.003 | 07/09/1998 | Steigman, Donald S. | Bryan, Mark<br>Miller, Emil P. | E-Mail<br>FW: Shapiro / Angelillo agreements | AC<br>WP |
| FLAPP/548533 | 11/10/1997 | Heinemann, Jeff | Steigman, Donald S.<br>Bowman, Monica L.<br>Bryan, Mark H.<br>Schochet, Barry P.<br>Smith, W. Randolph<br>(Randy) Summers, Carol | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC<br>WP |
| FLAPP/548533.001 | 11/09/1997 | Steigman, Donald S. | Heinemann, Jeff | E-Mail<br>RE: Homer / Bloom / Guida agreements | AC |
| FLAPP/548533.002 | 11/08/1997 | Heinemann, Jeff | Steigman, Donald S.<br>Bowman, Monica L.<br>Bryan, Mark H.<br>Schochet, Barry P.<br>Smith, W. Randolph<br>(Randy) Summers, Carol | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548534 | 11/08/1997 | Steigman, Donald S. | Heinemann, Jeff | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548535 | 11/07/1997 | Heinemann, Jeff | Bowman, Monica L.<br>Steigman, Donald S.<br>Bryan, Mark H.<br>Miller, Emil P.<br>Summers, Carol | E-Mail<br>Re [2] Homer / Bloom / Guida agreements | AC |
| FLAPP/548535.001 | 11/07/1997 | Steigman, Donald S. | N/A | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |

# 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECEPIENT (S) | DOCUMENT TYPE & SUBJECT MATTER | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|
| FLAPP/548535.002 | 11/07/1997 | Bowman, Monica L. | Miller, Emil P.<br>Steigman, Donald S.<br>Heinemann, Jeff | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548536 | 11/06/1997 | Steigman, Donald S. | Miller, Emil P.<br>Bowman, Monica L.<br>Heinemann, Jeff | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548536.001 | 11/06/1997 | Miller, Emil P. | Steigman, Donald S. | E-Mail<br>Homer / Bloom / Guida agreements | AC |
| FLAPP/548537.001 | 10/18/1997 | Steigman, Donald S. | Heinemann, Jeff | E-Mail<br>Re: Re [2]: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548537.002 | 10/18/1997 | Heinemann, Jeff | Steigman, Donald S.<br>Bowman, Monica<br>Bryan, Mark<br>Miller, Emil P.<br>Schochet, Barry P. | E-Mail<br>Re [2]: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548538 | 10/17/1997 | Steigman, Donald S. | Heinemann, Jeff | E-Mail<br>Re: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548538.001 | 10/15/1997 | Heinemann, Jeff | Bowman, Monica L.<br>Bryan, Mark<br>Miller, Emil P.<br>Steigman, Donald S.<br>Schochet, Barry P. | E-Mail<br>Drs. Homer, Bloom, & Guida agreements | AC |
| FLAPP/548539 | 10/18/1997 | Heinemann, Jeff | Steigman, Donald S.<br>Bowman, Monica L.<br>Bryan, Mark<br>Miller, Emil P.<br>Schochet, Barry P. | E-Mail<br>Re [2]: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548539.001 | 10/17/1997 | Steigman, Donald S. | Heinemann, Jeff | E-Mail<br>Re: Drs. Homer, Bloom & Guida agreements | AC |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECEPIENT (S) | DOCUMENT TYPE & SUBJECT MATTER | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|
| FLAPP/548539.002 | 10/15/1997 | Heinemann, Jeff | Bowman, Monica L. Bryan, Mark Miller, Emil P. Steigman, Donald S. Schochet, Barry P. | E-Mail Drs. Homer, Bloom, & Guida agreements | AC |
| FLAPP/548540 | 09/23/1997 | Bryan, Mark H. | Miller, Emil P. | E-Mail RE: Drs. Homer, Bloom and Guida agreements | AC |
| FLAPP/548540.001 | 09/23/1997 | Miller, Emil P. | Bryan, Mark | E-Mail Fw: Drs. Homer, Bloom and Guida agreements | AC |
| FLAPP/548541 | 07/02/1997 | Bryan, Mark H. | Renneker, David Steigman, Donald S. | E-Mail Re: Nassberg agreement | AC |
| FLAPP/548541.001 | 07/02/1997 | Renneker, David | Bryan, Mark Sshwarzkopf, Paul | E-Mail FW: Sheldon Nassberg agreement | AC |
| FLAPP/548541.002 | 06/30/1997 | Miller, Emil P. | Renneker, David | E-Mail FW: Sheldon Nassberg agreement | AC |
| FLAPP/548544 | 11/10/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Bryan, Mark H. Schochet, Barry P. Smith, W. Randolph (Randy) Summers, Carol | E-Mail Re [6]: Homer / Bloom / Guida agreements | AC |
| FLAPP/548544.001 | 11/09/1997 | Steigman, Donald S. | Heinemann, Jeff | E-Mail RE: RE [4]: Homer / Bloom / Guida agreements | AC |
| FLAPP/548545 | 11/08/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Schochet, Barry P. Smith, W. Randolph (Randy) Summers, Carol | E-Mail Re [4]: Homer / Bloom / Guida agreements | AC |
| FLAPP/548546 | 11/08/1997 | Steigman, Donald S. | Heinemann, Jeff N/A | E-Mail RE: Re [2]: Homer / Bloom / Guida agreements | AC |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECEPIENT (S) | DOCUMENT TYPE & SUBJECT MATTER | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|
| FLAPP/548546.001 | 11/07/1997 | Heinemann, Jeff | Bowman, Monica L. Steigman, Donald S. Bryan, Mark Miller, Emil P. Summers, Carol | E-Mail Re [2]: Homer / Bloom / Guida agreements | AC |
| FLAPP/548546.002 | 11/07/1997 | Steigman, Donald S. | N/A | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548546.003 | 11/07/1997 | Bowman, Monica L. | Miller, Emil P. Steigman, Donald S. Heinemann, Jeff | E-Mail RE: Homer / Bloom / Guida agreements | AC |
| FLAPP/548547 | 11/06/1997 | Steigman, Donald S. | Miller, Emil P. Bowman, Monica L. Heinemann, Jeff | E-Mail RE: Homer / Bloom / Guida agreements | AC |
| FLAPP/548547.001-FLAPP/548548 | 11/06/1997 | Miller, Emil P. | Steigman, Donald S. | E-Mail Homer / Bloom / Guida agreements | AC |
| FLAPP/548549.001 | 10/18/1997 | Steigman, Donald S. | Heinemann, Jeff | E-Mail Re: Re [2]: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548549.002 | 10/18/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica Bryan, Mark Miller, Emil P. Schochet, Barry P. | E-Mail Re [2]: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548550 | 10/17/1997 | Steigman, Donald S. | Heinemann, Jeff | E-Mail RE: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548550.001 | 10/15/1997 | Heinemann, Jeff | Bowman, Monica L. Bryan, Mark Miller, Emil P. Steigman, Donald S. Schochet, Barry P. | E-Mail Drs. Homer, Bloom & Guida agreements | AC |

# 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT (S) | DOCUMENT TYPE & SUBJECT MATTER | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|
| FLAPP/548551 | 10/18/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Bryan, Mark Miller, Emil P. Schochet, Barry P. Heinemann, Jeff | E-Mail RE (2): Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548551.001 | 10/17/1997 | Steigman, Donald S. | | E-Mail RE: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548551.002 | 10/15/1997 | Heinemann, Jeff | Bowman, Monica L. Bryan, Mark Miller, Emil P. Steigman, Donald S. Schochet, Barry P. Miller, Emil P. | E-Mail Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548552 | 09/23/1997 | Bryan, Mark H. | | E-Mail Re: Drs. Homer, Bloom and Guida agreements | AC |
| FLAPP/548552.001 | 09/23/1997 | Miller, Emil P. | Bryan, Mark | E-Mail Fw: Drs. Homer, Bloom and Guida agreements | AC |
| FLAPP/548554.001 | 03/24/1998 | Bowman, Monica L. | N/A | E-Mail Re: Guida agreements | AC WP |
| FLAPP/548554.002 | 03/24/1998 | Colasacco, Julie | Bowman, Monica L. Heinemann, Jeff Simon, Richard | E-Mail Guida agreements | AC WP |
| FLAPP/548555 | 03/25/1998 | Heinemann, Jeff | Goldman, Donald A., Esq. Miller, Emil P. Steigman, Donald S. | E-Mail Re: Guida agreements | AC WP |
| FLAPP/548555.001 | 03/24/1998 | Colasacco, Julie | Bowman, Monica L. Heinemann, Jeff Simon, Richard | E-Mail Guida agreements | AC |
| FLAPP/548556 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail FW: Homer & Bloom agreements | AC |
| FLAPP/548556.001 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail Re: Homer and Bloom agreements | AC |
| FLAPP/548556.002 | 03/24/1998 | Steigman, Donald S. | Miller, Emil P. | E-Mail Re: Homer and Bloom agreements | AC |
| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| | | | | | |
|---|---|---|---|---|---|
| FLAPP/548556.003 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail<br>Re: Horner and Bloom agreements | AC |
| FLAPP/548557 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail<br>Re: Horner and Bloom agreements | AC |
| FLAPP/548557.001 | 03/24/1998 | Steigman, Donald S. | Miller, Emil P. | E-Mail<br>Re: Horner and Bloom agreements | AC |
| FLAPP/548557.002 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail<br>Re: Horner and Bloom agreements | AC |
| FLAPP/548558 | 03/24/1998 | Heinemann, Jeff | Steigman, Donald S.<br>Bowman, Monica L.<br>Miller, Emil P.<br>Schochet, Barry P.<br>Smith, Randy | E-Mail<br>Re: Horner and Bloom agreements | AC |
| FLAPP/548558.001 | 03/23/1998 | Steigman, Donald S. | N/A | E-Mail<br>Re: Horner and Bloom agreements | AC |
| FLAPP/548560 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail<br>Re: Horner and Bloom agreements | AC |
| FLAPP/548562.002-FLAPP/548563 | 03/04/1998 | Bowman, Monica L. | N/A | E-Mail<br>Re: Bloom, Horner & Guida agreements | AC |
| FLAPP/548564 | 03/03/1998 | Heinemann, Jeff | Bowman, Monica L.<br>Miller, Emil P.<br>Simon, Richard<br>Steigman, Donald S.<br>Windnagle, Daniel T.<br>Heinemann, Jeff | E-Mail<br>Re: Bloom, Horner & Guida agreements | AC |
| FLAPP/548564.001-FLAPP/548565 | 03/03/1998 | Bowman, Monica L. | | E-Mail<br>Re: Bloom, Horner & Guida agreements | AC |
| FLAPP/548566.001-FLAPP/548567 | 03/04/1998 | Bowman, Monica L. | N/A | E-Mail<br>Re: Bloom, Horner & Guida agreements | AC |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548568 | 03/03/1998 | Heinemann, Jeff | Bowman, Monica L. Miller, Emil P. Simon, Richard Steigman, Donald S. Windnagle, Daniel T. | E-Mail Re: Bloom, Homer & Guida agreements | AC |
| FLAPP/548568.001-FLAPP/548570 | 03/03/1998 | Bowman, Monica L. | Heinemann, Jeff | E-Mail Bloom, Homer & Guida agreements | AC |
| FLAPP/548571.001-FLAPP/548572 | 02/05/1998 | Bowman, Monica L. | N/A | E-Mail Re: Copen, Dolchin, Gozansky agreement | AC |
| FLAPP/548573 | 11/05/1997 | Heinemann, Jeff | Bowman, Monica L. Steigman, Donald S. Miller, Emil P. | E-Mail Re(2) : Lauderdale Clinical Services agreements | AC |
| FLAPP/548573.001 | 11/04/1997 | Steigman, Donald S. | N/A | E-Mail Re: Lauderdale Clinical Services agreements | AC |
| FLAPP/548573.002-FLAPP/548574 | 11/04/1997 | Bowman, Monica L. | Miller, Emil P. Steigman, Donald S. Heinemann, Jeff Simon, Richard | E-Mail Lauderdale Clinical Services agreements | AC |
| FLAPP/548575 | 10/24/1997 | Heinemann, Jeff | Steigman, Donald S. | E-Mail Lauderdale Clinical Services agreements | AC |
| FLAPP/548576 | 03/08/1998 | Steigman, Donald S. | Miller, Emil P. Bowman, Monica L. | E-Mail Re: Bloom, Homer & Guida agreements | AC |
| FLAPP/548576.003-FLAPP/548577 | 03/04/1998 | Bowman, Monica L. | N/A | E-Mail Re: Bloom, Homer & Guida agreements | AC |
| FLAPP/548578 | 03/03/1998 | Heinemann, Jeff | Bowman, Monica L. Miller, Emil P. Simon, Richard Steigman, Donald S. Windnagle, Daniel T. | E-Mail Re: Bloom, Homer & Guida agreements | AC |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548578.001-FLAPP/548580 | 03/03/1998 | Bowman, Monica L. | Heinemann, Jeff | E-Mail Bloom, Homer & Guida agreements | AC |
| FLAPP/548581.002 | 03/24/1998 | Steigman, Donald S. | N/A | E-Mail Re: Homer and Bloom agreements | AC |
| FLAPP/548582 | 03/24/1998 | Steigman, Donald S. | Miller, Emil P. | E-Mail Re: Homer and Bloom agreements | AC |
| FLAPP/548582.001 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail Re: Homer and Bloom agreements | AC |
| FLAPP/548583 | 09/29/1997 | Heinemann, Jeff | Bowman, Monica L. Feldman, Mitch Steigman, Donald S. | E-Mail Re[2]: Dr. Davis agreements | AC |
| FLAPP/548583.001 | 09/26/1997 | Bowman, Monica L. | N/A | E-Mail Re: Dr. Davis agreements | AC |
| FLAPP/548583.002 | 09/26/1997 | Feldman, Mitch | Bowman, Monica L. Steigman, Donald S. | E-Mail Re: Dr. Davis | AC |
| FLAPP/548584 | 09/26/1997 | Bowman, Monica L. | Feldman, Mitch Heinemann, Jeff Steigman, Donald S. | E-Mail Dr. Davis agreements | AC |
| FLAPP/548584.001 | 09/26/1997 | Bowman, Monica L. | Feldman, Mitch Heinemann, Jeff Steigman, Donald S. | E-Mail RE: Dr. Davis agreements | AC |
| FLAPP/548584.002 | 09/26/1997 | Feldman, Mitch | Bowman, Monica L. Steigman, Donald S. | E-Mail RE: Dr. Davis agreements | AC |
| FLAPP/548584.003 | 09/26/1997 | Bowman, Monica L. | Feldman, Mitch Heinemann, Jeff Steigman, Donald S. | E-Mail Dr. Davis agreements | AC |
| FLAPP/548585 | 09/26/1997 | Feldman, Mitch | Bowman, Monica L. Steigman, Donald S. | E-Mail Re: Dr. Davis agreements | AC |
| FLAPP/548585.001 | 09/26/1997 | Bowman, Monica L. | Feldman, Mitch Heinemann, Jeff Steigman, Donald S. | E-Mail Dr. Davis agreements | AC |
| FLAPP/548586 | 09/26/1997 | Bowman, Monica L. | Feldman, Mitch Heinemann, Jeff Steigman, Donald S | E-Mail Dr. Davis agreements | AC |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548587 | 09/26/1997 | Steigman, Donald S. | Bowman, Monica L.<br>Heinemann, Jeff | E-Mail<br>Re: Dr. Davis agreements | AC |
| FLAPP/548587.001 | 09/26/1997 | Bowman, Monica L. | Feldman, Mitch<br>Heinemann, Jeff<br>Steigman, Donald S. | E-Mail<br>Re: Dr. Davis agreements | AC |
| FLAPP/548588 | 06/20/1998 | Bowman, Monica L. | Miller, Emil P.<br>Steigman, Donald S. | E-Mail<br>Re: Dr. Nigen agreements | AC<br>WP |
| FLAPP/548588.001 | 06/17/1998 | Miller, Emil P. | Bowman, Monica L.<br>Steigman, Donald S. | E-Mail<br>Re: Dr. Nigen agreements | AC<br>WP |
| FLAPP/548588.002 | 06/17/1998 | Bowman, Monica L. | Miller, Emil P.<br>Steigman, Donald S. | E-Mail<br>Re: Dr. Nigen agreements | AC<br>WP |
| FLAPP/548588.003 | 06/17/1998 | Miller, Emil P. | Bowman, Monica L.<br>Steigman, Donald S. | E-Mail<br>Re: Dr. Nigen agreements | AC<br>WP |
| FLAPP/548588.004 | 06/17/1998 | Bowman, Monica L. | Simon, Richard<br>Colasacco, Julie<br>Miller, Emil P. | E-Mail<br>Re: Dr. Nigen agreements | AC<br>WP |
| FLAPP/548588.005-FLAPP/548591 | 06/10/1998 | Simon, Richard | Bowman, Monica L.<br>Colasacco, Julie<br>Miller, Emil P.<br>Young, Steve | E-Mail<br>Re: Dr. Nigen agreements | AC<br>WP |
| FLAPP/548592 | 06/17/1998 | Miller, Emil P. | Bowman, Monica L.<br>Steigman, Donald S. | E-Mail<br>Re: Dr. Nigen agreements | AC<br>WP |
| FLAPP/548592.001 | 06/17/1998 | Bowman, Monica L. | Miller, Emil P.<br>Steigman, Donald S. | E-Mail<br>Re: Dr. Nigen agreements | AC<br>WP |
| FLAPP/548592.002 | 06/17/1998 | Miller, Emil P. | Bowman, Monica L.<br>Steigman, Donald S. | E-Mail<br>Re: Dr. Nigen agreements | AC<br>WP |
| FLAPP/548592.003 | 06/17/1998 | Bowman, Monica L. | Simon, Richard<br>Colasacco, Julie<br>Miller, Emil P.<br>Young, Steve | E-Mail<br>Re: Dr. Nigen agreements | AC<br>WP |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548592.004-FLAPP/548595 | 06/10/1998 | Simon, Richard | Bowman, Monica L. Colasacco, Julie Miller, Emil P. Young, Steve | E-Mail Re: Dr. Nigen agreements | AC WP |
| FLAPP/548596 | 06/17/1998 | Bowman, Monica L. | Miller, Emil P. Steigman, Donald S. | E-Mail Re: Dr. Nigen agreements | AC WP |
| FLAPP/548596.001 | 06/17/1998 | Miller, Emil P. | Bowman, Monica L. Steigman, Donald S. | E-Mail Re: Dr. Nigen agreements | AC WP |
| FLAPP/548596.002 | 06/17/1998 | Bowman, Monica L. | Simon, Richard Colasacco, Julie Miller, Emil P. Young, Steve | E-Mail Re: Dr. Nigen agreements | AC WP |
| FLAPP/548596.003-FLAPP/548598 | 06/10/1998 | Simon, Richard | Bowman, Monica L. Colasacco, Julie Miller, Emil P. Young, Steve | E-Mail Re: Dr. Nigen agreements | AC WP |
| FLAPP/548599 | 06/17/1998 | Miller, Emil P. | Bowman, Monica L. Steigman, Donald S. | E-Mail Re: Dr. Nigen agreements | AC WP |
| FLAPP/548599.001 | 06/17/1998 | Bowman, Monica L. | Simon, Richard Colasacco, Julie Miller, Emil P. Young, Steve | E-Mail Re: Dr. Nigen agreements | AC WP |
| FLAPP/548599.002-FLAPP/548602 | 06/10/1998 | Simon, Richard | Bowman, Monica L. Colasacco, Julie Miller, Emil P. Young, Steve | E-Mail Re: Dr. Nigen agreements | AC WP |
| FLAPP/548604 | 04/17/1998 | Simon, Richard | Bowman, Monica L. | E-Mail Re: Bloom Homer & Guida agreements | AC |
| FLAPP/548605.002 | 04/17/1998 | Simon, Richard | Bowman, Monica L. | E-Mail Re: Bloom, Homer & Guida agreements | AC |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548616.002 | 03/24/1998 | Zuniga, Dianna | N/A | E-Mail FW: Drs. Homer, Bloom, and Guida agreements | AC |
| FLAPP/548618.001 | 03/24/1998 | Bowman, Monica L. | N/A | E-Mail Re: Dr. Guida agreements | AC |
| FLAPP/548618.002 | 03/24/1998 | Colasacco, Julie | Bowman, Monica L. Heinemann, Jeff Simon, Richard | E-Mail Re: Dr. Guida agreements | AC |
| FLAPP/548619.001 | 03/24/1998 | Zuniga, Dianna | N/A | E-Mail FW: Drs. Homer, Bloom, and Guida agreements | AC |
| FLAPP/548621.001 | 03/24/1998 | Colasacco, Julie | N/A | E-Mail Re: Guida agreement | AC |
| FLAPP/548622 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail Re: Homer and Bloom agreement | AC |
| FLAPP/548622.001 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail Re: Homer and Bloom agreement | AC |
| FLAPP/548622.002 | 03/24/1998 | Steigman, Donald S. | Miller, Emil P. | E-Mail Re: Homer and Bloom agreement | AC |
| FLAPP/548622.003 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail FW: Homer and Bloom agreement | AC |
| FLAPP/548623.001 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail Re: Homer and Bloom agreement | AC |
| FLAPP/548623.002 | 03/24/1998 | Steigman, Donald S. | Miller, Emil P. | E-Mail Re: Homer and Bloom agreement | AC |
| FLAPP/548623.003 | 03/23/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail FW: Homer and Bloom agreement | AC |
| FLAPP/548624 | 03/24/1998 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Miller, Emil P. Schochet, Barry P. Smith, Randy | E-Mail Re: Homer and Bloom agreement | AC |
| FLAPP/548624.001 | 03/23/1998 | Steigman, Donald S. | N/A | E-Mail Re: Homer and Bloom agreement | AC |

# 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548624.002-FLAPP/548625 | 03/23/1998 | Heinemann, Jeff | Bowman, Monica L.<br>Miller, Emil P.<br>Simon, Richard<br>Steigman, Donald S. | E-Mail<br>Re: Homer and Bloom agreement | AC |
| FLAPP/548627 | 03/23/1998 | Steigman, Donald S. | N/A | E-Mail<br>Re: Homer, Bloom, and Guida agreements | AC |
| FLAPP/548629 | 03/24/1998 | Miller, Emil P. | Steigman, Donald S. | E-Mail<br>FW: Homer and Bloom agreements | AC |
| FLAPP/548632.001 | 03/23/1998 | Steigman, Donald S. | N/A | E-Mail<br>Re: Drs. Homer, Bloom, and Guida agreements | AC |
| FLAPP/548638 | 03/21/1998 | Simon, Richard | Heinemann, Jeff<br>Bowman, Monica L.<br>Miller, Emil P.<br>Steigman, Donald S. | E-Mail<br>Re: Drs. Homer, Bloom, and Guida agreements | AC |
| FLAPP/548640.001 | 03/17/1998 | Simon, Richard | N/A | E-Mail<br>Re: Guida agreement | AC |
| FLAPP/548640.002-FLAPP/548641 | 03/17/1998 | Miller, Emil P. | Heinemann, Jeff<br>Bowman, Monica L.<br>Simon, Richard<br>Steigman, Donald S. | E-Mail<br>Re: Guida agreement | AC |
| FLAPP/548643.002-FLAPP/548644 | 03/04/1998 | Bowman, Monica L. | N/A | E-Mail<br>Re: Homer, Bloom, and Guida agreements | AC |
| FLAPP/548645 | 03/03/1998 | Heinemann, Jeff | Bowman, Monica L.<br>Miller, Emil P.<br>Simon, Richard<br>Steigman, Donald S.<br>Windnagle, Daniel T. | E-Mail<br>Re: Homer, Bloom, and Guida agreements | AC |

# 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548670 | 11/10/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Bryan, Mark H. Schochet, Barry P. Smith, W. Randolph (Randy) Summers, Carol | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548670.001 | 11/09/1997 | Steigman, Donald S. | Heinemann, Jeff | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548670.002 | 11/08/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Bryan, Mark H. Schochet, Barry P. Smith, W. Randolph (Randy) Summers, Carol | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548671 | 11/08/1997 | Steigman, Donald S. | N/A | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548671.001 | 11/07/1997 | Heinemann, Jeff | Bowman, Monica L. Steigman, Donald S. Bryan, Mark H. Miller, Emil P. Summers, Carol | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548671.002 | 11/07/1997 | Heinemann, Jeff | Bowman, Monica L. Steigman, Donald S. Bryan, Mark H. Miller, Emil P. Summers, Carol | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548672 | 11/07/1997 | Steigman, Donald S. | N/A | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548672.001 | 11/07/1997 | Bowman, Monica L. | Miller, Emil P. Steigman, Donald S. Heinemann, Jeff | E-Mail Re: Homer / Bloom / Guida agreements | AC |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548673 | 11/06/1997 | Steigman, Donald S. | Miller, Emil P.<br>Bowman, Monica L.<br>Heinemann, Jeff | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548673.001 | 11/06/1997 | Miller, Emil P. | Steigman, Donald S. | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548674 | 11/08/1997 | Heinemann, Jeff | Steigman, Donald S.<br>Bowman, Monica L.<br>Bryan, Mark H.<br>Schochet, Barry P.<br>Smith, W. Randolph<br>(Randy) Summers, Carol | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548674.001 | 11/08/1997 | Steigman, Donald S. | N/A | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548675 | 11/07/1997 | Heinemann, Jeff | Bowman, Monica L.<br>Steigman, Donald S.<br>Bryan, Mark H.<br>Miller, Emil P.<br>Summers, Carol | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548675.001 | 11/07/1997 | Steigman, Donald S. | N/A | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548675.002 | 11/07/1997 | Bowman, Monica L. | Miller, Emil P.<br>Steigman, Donald S.<br>Heinemann, Jeff | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548675.003 | 11/06/1997 | Steigman, Donald S. | Miller, Emil P. | E-Mail<br>Re: Drs. Homer, Bloom and Guida agreements | AC |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548676.001 | 10/18/1997 | Steigman, Donald S. | N/A | E-Mail Re: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548677 | 10/18/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Bryan, Mark Miller, Emil P. Schochet, Barry P. | E-Mail Re: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548677.001 | 10/17/1997 | Steigman, Donald S. | N/A | E-Mail Re: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548677.002 | 10/15/1997 | Heinemann, Jeff | Bowman, Monica L. Bryan, Mark Miller, Emil P. Steigman, Donald S. Schochet, Barry P. | E-Mail Re: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548678 | 10/18/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Bryan, Mark Miller, Emil P. Schochet, Barry P. | E-Mail Re: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548678.001 | 10/17/1997 | Steigman, Donald S. | N/A | E-Mail Re: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548678.002 | 10/15/1997 | Heinemann, Jeff | Bowman, Monica L. Bryan, Mark Miller, Emil P. Steigman, Donald S. Schochet, Barry P. | E-Mail Re: Drs. Homer, Bloom & Guida agreements | AC |

# 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548685.001 | 10/18/1997 | Heinemann, Jeff | Steigman, Donald S.<br>Bowman, Monica L.<br>Bryan, Mark<br>Miller, Emil P.<br>Schochet, Barry P. | E-Mail<br>Re: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548685.002 | 10/17/1997 | Steigman, Donald S. | N/A | E-Mail<br>Re: Drs. Homer, Bloom & Guida agreements | AC |
| FLAPP/548685.003 | 10/15/1997 | Heinemann, Jeff | Bowman, Monica L.<br>Bryan, Mark<br>Miller, Emil P.<br>Steigman, Donald S.<br>Schochet, Barry P. | E-Mail<br>Re: Drs. Homer, Bloom, & Guida agreements | AC |
| FLAPP/548686 | 11/08/1997 | Steigman, Donald S. | Heinemann, Jeff | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548686.001 | 11/07/1997 | Heinemann, Jeff | Bowman, Monica L.<br>Steigman, Donald S.<br>Bryan, Mark H.<br>Miller, Emil P.<br>Summers, Carol | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548686.002 | 11/07/1997 | Steigman, Donald S. | N/A | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548686.003 | 11/07/1997 | Bowman, Monica L. | Miller, Emil P.<br>Steigman, Donald S.<br>Heinemann, Jeff | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548687 | 11/06/1997 | Steigman, Donald S. | Miller, Emil P.<br>Bowman, Monica L.<br>Heinemann, Jeff | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548687.001 | 11/06/1997 | Miller, Emil P. | Steigman, Donald S. | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |

# 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548687.002 | 11/09/1997 | Steigman, Donald S. | Heinemann, Jeff<br>Bryan, Mark<br>Schochet, Barry P.<br>Smith, Randy<br>Summers, Carol | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548687.003 | 11/08/1997 | Heinemann, Jeff | Steigman, Donald S.<br>Bowman, Monica L.<br>Bryan, Mark H.<br>Schochet, Barry P.<br>Smith, W. Randolph<br>(Barry), Summers, Carol | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548688 | 11/08/1997 | Steigman, Donald S. | N/A | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548688.001 | 11/07/1997 | Heinemann, Jeff | Bowman, Monica L.<br>Steigman, Donald S.<br>Bryan, Mark H.<br>Miller, Emil P.<br>Summers, Carol | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548689 | 11/07/1997 | Steigman, Donald S. | N/A | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548689.001 | 11/07/1997 | Bowman, Monica L. | Miller, Emil P.<br>Steigman, Donald S.<br>Heinemann, Jeff | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548689.002 | 11/06/1997 | Steigman, Donald S. | Miller, Emil P.<br>Bowman, Monica L.<br>Heinemann, Jeff | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548689.003 | 11/06/1997 | Miller, Emil P. | Steigman, Donald S. | E-Mail<br>Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548690 | 11/10/1997 | Steigman, Donald S. | Bryan, Mark<br>Miller, Emil P. | E-Mail<br>FW: Re Homer / Bloom /Guida agreements | AC |

# 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548690.001 | 11/10/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Bryan, Mark H. Schochet, Barry P. Smith, W. Randolph (Randy) Summers, Carol | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548690.002 | 11/09/1997 | Steigman, Donald S. | N/A | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548690.003 | 11/08/1997 | Heinemann, Jeff | Steigman, Donald S. Bowman, Monica L. Bryan, Mark H. Schochet, Barry P. Smith, W. Randolph (Randy) Summers | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548691 | 11/08/1997 | Steigman, Donald S. | N/A | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548692 | 11/07/1997 | Heinemann, Jeff | Bowman, Monica L. Steigman, Donald S. Bryan, Mark H. Miller, Emil P. Summers, Carol | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548692.001 | 11/07/1997 | Steigman, Donald S. | N/A | E-Mail Re: Homer / Bloom / Guida agreements | AC |
| FLAPP/548692.002 | 11/07/1997 | Bowman, Monica L. | Miller, Emil P. Steigman, Donald S. Heinemann, Jeff | E-Mail Re: Homer / Bloom / Guida agreements | AC |

## 226 UNSUPPORTED ENTRIES FROM MIDDLE OF SECOND PRIVILEGE LOG

| DOCUMENT ID No. | Doc. Date | FROM/SIGNED BY | RECIPIENT(S) | DOCUMENT TYPE & SUBJECT MATTER | Privilege Claimed |
|---|---|---|---|---|---|
| FLAPP/548701 | 03/08/1998 | Steigman, Donald S. | Miller, Emil P. Bowman, Monica L. | E-Mail Re: Bloom, Homer, & Guida agreements | AC |
| FLAPP/548702 | 03/04/1998 | Bowman, Monica L. | N/A | E-Mail Re: Bloom, Homer & Guida agreements | AC |
| FLAPP/548703 | 03/03/1998 | Heinemann, Jeff | Bowman, Monica L. Miller, Emil P. Simon, Richard Steigman, Donald S. Windnagle, Daniel T. | E-Mail Re: Bloom, Homer & Guida agreements | AC |
| FLAPP/548704-FLAPP/548705 | 03/03/1998 | Bowman, Monica L. | N/A | E-Mail Re: Bloom, Homer & Guida agreements | AC |