IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA ex. rel.
SAL A. BARBERA,

        Plaintiffs,

vs.

TENET HEALTHCARE CORPORATION,
f/k/a National Medical Enterprises, and
d/b/a American Medical Holdings, Inc.,
North Ridge Medical Center, Palms of
Pasadena Hospital, Town and Country
Hospital, Lauderdale Clinical Services,
The Pain Institute of Tampa, The Center
For Quality Care and the Town and
Country Women's Center; and AMISUB
(North Ridge Hospital), Inc. d/b/a North
Ridge Medical Center,

        Defendants.

_____/

CASE NO. 97-6590-CIV-JORDAN
MAGISTRATE JUDGE BROWN

## RELATOR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ALLEGED PRIVILEGED DOCUMENTS

Relator, Sal A. Barbera, adopts and incorporates by reference the Memorandum

filed by the United States in support of its motion to compel dated June 27, 2003.  In

addition, Relator states as follows:

The Corporate Integrity Agreement between the Government and Tenet required

Tenet to maintain a Corporate Integrity Program and to provide an Annual Compliance

Report to the United States.  As part of the Annual Compliance Report, Tenet was required

to certify that it reviewed its records and practices during the preceding twelve (12) months

and to state whether it was either in or out of compliance with the Stark laws and other

federal program requirements.  Tenet was also required to report to HHS any credible

evidence of misconduct that may constitute a violation of the law or regulations governing

federally funded health care programs.  See Relator's Second Amended Complaint,

paragraph 155.  Specifically, the Corporate Integrity Agreement stated that

> [TENET] shall report to HHS any credible evidence of
> misconduct that management has reasonable grounds, after
> appropriate inquiry, to believe may constitute a violation of
> criminal law relating to, or may constitute a material violation
> of the civil law, rules or regulations governing federally funded
> health care programs....  The evidence to be reported pursuant
> to this requirement shall ... include evidence disclosed to
> [TENET] from any source.  [TENET] will investigate any report
> of such violation that comes to its attention and will notify DOJ
> and HHS of the outcome of the investigation and any potential
> or actual adverse effect on the operation of federally funded
> healthcare programs or on their beneficiaries.

Evidence has been obtained in discovery which indicates that Tenet possessed

information it should have disclosed to the government under the Corporate Integrity

Agreement.  See the following Exhibit list which reflects examples:

| | | |
|---|---|---|
| EXH  1. | FLAPP# 084190: | Tony Bennett memo dated 2/24/97 to Jeff Heineman re: Legal concerns related to LCS practices. |
| EXH  2. | FLAPP# 064235: | Tenet administrator, Bennett's handwritten note to Monica at bottom of May 1, 1997 Memorandum stating: "This could have a number of legal ramifications...perhaps this should go on our compliance report," Tony B. |
| EXH  3. | Barbera out processing interview question. | |

> Q. "Are you aware of any fraudulent or improper
> practices?"
> A. "Concerns in this area have been shared with
> Dennis Brown."

| | | |
|---|---|---|
| EXH  4. | FLAPP# 021304: | L C S    o p e r a t i o n   a s s e s s m e n t (conclusions/recommendations) by Les Alt (July 12, 1996). "Address potential fraud and abuse issues ... ." |

EXH 5.   TK2556(13G):   Nassberg memo to Emil Miller dated October 20, 1997 re: conversations with Tenet administrator Jeff Heineman wherein he stated: "Your contracts are illegal."

EXH 6.   FLAPP# 041613:   Letter from attorney Stanley Rosenkranz dated July 23, 1993 to doctors hired by Defendants wherein he stated: "From a fraud and abuse perspective, these aspects of the arrangement give us great concern."

There are voluminous additional documents which Tenet refuses to produce under the guise of privilege. These documents include several in-house reports compiled by Tenet containing information which, if examined, are likely to reveal fraudulent conduct that should have been disclosed to the government in Tenet's Annual Compliance Reports. The following list reflects some of the important documents which Tenet refuses to produce.

1.   FLAPP# 523364-523812: Report on Legal Compliance audit - North Ridge Medical Center, 8/25/98 (448 pages).

2.   FLAPP# 534807-534847: McDermott Will & Emory Report on Legal Review of North Ridge Medical Center, Fort Lauderdale, 2/8/96 (41 pages).

3.   FLAPP# 534761-534799: Facility Compliance Audit Report of North Ridge Hospital and attached Report prepared by McDermott Will & Emory (39 pages).

4.   FLAPP# 549516-549569: Report from outside counsel re: physician agreements, 4/9/96 (54 pages).

5.   FLAPP# 551850-552014: Report Review of Tenet Physician Services, Physician Practices 6/23/97 (165 pages).

Any absence from Tenet's Annual Compliance Reports of the above cited exhibits or documents referred to therein justifies application of the crime-fraud exception to Tenet's assertions of the attorney-client/work product privilege. Pollock v. United States, 202 F. 2d 281, 282 (5th Cir. 1953). The failure to disclose those documents to the government not only violates the Corporate Integrity Agreement, such failure would constitute an abuse of

the attorney-client relationship directly relating to issues in this case. International Tel. & Tel. Corp. v. United Tel. Co. of Fla., 60 F.R.D. 177, 180 (M.D. Fla. 1982). ("The privilege may be overcome, not only where fraud or crime is involved, but also where there are substantial abuses of the attorney-client relationship). See also In re: Warner, 87 B.R. 199, 202 (M.D. Fla. 1988).

## CONCLUSION

WHEREFORE, Relator respectfully requests this court to grant all relief sought in the Government's Motion to Compel dated June 27, 2003 and requests this court to apply that relief to Relator's separately pled claims as well. Further, Relator requests this court to order production of or an in camera inspection of, all documents listed in Exhibit 2 to this Motion.

Respectfully Submitted,

Gary E. Sherman

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by Facsimile and U.S. Mail this 24th day of July, 2003 upon: Ana Martinez, Esq., Assistant United States Attorney, 99 N.E. 4th Street, Miami, Fl. 33132; David Wiseman, Esq., Department of Justice, Civil Division, Post Office Box 261, Ben Franklin Station, Washington, D.C. 20044; Allan J. Sullivan, attorneys for North Ridge Hospital and Tenet Healthcare Corporation, Miami Center, Suite 1450, 201 S. Biscayne Boulevard, Miami, Fl. 33131; Thomas Holliday, Esq., and Rodney Stone, Esq., Gibson, Dunn & Crutcher L.L.P. 333 South Grand Avenue, Suite 4600, Los Angeles, California 90071-3197; and Robert B. Krakow, Esq., Gibson Dunn & Crutcher LLP, 2100 McKinney Avenue, Ste. 1100, Dallas, TX 75201-6911.

LAW OFFICES OF GARY E. SHERMAN, P.A.
Attorneys for Relator, Sal A. Barbera
440 South Andrews Avenue
Fort Lauderdale, FL 33301
Tel. 954/524-1100
Fax. 954/524-0008

GARY E. SHERMAN
Florida Bar No. 377295

H:\M\C\BARBERA\QUITAM\PLEADING\MemoLawMotiontoCompel3.wpd
7/24/03 - 10 49 am

# Tenet Physician Services

Tenet HealthSystem

# MEMORANDUM

**Date:**  April 5, 2000

**To:**  Jeff Heinemann

**From:**  Tony Bennett

**Subject:**  Legal Concerns related to LCS practices

Additional Distribution:

*** Personal and Confidential ***

As per our conversation on Friday, I am concerned that Tenet may have some legal exposure related to some of the LCS deals. I have reviewed the files, and I am familiar with the "Stark-II"(Physician Self Referral) law. Based on my review, I have a couple of issues that perhaps you could help me to resolve.

Under Stark II the law **prohibits the referral of patients or the submission of claims for "designated services" if the referring physician has a "financial relationship" with the entity that provides the services.**

The "designated services" include (among others) clinical laboratory services, and inpatient and outpatient hospital services.

A "financial relationship" includes a compensation arrangement between the physician and the entity.

An exception to the compensation prohibition includes a bona fide employment relationship. However, an employment relationship is only excluded if the employment is for identifiable services, **consistent with fair market value, does not take into account the volume of referrals, and is for payment that would be commercially reasonable if there were no referrals.**

My concerns are as follows:

1) **"Compensation consistent with fair market value, and commercially reasonable":** In every case the physicians salary and benefits were increased above their current levels (in some cases by more than 50%). In every case the salary was raised to a level greater than MGMA mean compensation for Internal Medicine. In every case the proforma indicated a substantial loss on the clinic, even on the combined income of the clinic and the lab referral income to be obtained from the clinic. It would certainly be difficult to defend that if not for the referrals this arrangement would not be made.

2) **"does not take into account the volume of referrals":** In most of the files I reviewed, the workpapers supporting the employment arrangement utilized the amount of lab





FLAPP 084190

currently being performed in the doctors office as a basis for determining the level of compensation for the physician. In other words the amount of increase from the existing level to the new level under the employment agreement, had a direct correlation to the volume of anticipated lab referral.

3) **"does not take into account the volume of referrals"**: In at least one case, the physician did not perform lab services in his office, but instead used an outside referral lab. In this instance the hospital estimated the value of the referrals that would, as a result of the employment arrangement, be redirected to the hospital in determining the compensation for the physician. And, just lake all of the other agreements, indicated that the entire arrangement would operate at a loss.

The aforementioned issues related to the LCS practices are not entirely unique, but are the most conspicuous. There are similar issues related to the few physician employment arrangements associated with the former AMI hospitals in the Tampa area. Primarily, the arrangements do not appear to be commercially reasonable because the agreements do not allow for any profit to be returned to the employer, and furthermore provide for discretionary bonuses on top of the operating deficits.

These issues were pointed out previously, and were addressed by my superiors. However, no one has shared directly with me the legal opinions upon which any conclusions were based. Therefore I am requesting that you help me to gain the comfort I need to move on with other, more pressing matters.

**FLAPP 084191**



**Tenet Physician Services**
Tenet HealthSystem

# MEMORANDUM

| | |
|---|---|
| **Date:** | **May 1, 1997** |
| **To:** | **Monica Bowman** |
| **From:** | **Dan Johnson** |
| **Subject:** | **Sheldon Nassberg, MD - Practice Acquisition** |

**Additional Distribution:**
**Tony Dattilo, Tony Bennett,**
**Mary Ellen Hamilton all w/o**
**attachments**

---

Attached, please find a CER for the purchase of Sheldon Nassberg, PA for $300,000.

As you are aware, Lauderdale Clinical Services, Inc. (LCS), the former NRMC MSO, acquired the medical practice of Sheldon Nassberg, MD on October 1, 1995, just prior to the merger between LCS and National Medical Services, Inc.  It has now come to my attention that Dr. Nassberg deferred payment of the entire purchase price of his medical practice ($300,000) until an unspecified later date in the future.  Dr. Nassberg has now requested payment of this amount no later than May 10th of this year.

I am not sure why the transaction was completed in this manner, but in speaking with Michael Nolan, Esq., outside legal counsel for LCS at the time of the close, he confirmed that, indeed, no money exchanged hands at the close.

I have reviewed the file and all required paperwork (also attached) appears to be in order.  A new CER is required because the original expired at the end of FY96.  The source of funding from the FY97 budget will be the majority of those funds reserved for the acquisition of Dr. H.C. McLoughlin's medical practice which did not take place.

Please review this package and sign the CER for further forwarding to Emil Miller, Don Steigman and Jeff Heinemann for additional approvals.

Thank you.

*Monica,*
*This could have a number of*
*legal ramifications ... perhaps this should*
*go on our compliance report.*
*Tony B.*

**TENET.**
**FLAPP 064235**

EXHIBIT "2"


# TENET.

## OUTPROCESSING INTERVIEW QUESTION

**1. Are you aware of any fraudulent or improper practices?**

"Concerns in this area have been shared with Dennis Brown."

___SAL BARBERA___  ___7-12-96___
**Employee Name**                    **Date**

**HUMAN RESOURCES REPRESENTATIVE**

EXHIBIT "3"



file

LCS

# LAUDERDALE CLINICAL SERVICES

## OPERATIONS ASSESSMENT

### JULY 12, 1996

EXHIBIT "4"

FLAPP 021304

TENET PHYSICIAN SERVICES
LAUDERDALE CLINICAL SERVICES

## OPERATIONS ANALYSIS

Performed By:      Les S. Alt, Strategic Analyst/Consultant

Date Submitted:    July 12, 1996

## INTRODUCTION

The following is a status report with preliminary findings and recommendations regarding operations at Lauderdale Clinical Services ("LCS").

Since engaging with the project, I have been attempting to retrieve or recreate the underlying assumptions and financial models justifying each physicians employment agreement. As you are aware, thus far, many of the historical files have not been located and much of the past practice financial information is inconsistent and/or unreliable. Therefore, my approach has been prospectively focused, using current financial information, direct clinic observation and physician interviews as the basis for much of my findings and recommendations.

Overall, the interviews conducted with each group were very constructive and received positively by the physicians. Many common themes and concerns were expressed, and have been summarized in this report under "General Observations". Upon meeting with each group, I prepared a practice specific profile highlighting their opportunities for improvement (attached). The report is limited to the following groups that I have been able to meet with thus far:

Doctors Homer, Bloom & Guida
Doctors Nassberg and Biederman
Doctors Copen, Dolchin and Gozansky
Doctors Coleman and Perer
Doctors Mellin and Schwartz
Doctor Yesner
Doctors Erdman and Shook

I have not met or included in this report an analysis for Dr. Myers, Doctors Angelillo and Shapiro, Drs. Shansky and Nigen, Priority Care or NRMSS.

Lastly, I summarize the common opportunities for financial and operational improvement within the LCS organization. In many of the suggestions, further analysis will be required to determine the full savings or revenue enhancement.

PLAFF 021305

## GENERAL OBSERVATIONS

- LCS is an excellent but loosely organized group(s) of primary care physicians geographically dispersed within North Ridge Hospital's catchment area (see map attached). The physicians are for the most part satisfied with their contractual relationship and wish to extend or renew their existing agreements.

- LCS was created to:

  - Preserve North Ridge Hospital's market share (Appendix "A").

  - Add incremental volume to North Ridge.

  - Enhance North Ridge's position with respect to managed care.

- LCS clinics are independent from one another.

- LCS physician compensation is a function of:

  - The historical volume of the practice including ancillary revenue.

  - Competitive bidding among other area hospitals.

- Most LCS physicians have benefited financially from their LCS employment agreements.

- Laboratory services (revenue and associated expenses) have been removed from the physician practices and consolidated at North Ridge Hospital.

- All billing for LCS practices has been consolidated to Tenet Physician Services.

- Most LCS physicians are loyal to North Ridge Hospital/Tenet and believe LCS is the qualitative primary care network in the greater Ft. Lauderdale area.

- Physicians believe management of LCS under Tenet Physicians Services has been arms distance as compared to its direct oversight under the North Ridge Hospital administration (Don Steigman).

- Management turnover within the Hospital and MSO (Tenet Physician Services) have plagued LCS since its inception.

- Physicians desire more structure and direction with regard to LCS organization. They wish to have meaningful meetings to exchange common problems and opportunities.

- Mary Ellen Hamilton, LCS administrator, is viewed as an advocate to the LCS physicians and capable of solving their day-to-day issues within the clinics. She is not viewed as having the control to solve the larger LCS organization issues and hospital interface problems (billing, marketing, lab interface).

- Physician accountability is limited strictly to patient visits. Some LCS physicians appear to see fewer new patients and perform less time consuming procedures since engagement. Doctors are very conscious of visit production and maximization.

- Due to a historically large M/C fee-for-service business, most LCS physicians are managed care unfriendly or indifferent.

2

PLAPP 021306

- Many LCS Physicians believe North Ridge's reputation is eroding primarily due to environmental issues (housekeeping, physical plant, food service).

- LCS physicians are envious of Holy Cross' marketing of their own primary care network.

- LCS physician productivity requirements per contract are well below national standards of performance (Appendix "B").

- LCS physicians do not like redundancy of PAC-COM system for their patients requiring laboratory services. This is the source of many patient complaints.

- LCS physicians believe (without hard evidence) that billing is grossly inefficient as compared to when they were in control (many patient complaints on billing inaccuracies).

- LCS physicians feel Human Resources was more responsive when at North Ridge (coverage, etc.)

- Management information system is very limited, unreliable and too late for any meaningful concurrent operational analysis.

- LCS physicians have not been aggressively challenged with respect to productivity issues.

- Most LCS physicians, are meeting or exceeding the minimal visit thresholds of their contracts.

- LCS physicians are in general compliance with their employment agreements.

Alt\Operation.Anl

8

FLAPP 021307



## Lauderdale Clinical Services
### Center Locations

## PRACTICE ANALYSIS

Dr. Harold Mellin/Dr. Alan Schwartz
5601 N. Dixie Highway
Ft. Lauderdale, FL 33334

### Summary

These IM/GI physicians were physically relocated from the Holy Cross campus to the North Ridge campus medical office building. Their contract was based on the level of volume they were generating before the relocation. The physician's have separate but identical agreements. All performance targets are for the combined volume of these physicians while bonuses are paid to each.

### Contract Terms

Start Date:    February 2, 1994

Term:    Ten (10) Years

Termination Without Cause:

1.    Upon written notice at least 180 days prior to the fifth anniversary date with payment of a severance fee of $100,000 each.

2.    If visits fall by 25% or more from base target.

Salary:

$225,000 each with CPI adjustments annually (max 5%). Full benefit package with liability insurance and $5,000 CME provision.

Base Visits:    4,850 + 600 endoscopies combined.

Incentive Compensation:

| | |
|---|---|
| If visits exceed base year by 10% - 15%  : | $ 5,000 bonus ea. |
| If visits exceed base year by 15% - 20%  : | $ 7,500 bonus ea. |
| If visits exceed base year by 20% - 25%  : | $10,000 bonus ea. |
| If endoscopies reach 600 in a contract year | $ 5,000 bonus ea. |
| For each additional 40 endoscopies over 600 | $ 2,500 bonus ea. |

Compensation Penalties:

o    If visits fall by 25% from base year can terminate agreement.

o    If visits fall 10% or more from base year - salary adjustment will commensurate with percentage decrease (one year).

o    If endoscopies drop by 20% - 25% -- salary reduction of $20,000 each.

o    If endoscopies drop by 25% - 30% -- salary reduction of $25,000 each.

o    If endoscopies drop by 30% - 35% -- salary reduction of $30,000 each.

PLAFF 021309

## Financial Summary

### February, 1995 through January, 1996

| | |
|---|---|
| Gross Revenues | 869,244 |
| Net Revenues | 474,739 |
| % Net / Gross Revenue | 54.6% |
| FTE's | 7.0% |
| Operating Expense | 820,739 |
| Net Income (Loss) | (345,819) |
| Lab Revenue | 222,403 |

### Managed Care Summary

Practice does not participate with any HMO plans. Physicians hesitant to accept any managed care without proper education on its impact on their practice.

### Office Accommodations

Lease -- $4,200/month @ $50,400/year; no lease.

Physicians are located in medical office building on North Ridge campus. Employment contract provides for relocation at NMS' discretion within greater Ft. Lauderdale area. Physicians open to relocation; prefer to stay on campus or within ½ mile.

Current square footage of office is approximately 2,300 with 4 exam rooms. No opportunity for expansion within existing location.

### Conclusions/Opportunities

Option I   Remain at Existing Space/Location Without Expansion

- Reduction of 1 FTE (Lab Tech) with proper cross-training of 2 FTE's MA's in phlebotomy (savings approximately $20,000 per year).

- Expand office hours from 8:30-4:30 to 8:00-5:00 p.m. in season (stagger MD hours).

- Keep office open Wednesdays with 1 MD present. Currently the MD's assist each other with scopes on Wednesday (may offer MD's some contract allied professional help if necessary.)

- Obtain HMO/PPO agreements consistent with those at North Ridge Hospital.

2

FLAPP 021310

    o    Eliminate duplicate information/billing services (PAC-Com system)

    o    Eliminate overtime hours (particularly off season) - stagger office hours.

    o    Convert Office Manager to exempt status (2-3 hours O.T.).

## Option II

**A.**    <u>Relocation/Merger</u>
(Assumption: Yesner - Mellin/Schwartz merger)

    o    Group is ideally situated for relocation. Resistance from physicians is minor, however, they would prefer to be on North Ridge campus. Potential annual savings if we were to merge this group with Dr. Yesner's newly expanded offices (3,000 sq. ft.) are as follows:

| | |
|---|---|
| FTE's Reduction(3) | $ 70,000 |
| Rent/Utilities Savings | $ 65,000 |
| Repairs/Maintenance Savings | $ 5,000 |
| Purchase Services Economies | $ 10,000 |
| | $150,000/yr |

Obstacles - Dr. Yesner not likely to accept this arrangement. His wife would need to be severenced out of combined practice. I recommend offering each MD a bonus and six months severance for Dr. Yesner's wife to leave the combined practice.

**B.**    <u>Relocation/Merger</u>
(Assumption: (Homer/Bloom/Guida - Mellin/Schwartz)

    o    Expand Homer Bloom & Guida space by 2,400 sq. ft. which is available adjacent to their current office. In order for this to occur, a favorable lease with a liberal buildout allowance would have to be negotiated with landlord (not likely). Savings would be similar to above if this were to be accomplished.

## Contract Restructure:

Current contract offering first option for termination of February 2, 1999 (180 days prior notice required). Recommend terminating agreement on first option if we are unable to restructure contract. New agreement should raise the performance (expectations (visit targets) and make their targets physician specific. Under existing agreement the physicians are only required to see a combined volume of 21 patients per day to justify their $450,000 in base salary.

Alt\Practice.Anl

3

FLAPP 021311

## PRACTICE ANALYSIS

Drs. Homer/Bloom/Guida
5601 North Dixie Highway
Suite 412
Ft. Lauderdale, FL 33334

### Summary

These physicians have had a long standing North Ridge based practice and have demonstrated exceptional loyalty to the hospital (299 hospital admissions from 6/95 - 5/96). Doctors Homer and Bloom have separate but identical contracts. Dr. Guida has a contract that guarantees him a base salary without any productivity requirement. This is a high profile practice with excellent ties to the community.

### Contract Terms

| | Dr. Homer & Bloom | Dr. Guida |
|---|---|---|
| Effective Date: | April 5, 1993 | September 6, 1993 |
| Term: | Five (5) yrs w/optional 5 year renewal | 5 years only |
| Termination without Cause: | If visits fall below 20% base. | None. |
| Base Salary: | $200,000 each + CPI adj. | $160,000 + CPI adj. |
| Benefits: | $5,000 CME; liability insurance; dues & subscription; 32 days off/year, health & dental insurance. | $5,000 CME; liability insurance; dues & subscription; 32 days off/yr, health and dental insurance. |
| Base Visits: | Combined clinic visits of 5334 per year If third MD is added, base visits would be renegotiated (not evidenced w/addition of Dr. Guida) | |
| Incentive Compensation: | Achieving 92.5% - 100% base visits; $40,000 bonus each; for each 2% over base additional $2,000 each | Automatic Bonus Yr 1 - $ 9,000; Automatic Bonus Yr 2 - $12,000; Automatic Bonus Yr 3 - $14,500; Automatic Bonus Yr 4 - $17,000; Automatic Bonus Yr 5 - $22,000 |
| Penalties: | 7.5-10% below base - bonus decrease of $15,000 each 10-15% below base - bonus decreased of $30,000 each 15-20% below base - no bonuses. | |

FLAPP 021312

## Financial Summary

### 4/95 through 2/96 (11 months)

| | |
|---|---|
| Gross Revenues | 1,031,832 |
| Disc/Writeoffs | 338,473 |
| Net Revenues | 654,827 |
| Percentage Net/Gross | 63.5% |
| Operating Expense | 1,061,674 |
| Lab Revenues | 374,764 |
| Net Loss (w/o Lab) | ( 406,847) |
| FTE's | 7.0 |
| Collections | 742,389 |
| Collections/ % gross | 72% |
| Collections / % net | 114% |

## Staffing

Practice historically had 7 FTE's but recently added one additional front office person (4 front office; 3 MA's; 1 Mgr.). Based upon volume and comparisons of other like groups, the additional support person may not have been necessary.

## Managed Care Summary

Group is 90+% Fee for Service/Medicare and participates with only one managed care plan (Pacifcare). Practice operates at capacity in season only. Physicians willing to accept additional plans with guidance.

## Office Accommodations

Practice is based on the North Ridge campus Medical office building. Space will not support an additional MD. There is an additional 2,400 square foot of space available adjacent to this practice that would allow for the consolidation of another LCS practice or expansion of 2 MDs. Physicians believe their existing location is vital to their success and would be very resistant to change. There is no executed lease on this office consistent with other LCS practices in this building.

2

PLAPP 021313

## Recommendations

o    Add managed care plans consistent with North Ridge's overall strategy.

o    Perform staffing analysis to determine true need for more than 7 FTE's of support staff.

o    Merge PAC-Com system with Medic, if possible. Eliminate redundancy in registration and billing.

o    Evaluate 2,400 square feet addition adjacent to practice; negotiate buildout and lease consistent with market standards.

o    If space can be expanded, add 2 additional MDs (merger of potential new acquisitions).

o    Educate physicians on practicing in a managed care environment. Once managed care volume is increased, consider adding a physician extender to the practice.

o    Monitor employee overtime hours and eliminate by staggering hours.

o    Change office manager from non-exempt to exempt status.

Alt\Practice.An6

3

## PRACTICE ANALYSIS

Drs. Nassberg/Biederman
5601 N. Dixie Highway
Ft. Lauderdale, FL 33334

### Summary

Group was originally 3 MD prior to LCS employment. One MD split to contract with Holy Cross. Practice has been in existing location one the campus of North Ridge since 10/1/93. Physicians practice endocrinology/IM and participate with Hospital's diabetes program. Physicians have similar employment agreements where base salary and visit thresholds are physician specific.

### Employment Agreement

| | |
|---|---|
| Effective Date: | 10/1/95 |
| Term: | Five (5) years with option of 5 - 1 year renewals. |
| Base Salary: | Nassberg: $280,000   Biederman: $185,000 increases annually according to hospital policy. |
| Benefits: | 30 days off; liability, health and dental insurance, etc. $4,000 CME; $4,000 dues and subscription. |
| Base Visits: | Nassberg 6763; Biederman 5547 |
| Clinic Hours: | Nassberg 7:30 a.m. - 2:00 p.m. Monday - Friday.<br>Biederman 9:45 a.m. - 5:00 p.m. Monday - Friday. |

Incentive Compensation:

Achieving 96% of target - $ 5,000 bonus each
Achieving 97% of target - $10,000 bonus each
Achieving 98% of target - $20,000 bonus each
Achieving 99% of target - $30,000 bonus each
Achieving 100% of target - $40,000 bonus each

Additional base percentage increase coincides with percent volume increase above 100%.

Compensation Penalties:

o   Failure to obtain 96% of target will result in commensurate base salary reduction calculated from 96% adjustment for CPL

o   If visits fall 40%, Tenet may terminate.

### Financial Analysis

Practice too new and financials too erratic to determine any trends.

FLAPP 021315

## Staffing

Practice has had significant turnover of staff. Present staffing: 1 manager; 3 front office; 2 MAs. Total FTEs of 6.0 which is within guidelines for their volume of activities. Office manager is presently out on maternity leave.

## Managed Care Summary

The practice does not participate with any HMO plans. Physicians do not feel they or the staff is adequately trained to handle a large managed care volume. Dr. Nassberg believes he has capacity to see approximately 20 - 25% more volume.

## Office Accommodations

Present office is approximately 2,600 square feet located in the North Ridge campus medical office building. There is no executed lease which is consistent with other LCS practices in this building. Physicians believe space can accommodate one additional MD.

## Recommendations

o  Practice to remain on campus to support hospital diabetes program.

o  Add managed care plans consistent with North Ridge overall strategy.

o  Add one MD to practice for full utilization of existing space. Maximum need for 1 FTE support staff if new MD is added.

o  Merge Pac-Com system with Medic, if possible.

Alt\Practice.An7

2

FLAPP 021316

## PRACTICE ANALYSIS

Dr. Yesner
4800 N.E. 20th Terrace
Ft. Lauderdale, FL

### Summary

Dr. Yesner has been operating as a solo practitioner in a location adjacent to Holy Cross Hospital. He has shifted most of his non-office work to North Ridge Medical Center and has accepted HIP patients since engaging with LCS/Tenet. Dr. Yesner admitted 74 patients to North Ridge from 6/95 through 5/96.

### Contract Terms

Effective Date: November 29, 1993

Term:          Ten (10) Years.

Employment:    Within geographic boundaries.

Schedule:      Four (4) days per week.

### Termination Without Cause:

Upon written notice at least 180 days prior to the fifth anniversary date with one year base severance. Forty percent (40%) decrease in base year visits in any contract year.

### Salary:

$275,000 (amended to $283,000 11/28/94) plus CPI adjustments not to exceed five percent (5%) annually. Sign on bonus of $25,000 (one time only). Matching $10,000 in retirement benefits; 32 days off per year, and liability, medical dental and life insurance provided.

### Incentive Compensation: (Includes SNF, Hospital, HCHF, etc.)

Exceeding base year of 2,700 visits.

If visits exceed individual base by 10% - 15% - $ 5,000 bonus
If visits exceed individual base by 15% - 20% - $12,500 bonus
If visits exceed individual base by 20% - 25% - $22,500 bonus
For each 5% above 25% - additional bonus of $5,000.

If visits fall more than 10% below base of 2,700, salary will be adjusted accordingly (not including CPI adjustment).

### Office Accommodations

Dr. Yesner is moving from his 1,100 square foot office across from Holy Cross Hospital to approximately 3,000 square feet within the same office complex. There appears to be

## PRACTICE ANALYSIS

Drs. Erdman/Shook
1130 Bayview Drive
Ft. Lauderdale, FL

### Summary

Practice was originally 4 MD's at the existing location, approximately 5 miles south of North Ridge Hospital. Group split with one MD going to North Broward Hospital and one going to Holy Cross Hospital. Drs. Erdman and Shook decided on employment with LCS rather than North Broward Hospital District or Holy Cross based on their confidence in Don Steigman. Physicians worked primarily with Imperial Point Hospital and Broward General Hospital. They claim that their engagement with LCS caused a significant loss of consult referrals at their base hospitals. Physicians admitted 58 patients to north Ridge from 6/95 through 5/96. The physicians have separate but similar employment agreements. Volume thresholds and commensurate base salary are physician specific.

### Contract Terms

Start Date:   August 8, 1994

Term:   Dr. Shook - Five (5) years with optional 5 year renewal upon mutual agreement. Must give six (6) months notice of intent to renew or pay a penalty of $100,000, if agreement is not renewed.

Dr. Erdman - Five (5) years, $20,000 buyout if MD retires within 3 years.

Term w/o Cause: If visits drop 25% from base targets in any contract year.

Salary:   Dr. Shook $195,000, no CPI; Dr. Erdman $140,000, no CPI.

Benefits:   Liability Insurance, Medical and Dental Insurance, 32 days off, CME, dues and subscription.

Clinic Hrs.:   Dr. Shook - 80 hours/2 week period 9:00 a.m. - 5:00 p.m. Monday - Friday.
Dr. Erdman - not required to work more than 155 days/year.

Incentive Compensation:

If visits exceed base year by 10% - 15% :   $15,000 bonus ea.

For each full 5% above 15% - additional bonus of $5,000.

Base Visits: Dr. Shook (1907) Dr. Erdman (1795)

Compensation Penalties:

o   If visits fall by more than 10% from base year - compensation will be salary adjusted accordingly.

FLAPP 021320

## Lease Terms

New lease executed with assumption of new space.

    Term - Five (5) years.

    Lease is assignable for medical practices only.

    Square footage is approximately 3,000 - capacity for 6 exam rooms.

    Rate - $4,100 per month.

### Operations and Financial Performance

|  | Base Year | Year 1<br>11/93-11/94 | Year 2<br>11/94 - 11/95 |
|---|---|---|---|
| Visits | 2,700 | 3,798 | |
| Gross Revenues | | 206,504 | 303,820 |
| Net Revenues | | 186,591 | 254,672 |
| Collection % Net Revenues | | | 71.8% |
| Salary Expense/<br>Operating Expense | | 474,219 | 732,382 |
| Net Income (Loss) | | (185,111) | (477,710) |
| FTE's | | 2.2 | 2.5 |
| Lab Revenue | | 102,517 | 146,364 |

Approximately $23,000 operating expense increase from 4/95 - 4/96 to $66,830 - due to Dr. Gravel's salary being expensed through this cost center.

Physicians bonuses were not accrued for budgetary purposes. Appears base year visits were established too low (MD salary w/bonus is more than the gross revenues of the practice (excluding lab).

Staffing: practice has 3 FTEs which is ideal for current operations. Dr. Yesner's wife is the office manager which will be an issue when attempting to add other MDs to this practice.

### Managed Care Summary

Practice accepts HIP patients. Dr. Yesner indifferent to accepting other plans. He is near maximum capacity now. Without an MD or PA added to the practice, new managed care plans would just be a conversion of M/C business.

FLAPP 021318

## Conclusions/Opportunities

o   Take advantage of new space by consolidating one of the existing LCS practices to Yesner's practice location (Mellin/Schwartz; Coleman/Perer; Shansky/Nigen).

o   Remove wife from expanded practice with appropriate severance package.

o   Do not add any other staff to this clinic unless merger occurs.

o   Assess adding more managed care plans with the addition of a physician extender.

Alt\Practice.An3

FLAPP 021319

8

## Financial Analysis

### Operations and Financial Performance

Aug., 1994 - July, 1995

| | |
|---|---|
| Gross Revenues | 409,611 |
| Disc./Write offs | 106,820 |
| Net Revenues | 302,791 |
| % Net/Gross | 74% |
| Operating Expense | 635,493 *(May be inaccurate - 1 MD from another lost center incl) |
| Lab Revenue | 118,211 |
| Net (loss) | ERR |
| FTE's | 4.3 |
| Collections/ % gross | 67% |
| Collections/ % net | 90% |

### Staffing

Practice went from 8.5 FTE's serving 4 MD to approximately 4.5 FTE's with 2 MDs. No opportunities for FTE reductions at present (Dr. Myers was relocated to this practice in June, 1996 and brought 2 FTE additional staff with him). If volume continues to remain very low we could consider dropping one full-time FTE to part-time.

### Managed Care Summary

Practice has been expanded to accept HIP patients. MD's claim patients from HIP are too sick and require multiple visits. (Needs assessment)

### Physician Productivity

| Visit Summary | 8/95-4/96 (9mos) | Visits Annualized | Base Target |
|---|---|---|---|
| Dr. Shook | 1885 (10.5 pts/day) | 2513 | 1907 |
| Dr. Erdman | 1981 (11 pts/day) | 2641 | 1795 |

Physicians exceeding base targets but are well below national productivity standards. Dr. Shook's assessment is that he is at 70% of his maximum capacity and Dr. Erdman believes he is at maximum capacity throughout tourist season.

2

FLAPP 021321

## Office Accommodations

Medical office is owned by Dr. Erdman. Leased to Tenet on August 8, 1994; coterminous with employment agreement (5 years with option for additional 5 years renewal).

## Recommendations

○   Evaluate space and seek to add 1 additional MD without any new support staff.

○   Add managed care plans consistent with North Ridge objectives.

○   Increase physician productivity through aggressive management.

○   Renegotiate contracts requiring enhanced productivity for achieving existing base salary.

○   Cosmetic renovation of physical plant required; convert lab space to accommodate additional MD.

Alt\Practice.An5

3

FLAPP 021322

## PRACTICE ANALYSIS

Dr. Copen/Dolchin and Gozansky
6550 N. Federal Highway
Suite 420
Ft. Lauderdale, FL 33305

### Summary

These three (3) physicians were physically relocated from the Imperial Point Medical Center ("IPMC") campus to a "Class A" building opposite IPMC. They historically performed the bulk of their non-office work at Holy Cross Medical Center. These physician's have separate but identical employment agreements. Volume thresholds for earning incentive bonuses are physician specific.

### Contract Terms

Effective Date: September, 1993

Term:        Ten (10) Years

Termination Without Cause:

Upon written notice at least 180 days prior to the fifth anniversary date with one year base severance.

Salary:

$275,000 each physician plus CPI adjustments annually. Full benefit package with $10,000 annual retirement contribution, liability insurance and CME.

Incentive Compensation:

Base Visits for Dr. Gozansky    3,100
Base Visits for Dr. Copen       2,740
Base Visits for Dr. Dolchin     2,620

If visits exceed individual base by 10% - 15% - $ 5,000 bonus
If visits exceed individual base by 15% - 20% - $12,500 bonus
If visits exceed individual base by 20% - 25% - $22,500 bonus

For each 5% over 25% add $4,000 to $22,500.

### Base Year Visits by Physician

| Physician | Visits |
|---|---|
| Dr. Copen | 4,850 |
| Dr. Dolchin | 2,620 |
| Dr. Gozansky | 3,100 |

FLAPP 021323

## Operations and Financial Performance

| | |
|---|---|
| Gross Revenues | 1,063,176 |
| Net Revenues | 611,094 |
| Collections | 684,578 |
| FTE's | 8.5 |
| Operating Expense | 1,385,035 (Physician base salaries of $888,000) |
| Net Income (Loss) | ( 773,000) |
| Lab Revenue | 451,073 |

Net Revenue w/Lab

Physicians have converted most of their inpatient/outpatient practice and lab services to North Ridge Medical Center which had previously not been utilized. Annual impact to North Ridge Medical Center (not including specialty referral services) from 9/94 through 8/95 was 174 admissions and 1,370,000 outpatient revenues. Practice as a stand alone financial entity does not break even. Physicians are very comfortable meeting minimum volume thresholds (patient visits)

## Managed Care Summary

Practice accepts HIP patients (10% - 20% of practice volume) which has added some incremental volume along with conversion of existing volume to the practice. The physicians are resistant to accepting additional managed care. They claim they are at full production capacity and any new volume would be at the expense of fee-for-service business. The physicians would, if required, accept any plans that were presented as their current employment contract pays them by visit regardless of payor type.

## Office Accommodations

Practice was relocated in a hastened fashion off the Imperial Point Hospital Campus. A sub-lease was entered into on December 1, 1994 for 4,251 square feet in Class A space opposite Imperial Point on U.S. 1 approximately 3 miles northeast of North Ridge Medical Center.

Lease Terms.

Commencement - December 1, 1994

Term - August 31, 2001

Lease is assignable for medical practices only.

Square footage is 4,251 rentable.

Rate - $11.25/square foot ($3,985/mo - $47,824/yr. - plus operating expenses - escalates 3% - 5% annually)

2

FLAPP 021324

A significant buildout expense was incurred to establish these physicians in this location. There are 9 exams rooms and ample space for the existing three physicians. Physicians claim the space does not allow for the addition of another physician (lacks an office); however, according to national standards it would seem that 4 primary care physicians could be accommodated in 4,251 square feet.

The practice performs chest x-rays and laprascopic procedures in their office.

### Conclusions/Opportunities

Physicians have converted most of their practice (inpatient, outpatient and laboratory) to North Ridge Medical Center.

- One FTE reduction could be realized if the PacCom system could be merged with Medic.

- One additional MD/PA could be added/merged into the practice. Recommend a local physician with excess capacity that could accept practice overflow. One medical Assistant would be the only additional staffing required to grow this practice by 25%. New physician should be managed care friendly and ideally female. Physician could either be primary care, OB/GYN or Pediatrics.

- Expand office hours of physician coverage to 8:00 am to 5:00 pm.

- Contract needs to be renegotiated with higher thresholds for productivity. Extraordinary base salaries are being paid for minimal production quotas.

Alt\Practice.An2

3

## PRACTICE ANALYSIS

Dr. Coleman/Perer
5700 N. Federal Highway
Suite 6
Ft. Lauderdale, FL 33305

### Summary

The physicians are in a duplex office condo's that have a shared waiting room. The physicians own their office(s) and lease them to LCS concurrent with their employment contracts. Their practice was dispersed among Imperial Point, Holy Cross and North Ridge. Since engagement with LCS, much of their non-office work has been shifted to North Ridge. Dr. Coleman sees patients twice weekly on-site at John Knox Village Retirement campus.

### Contract Terms

Start Date:     November 8, 1993

Term:     Five (5) Years

Salary:     Coleman: $275,000 plus bonus
            Perer:   $225,000 plus $10,000 licensing fee annually.

Benefits:     Liability; $5,000 CME; $10,000 retirement; $1,500 subscription, Medical, etc.

Contract Clinic Hours: 9:00 a.m. 5:00 p.m. Monday - Friday.

Incentive Compensation:

If visits exceed base year by 10% - 15% :     $10,000 bonus ea.
If visits exceed base year by 15% - 20% :     $20,000 bonus ea.
If visits exceed base year by 20% - 25% :     $30,000 bonus ea.

Base Visit Requirements:     Coleman 3286
                            Perer   2917

Compensation Penalties:

●     If visits fall 10% or more from base year - salary adjustment will commensurate with same percentage decrease.

●     If visits fall 40%, Tenet may terminate.

**FLAPP 021326**

Financial Analysis
11/94 - 10/95

Operations and Financial Performance

|  | COLEMAN | PERER |
|---|---|---|
| Gross Revenues | 553,345 | 454,334 |
| Disc. | 227,390 | 179,129 |
| Net Revenues | 325,955 | 275,205 |
| % Net/Gross Revenues | 59% | 60.6% |
| Operating Expense | 532,801* | 500,772 |
| Lab Revenue | 153,996 | 165,473 |
| Net (loss) | (206,846) | (225,567) |
| FTE's | 4.0 | 3.0 |
| Collections/ % gross | 61% | 67% |

*Shared office manager charged 100% to Dr. Coleman's practice.

### Staffing

Physicians have 3 FTE's each plus a shared manager of the physical layout of these condos do not allow for maximum efficiency. If truly combined the practice should only have 5 - 6 FTEs (1 manager; 2 front office; 2 MA's. Should be able to achieve 1.2 - 2.0 FTE reduction). Dr. Coleman has one additional M/A and Dr. Perer has one additional front office staff that would not be necessary in a combined practice.

Practices have had 3.0 FTE reductions since engagement with LCS (1 manager and 2 lab techs). Patients requiring halter monitors or lab work go to the hospital.

### Managed Care Summary

Dr. Coleman participates with PruCare and Principal (20%), while Dr. Perer does not see managed care patients.

Both MD's claim to see 20 patients/day (w/2 new patients/day).

### Office Accommodations

Office is a duplex condo owned by the MD;s (2,600 square feet). Lease is coterminous with employment agreement. Rent is fixed at $4,800 per month plus utilities.

2

FLAPP 021327

## Visit Analysis

### December, 1995  through April, 1996 (105 working days)

|              | PERER |           | COLEMAN |          |
|--------------|-------|-----------|---------|----------|
| Total Visits | 2,177 |           | 2,128   |          |
| New          | 50    | ( 2.30%)  | 184     | ( 8.6%)  |
| Established  | 1,681 | (77.20%)  | 1,393   | (65.5%)  |
| Hospital     | 424   | (19.56%)  | 540     | (25.4%)  |
| Other        | 9     |           | 7       |          |
| Visits/Day:  | 20.73 |           | 20.26   |          |

## Recommendations

- Perform staffing analysis to determine feasibility of 1-2 FTE reductions.

- Add managed care volume consistent with North Ridge goals.

- Seek to relocate MD's by subletting or identifying a buyer for their condo's.

- Once able to relocate, strive to merge with another LCS practice for maximum savings (i.e. Shansky and Nigen).

Alt\Practice.An4

3

FLAPP 021328

## CONCLUSIONS/RECOMMENDATIONS

o   LCS, given the structure of the existing employment agreements, will not breakeven for Tenet Physician Services.

o   When evaluating financial performance of individual LCS centers, net lab revenues must be included as practice revenue to determine true profit/loss.

o   Execute opportunities for consolidation and growth economies (see Appendix "C"). If implemented, overall financial annual impact to LCS bottom line would be between $250,000 and $500,000.

o   Group purchasing opportunities exist in the following areas:

> Liability Insurance (MDs - see Appendix "D")
> Office Cleaning and Pest Control
> Transcription Services
> Mobile Phones/Beepers/Yellow Pages
> Office Equipment - Service Contracts
> Supplies (Med/Non-Med)
> Answering Service/Phone Systems

o   Evaluate efficiency of PAC-COM billing and collection system for laboratory services generated by LCS physicians. Each practice commits .5 FTE labor to support the present North Ridge system. If merged with Medic, substantial savings could be realized.

o   Renegotiate existing employment contracts that more closely align physician compensation with practice performance. Establish more aggressive production targets and base compensation as a function of EBITA and/or visits.

o   Address potential fraud and abuse issues of current physician compensation formula's where salary and bonus are excessive relative to the gross or net revenue of the practice (see Appendix "C"). This may be the basis for contract renegotiation.

o   Improve management information systems. At minimum, monthly reports should reflect:

> - Gross Revenue
> - Discounts and Writeoffs
> - Practice Visits by Payor/MD type
> - Labor Separating MD Salaries and Overtime
> - Physician Revenue/Visits Per Day
> - Lab Revenue
> - Physician Days Off
> - Admissions (Total/North Ridge)

These reports should be available within three (3) working days of the close of any month. Management should use these reports in monthly physician meetings.

o   Management should be more aggressive and detail oriented when relating to physicians to improve productivity. A more detailed review of activities should be presented at monthly meetings with physicians.

o   An overall managed care strategy should be developed. Practices should be educated on performing in a managed care environment. May want to implement managed care plans uniformly among LCS practices for cross coverage and marketing purposes.

o   Develop an overall marketing strategy for LCS physicians.

FLAPP 021329

o      Assess overall billing and collection system and performance for LCS practices. Develop management reports to evaluate and monitor current performance.

o      Foster greater identity and integration of LCS organization. Possible opportunities include:

-     Inter-referrals among LCS physicians.

-     Establishing E.R. rotation coverage at North Ridge that is exclusive to LCS.

-     Establish rotational Saturday clinic with centralized call-in for LCS patients to be seen.

-     Employee cross coverage to eliminate contract labor or overtime hours.

-     Expanded and standardized office hours (i.e. 8:00 am through 5:30 pm)

o      Conduct training for office managers. Topics to include:

-     Staffing efficiency - Overtime elimination; employee cross-training.

-     Front end collection performance and accountability.

-     Physician scheduling and productivity.

o      Convert all managers from non-exempt to exempt status.

o      Hold, at minimum, quarterly LCS combined physician meetings with Senior Tenet Physician Services staff and hospital management (i.e., Emil, Sal or Tony D.)

Alt\Conclusions

2

FLAPP 021330

APPENDIX "A"

LCS ADMISSION TO NORTH RIDGE HOSPITAL
6/95 through 5/96

| | Inpatient | Outpatient |
|---|---|---|
| Homer/Bloom/Guida | 299 | 71 |
| Copen/Dolchin/Gozansky | 175 | 51 |
| Angelillo/Shapiro | 31 | 2 |
| Shansky/Nigen | 91 | 19 |
| Mellin/Schwartz | 52 | 264 |
| Erdman/Shook | 58 | 14 |
| Nassberg/Biederman | 67 | 9 |
| Myers | 21 | 13 |
| Coleman | 140 | 24 |
| Perer | 93 | 50 |
| Yesner | 73 | 9 |
| Gravel | 18 | 2 |
| TOTAL | 1,118 | 528 |

Alt\LCS.Adm

FLAPP 021331

APPENDIX "B"

## LCS PHYSICIAN PRODUCTIVITY

Productivity Assumption: It is assumed that primary care physicians working at full productivity can see 20 - 25 office visits (patients) per day.

Productivity Calculation: 260 week days/year - 32 days off = 228 work days/year

| | |
|---|---|
| 18 pts/day = 4,104 visits/yr | 22 pts/day = 5,016 visits/yr |
| 19 pts/day = 4,332 visits/yr | 23 pts/day = 5,244 visits/yr |
| 20 pts/day = 4,560 visits/yr | 24 pts/day = 5,472 visits/yr |
| 21 pts/day = 4,788 visits/yr | 25 pts/day = 5,700 visits/yr |

### LCS Contract Performance Requirements

All LCS employment contracts establish a baseline of visits the physicians are expected to see in a year to earn the base salary component of his/her income. The established base visit targets were presumed to be the actual visits the MD's experienced in the 12 months preceding the contract date. Exceeding the base visit target entitles the physicians to incentive bonuses as specified in their employment agreements. As we can see from the table below, there is no consistency with respect to base pay versus visits. In all cases except Nassberg and Biederman, the established minimum targets for the number of patients to be seen daily are well below national standards of performance.

### Base Salary and Visit Requirements Per Contract

| PHYSICIAN | BASE SALARY | VISIT REQUIREMENTS | AVERAGE VISIT/DAY | |
|---|---|---|---|---|
| Homer | 240,000 | achievement of | 23.4 | pts/day |
| Bloom | 240,000 | 5,334 group visits | | for group |
| Guida | 169,000 | | | |
| | | | | |
| Nassberg | 228,000 | 6,763 visits | 30 | pts/day |
| Biederman | 193,000 | 5,543 visits | 24 | pts/day |
| | | | | |
| Copen | 275,000 | 3,100 visits | 13.6 | pts/day |
| Dolchin | 275,000 | 2,740 visits | 12 | pts/day |
| Gozansky | 275,000 | 2,620 visits | 11.5 | pts/day |
| | | | | |
| Mellin | 225,000 | achievement of | 21.3 | pts/day |
| Scnwartz | 225,000 | 4,850 group visits; | 13 | scopes/week |
| | | 600 endosc. | | |
| | | | | |
| Coleman | 275,000 | 3,286 visits | 14.4 | pts/day |
| Perer | 235,000 | 2,917 visits | 12.8 | pts/day |
| | | | | |
| Erdman | 140,000 | 1,795 visits | 7.9 | pts/day |
| Shook | 195,000 | 1,907 visits | 8.4 | pts/day |
| | | | | |
| Yesner | 283,000 | 2,700 visits | 11.8 | pts/day |

Alt\LCS.vst

APPENDIX 'C'

LAUDERDALE CLINICAL SERVICES
CONSOLIDATION/GROWTH STRATEGIES

| PRACTICE | RECOMMENDATION |
|---|---|
| Copen/Dolchin/Gozansky | Remain at existing location; add 1 new MD with maximum of 1 FTE support staff. MD can be either I/M, F/P, OB/GYN, Ped. |
| Homer/Bloom Guida | Remain on campus; explore 2,000 square feet expansion (only if a lease is obtained and buildout expense is less than $35/sq. ft.). Practice should participate in all North Ridge managed care plans to increase volume. Once plans are on-line, a physician extender can be added to the practice. |
| Yesner | Practice moving to newly expanded 3,000 square feet office near Holy Cross. New space can support 3 MDs. Recommend Mellin and Schwartz merger (no barriers to immediate merger). If additional space could be obtained on this site, other LCS physicians could be merged (Coleman/Perer; Shansky/Niegen). |
| Coleman/Perer | Sublet or facilitate sale of their existing office condo. Ideal for relocation to Yesner's Holy Cross site of additional space can be secured. |
| Mellin/Schwartz | Relocate practice to Dr. Yesner's new space. Annual savings approximately $150,000. |
| Erdman/Shook/Myers | Stay in existing location; add one new MD to the practice with maximum of 1 FTE support staff. |
| Nassberg/Biederman | Stay in existing location; add one new MD to the practice with maximum of 1 FTE support staff. |
| Shapiro/Angelillo | Stay in existing location; add 2 MDs with maximum of 2 FTE support staff. |
| Gravel | Expand existing location to accommodate 1 - 2 additional MDs. |
| Shansky/Nigen | Lease has expired causing immediate need for decision on consolidation. Recommend finding a space that can accommodate 4+ physicians for potential merger of this practice with Coleman/Perer or other newly acquired LCS physicians. |

FLAPP 021332

APPENDIX "D"

## LIABILITY INSURANCE PAID BY PHYSICIAN IN MOST RECENT YEAR

| Physician | Expense (A/P Reports) |
|---|---|
| Homer | $ 19,609 |
| Bloom | $ 21,547 |
| Guida | $ 14,801 |
| Erdman | $ 14,101 |
| Shook | $ 10,240 |
| Copen | $ 15,671 |
| Dolchin | $ 17,412 |
| Gozansky | $ 14,332 |
| Yesner | $ 10,000 |
| Coleman | $ 11,378 |
| Perer | $ 15,684 |
| Shansky | $ 16,975 |
| Nigen | $ 17,713 |
| Mellin | $ 16,577 |
| Gravel | $ 11,378 |
| Nassberg | N/A |
| Biederman | N/A |
| **TOTAL** | **$242,174** |

If consolidated to one carrier, potential savings could be as much as 20% (48,000).

APPENDIX "E"

Below are the actual salaries and bonuses paid to LCS physicians for the associated production in their most current full contract year. Lab revenue is reported in gross only. By adding base salary and bonus and applying a benefit factor (i.e. 25%), we can compare physician compensation relative to practice net revenues (net revenue + lab). In many cases physician compensation is excessive relative to the financial performance of the practice (see below illustration).

| LCS Analysis | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Physician | Last Contract Year | Base | Bonus | Visits | Gross Revenue | Net Revenue | Collections | Lab |
| Homer | April 1996 | $216,568 | $50,000 | 5939 comb | $1,129,867 | $760,624 | $742,389 | $408,833 |
| Bloom | April 1996 | $216,568 | $50,000 | Same as above | | | | |
| Guida | Sept 1995 | $170,324 | $12,000 | no base | | | | |
| Mellin | Feb 1996 | $236,852 | No bonus | 5304 comb | $869,244 | $474,921 | $401,269 | $222,403 |
| | | | | 525 scopes | | | | |
| Schwartz | Feb 1996 | $236,852 | No bonus | Same as above | | | | |
| Coleman | Nov 1995 | $292,610 | $20,000 | 3910 visits | $553,345 | $325,955 | $336,173 | $153,996 |
| Perer | Nov 1995 | $239,381 | $30,000 | 3966 visits | $454,334 | $275,205 | $305,822 | $165,473 |
| Copen | Sept 1995 | $293,962 | $12,500 | 3233 visits | $1,063,176 | $611,064 | $684,578 | $451,073 |
| Dolchin | Sept 1995 | $293,962 | $22,500 | 3199 visits | | | | |
| Gozansky | Sept 1995 | $293,962 | No bonus | 3365 visits | | | | |
| Note: MD salaries the same but basefines are different | | | | | | | | |
| Erdman | Aug 1995 | $142,355 | $20,000 | 2218 visits | $409,611 | $302,791 | $272,984 | $118,211 |
| Shook | Aug 1995 | $195,514 | $15,000 | 2117 visits | | | | |
| Yeaner | Nov 1995 | $292,438 | $47,500 | 4140 visits | $303,820 | $254,672 | $182,920 | $146,364 |
| Nassberg | Oct 1996 begin | $280,000 | unknown | unknown | Practice will end first year 10/96 | | | |
| Biederman | Oct 1996 begin | $185,000 | unknown | unknown | Historical data not available | | | |

Example:

Copen/Dolchin/Gozansky

Average visits per day by MD:   Copen        14.2 (3233 + 228 days)
                                Dolchin      14
                                Gozansky     14.8

Combined physician salary and bonus   =   $  916,886
25% benefit                           =   $  220,221
Total Physician Comp.                 =   $1,146,107

Total Practice Net Revenue (w/lab)    =   $1,062,167

Conclusion: Physician Compensation is greater than total net revenue.

FLAPP 021334

# Lauderdale Clinical Services, Inc.

Edward B. Biederman, M.D., F.A.C.E.   •   Lee Alice Goscin, M.D., Ph.D.   •   Sheldon Nassberg, M.D.

TO:  Emil Miller, C.E.O. North Ridge Medical Center

FROM:  Sheldon Nassberg, M.D.

DATE:  October 20, 1997

SUBJECT:  Conversations with Mr. Jeff Heinemann

A meeting was called between the doctors of Lauderdale Clinical Services and Mr. Jeff Heinemann on August 20, 1997 to propose new contracts.  In attendance were Edward Biederman, M.D., Lee Goscin, M.D., Sheldon Nassberg, M.D., and Mr. Jeff Heienmann, and Monica Bowman.

After a brief introduction Mr. Heinemann proceeded and made the following statement.  "Your contracts are illegal.  I hope to re-negotiate new contracts.  If you don't sign a new contract, we will declare the old ones illegal and you can go get a lawyer and fight us."

On a second meeting  September 9, 1997, also about new contract proposals, Dr. Biederman reiterated Mr. Heinemann's comment of August 20.  Mr. Heinemann's retort was " I never said any such thing of the kind".

We, the three undersigned physicians, attest to the verbatim statements made by Mr. Jeff Heinemann.

Sheldon Nassberg, M.D.          Edward Biederman, M.D.          Lee Goscin, M.D., Ph. D.

# EXHIBIT "5"

**TK 2556**

Diabetes   •   Endocrinology   •   Insulin Pump Therapy   •   Thyroid   •   Osteoporosis   •   Wo

North Ridge Medical Plaza   •   5601 North Dixie Highway, Suite 106   •   Fort L
(954) 491-1552   •   (954) 491-1000

13G

## SHEAR, NEWMAN, HAHN & ROSENKRANZ
### PROFESSIONAL ASSOCIATION
### ATTORNEYS AT LAW

RICHARD W. BLYLER
WELDON EARL BRENNAN
GLENN M. BURTON
JEFFREY DREW BUTT
SCOTT P. DISTASIO
MARILYN DRIVAS
JAMES R. FREEMAN
WILLIAM E. HAHN
THOMAS M. HOELER
BRUCE DOUGLAS LAMB
ROLAND J. LAMB
RODNEY W. MORGAN
JERRY L. NEWMAN
MARK J. RAGUSA
STANLEY W. ROSENKRANZ
KELLY JO SCHMEDT
L. DAVID SHEAR

ENTERPRISE PLAZA
201 EAST KENNEDY BOULEVARD
SUITE 1000
POST OFFICE BOX 2378
TAMPA, FLORIDA 33601
(813) 228-8530
FAX (813) 221-9122

OF COUNSEL:

T. PAINE KELLY, JR.
JOHN G. PARÉ

July 23, 1993

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
6405 N. Federal Highway, Suite 102
Ft. Lauderdale, FL  33308

Gentlemen:

As requested, we have reviewed drafts of (i) Assignment and Warranty Bill of Sale, (ii) Confidentiality Agreement and (iii) Physician Employment Agreement with Additional Provisions and Schedules 1-4. Each of the described documents contemplates a relationship with Amisub (North Ridge Hospital), Inc. ("North Ridge") and either Babcock, Gozansky, Dolchin, Copen, M.D., P.A. (the "P.A.") or Drs. Gozansky, Dolchin, and Copen, individually.

Our comments concerning these documents will be bifurcated. The first part will comment upon the various drafts. The second, uon the various state and federal laws that might impact one or more, or all, of the agreements.

In connection with the drafts, we have the following comments:

### AGREEMENTS

### Assignment and Warranty Bill of Sale (the "Bill of Sale")

1. The name of the P.A., in the opening paragraphs and throughout the document, should reflect the P.A.'s actual legal name.

2. The Bill of Sale seeks to document the sale by the P.A. of its assets. Based on a conversation with Dr. Gozansky, we assume the intent is to sell both tangible assets (e.g., desks, computers, car phones, paintings, telephone system), and intangible assets such as accounts receivable. As will be more fully discussed below, we have some concerns about the "sale of business"

REDACTED

EXHIBIT "6"

FLAPP 041613

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
July 23, 1993
Page 2

aspects of transaction. For this reason, we feel the Bill of Sale should not be concerned with the "business" of the P.A. Accordingly, we urge that (i) paragraph 4 pertaining to Licenses be deleted, (ii) the word "neither DG&C nor" be deleted from paragraph 7, and (iii) paragraph 8 be deleted.

3.  We suggest the following sentence be added to the end of paragraph 10: "Nothing herein is intended to prevent DG&C from the good faith attempt to avoid the payment of any such obligation.

4.  We suggest the following language be added as paragraph 11 to the Bill of Sale: "To the fullest extent permitted by law, the medical records of the patients of the P.A. shall be assigned to the custody of North Ridge."

5.  Following are "technical" comments with regard to the Bill of Sale:

    a.  the second introductory paragraph, following the word "Assets," the phrase should read ". . . DG&C hereby covenants and represents . . . ."

    b.  the second word in paragraph 9 should be "as" instead of "to."

    c.  in the second to the last line of paragraph 10, the word "reasonable" should be inserted before "attorneys' fees."

6.  The sale of the P.A. has income tax ramifications. As we understand it, the P.A. is <u>not</u> looking to this firm for guidance in this regard. Accordingly, we make no comment.

<u>Confidentiality Agreement</u>

1.  Note here the reference is to a "proposal from North Ridge Medical Center" - i.e., no mention of Amisub. Apparently, North Ridge Medical Center is a fictitious name filed by Amisub (North Ridge Hospital), Inc.

2.  Paragraphs 1, 2 and 3 should each begin "Except as otherwise provided by law or regulation, . . . ."

3.  In paragraph 1, the term "fellow shareholders" should be substituted for the word "partners."

4.  The following language should be added to the end of paragraph 2: "; provided, however, I am free to discuss the nature of North Ridge's proposal, including the terms of employment, with

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
July 23, 1993
Page 3

my fellow shareholders, my legal counsel, and immediate family
members."

    5.   The following language should be added to the end of
paragraph 3: "; provided, however, copies of any and all contracts
and proposals may be made and provided to my fellow shareholders,
my legal counsel, and immediate family members."

    6.   Paragraph 5 should be number "4."

Physician Employment Agreement (the "Agreement")  (The numbers set
forth below correspond to the paragraph numbers of the Agreement.)

   1.   Employment.

      a.   The words "Suite 102" should be inserted after
"6405 North Federal Highway" in the first sentence of paragraph 1.

      b.   The Agreement provides, in part that the "Physician,
is to render services . . . at such other clinics operated by
Employer as Physician may be required to render services. . . ."
The Employer, therefore, can require you to perform services
anywhere. We suggest either some geographical limitation be
imposed or that services are to be provided at another location
only with the Physician's prior written consent. The term
"practice of medicine" at the end of the last sentence could be
broadly interpreted. See our suggestion regarding Schedule

      c.   The Agreement provides that Physician agrees to
devote a minimum of 80 hours of medical and related services each
two week payroll period. We suggest that this requirement be made
subject to vacation, sickness, absences due to mental or physical
disability, and other absences for conventions, meetings, or for
continuing medical education, as each is otherwise provided in the
Agreement.

      d.   We suggest that the following language be added
after the words "Schedule 1" in the last sentence of paragraph 1:
"or unless Employer consents in writing,".

   2.   Professional Judgment

      a.   Throughout the Agreement, North Ridge Medical Center
is used interchangeably with North Ridge Hospital. We are informed
that such entities are one and the same. In order to avoid
confusion, we suggest that one name or the other be used
consistently throughout the Agreement.

FLAPP 041615

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
July 23, 1993
Page 4

     b.   The first sentence of paragraph 2 contains the following language:  "which shall be comprised exclusively of physicians licensed to practice medicine in State of Florida."  We understand neither the significance of that language nor the language's relationship to this Agreement.  Assuming that language remains in the Agreement, the word "the" should be inserted before the words "State of Florida."

   3.   **Fees**

     a.   The second sentence of paragraph 3 provides in part: "Physician hereby assigns all rights . . . ."  We are uncomfortable with the word "assigns" in that it may have unfavorable income tax implications.  In lieu of the prposed second sentence, we suggest the following:  "All fees received or realized as a result of the performance of services by Physician during the course of his employment by Employer shall belong to Employer. Physician appoints Employer as attorney-in-fact for all matters related to the billing and collection of such fees."

     b.   The last line of paragraph 3 provides: ". . . bill payers directly."  It is not clear who the "payers" are and whether the term "third-party payors" is what is really intended.

   4.   **Space and Support**

     a.   The last sentence of paragraph 4 provides: "Employer shall use its best efforts to maintain the "Clinic" at its present location, . . . ."  What happens if Employer is unable to so maintain the Clinic?

     b.   We suggest the following language be added as the second sentence of paragraph 4:  "Employer agrees, at its sole expense and cost, to insure the space, equipment and supplies and to maintain same in good order and repair."

     c.   The Agreement provides that Employer will provide personnel at the Clinic.  It should be made clear whether or not Physician is are expected to have any supervisory responsibilities over such personnel.

   5.   **Compensation**

     a.   The second sentence of paragraph 5 provides in part: "Physician shall also be eligible to receive incentive compensation . . . ."  We suggest that sentence reads:  "Physician shall also receive incentive compensation . . . "

     b.   We suggest the last two words of paragraph 5, "those Schedules" be replaced with "the Schedules described herein."

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
July 23, 1993
Page 5

<u>Additional Provisions</u>    (The letters set forth below correspond to the lettered paragraphs of the Additional Provisions)

A.   <u>Policies</u>

     1.   Prior to entering into any agreements, we suggest you obtain a copy of and review the hospital policies with which you are expected to comply.

B.   <u>Professional Requirements</u>

     1.   This paragraph requires that at all times Physician must maintain membership in good standing on the active medical staff.  We strongly recommend that you procure staff privileges prior to entering into the proposed agreements.

     2.   Item (v) requires that Physician meet "all qualifications to participate in programs maintained by Employer . . . ." We suggest, prior to your entering into any agreements, you become familiar with the nature of those qualifications.

C.   <u>Other Businesses</u>

     1.   It is our understanding that the intent of the non-compete agreement (contained in paragraph C) is to allow the Physician, after termination of the Agreement, to engage in the private practice of medicine in the same county in which the Clinic is located.  That is to say, so long as such practice is not hospital affiliated, the physician may practice medicine with impunity.  We believe that, as the Agreement now reads, an argument can be made that, in whatever form, the private practice of medicine in the same county in which the Clinic is located is prohibited by paragraph C.  With the advent of what we believe will be significant changes in the way health care will be practiced, we suggest that the parties to the Agreement have a meeting of the minds with respect to what will be deemed to be "competition" for purposes of paragraph C.

     2.   In its present form, paragraph C applies upon termination of the Agreement for <u>whatever reason</u>, including expiration of the 10 year term of the Agreement.  We recommend that the non-compete provision apply only if Physician wrongfully terminates the Agreement or if the Employer terminates the Agreement for any of the reasons set forth in Paragraph F(i) - (v).

D.   <u>Liability Coverage</u>

     1.   This paragraph provides "Employer shall provide or arrange for professional malpractice and other liability coverage . . . ." We suggest the words "or arrange" be deleted.

FLAPP 041617

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
July 23, 1993
Page 6

    E.   <u>Ownership of Medical Records</u>

       1.   We suggest the title to this paragraph be changed to "Medical Records."

       2.   Because the sale of assets is a transaction distinct from the employment relationship, we suggest that the Agreement makes no reference to the sale of assets.  Accordingly, we suggest paragraph E be re-written as follows:

       The medical records of patients treated by Physician prior to the effective date hereof (the "Physician's Medical Records") (including any additional information appended thereto after the effective date hereof) shall remain the responsibility of Physician subject to Employer's rights as custodian thereof.  With respect to the medical records of patients who visit the Clinic after the effective date hereof, and who were not former patients of Physician (the "Clinic's Medical Records"), Physician acknowledges that Employer has responsibility (including care, custody and control) for the Clinic's Medical Records.  Physician's Medical Records and Clinic's Medical Records shall include all physician-patient notes, lab and x-ray reports, interpretations or consultations regarding any diagnostic or therapeutic procedures, records transmitted from other treatment sources for the purpose of facilitating the patient's care, and any other identifying or explanatory notes or data, including but not limited to, the patient's name and address.  Physician shall be entitled to access Clinic's Medical Records in connection with the care and treatment of patients.  Similarly, Employer, as custodian of the Physician's Medical Records, shall have, in connection with the care and treatment of the pertinent patient, free access to, and the right to copy, all or any portion of, said records during the term hereof.  After the termination of this Agreement, Physician shall retain responsibility (including care, custody and control) of the Physician's Medical Records and Employer shall be relieved of its custodianship duties hereunder.  Similarly, after the termination of this Agreement, Employer shall retain responsibility (including care, custody and control) of the Clinic's Medical Records.  Each party hereto shall have access to any medical records necessary to defend, or assist in the defense of, a lawsuit for medical malpractice.

       3.   If it looks as if an agreement is to be reached between the parties, a letter should be sent to each P.A. patient notifying the patient (i) of the association with and employment by North Ridge and (ii) that the patient's records will be transferred to the custody of Employer.

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
July 23, 1993
Page 7

F.   Termination

1.) Item (vi) of this paragraph provides that Employer can terminate the Agreement immediately upon written notice in the event of Physician's uncured "breach of any other provision of this Agreement . . . ."   We recommend that the word "material" be inserted before the word "breach."

2.   In the last sentence of paragraph F, we suggest that the following language be added after the word "Further,": "after the fourth anniversary hereof,"

3.   Paragraph F should set forth the Physician's right to terminate the Agreement without penalty if North Ridge is excluded from either the Medicare or Medicaid program.

4.   With regard to the termination of the Agreement, we suggest there be added a paragraph entitled "Physician Retirement" which provides:

At any time after Physician reaches age 65, and upon 180 days written notice to Employer, Physician may terminate his employment under the Agreement.

G.   Liquidated Damages

1.   As the Agreement now reads, if a Physician wished to retire in year five, he would be subject to the liquidated damage provision set forth in paragraph G and be required to pay the Employer $50,000.00 as liquidated damages.

H.   Non-solicitation.

1.   Item (i) provides "solicit or divert patients with whom Physician had initiated personal contact during the term of this Agreement."   We are not really sure what is intended by "Physician had initiated personal contact" but we believe any ambiguity would be construed in your favor.

2.   We are curious why the "non-solicitation" is for 24 months when the noncompete period is only 12 months.

I.   Confidential Information

1.   We suggest a sentence be added to the end of paragraph I which provides:   "Anything contained herein to the contrary notwithstanding, medical records are to be governed by the provisions of paragraph E of these Additional Provisions."

SHEAR, NEWMAN, HAHN & ROSENKRANZ
PROFESSIONAL ASSOCIATION

FLAPP 041619

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
July 23, 1993
Page 8

### K.   Books and Records

1.   We suggest the obligation to retain books and records be a mutual obligation. Accordingly, the first word in the paragraph, "Physician," should be replaced with "The parties."

### L.   Notice.

1.   We suggest the second sentence of paragraph L be changed to read as follows: "The Notice shall be sent to the intended party at the address indicated below his/its signature at the end of the Physician Employment Agreement."

### M.   Arbitration

1.   We are having one of our litigators review this paragraph. From a practical standpoint, we are not sure how the Federal Arbitration Act, the state arbitration laws and the rules of the American Arbitration Association are procedurally intended to interrelate.

### N.   Assignment

1.   We suggest a sentence be added to the end of paragraph N which provides: "Likewise, Employer may not assign the Agreement or delegate its duties hereunder to another entity or person without the prior written consent of Physician."

Finally, we suggest that there be added to the Additional Provisions a paragraph entitled "Referrals" to provide:

The parties hereto acknowledge and agree that it is not a purpose of this agreement to exert influence in any over the reason or judgment of any party hereto with respect to the referral of patients or business of any nature and that Physician is under no obligation whatsoever to refer any patients or business to employer or a parent, subsidiary, or affiliate of employer.

### Schedule 1 to Agreement

1.   You may wish to set forth on this Schedule that you may serve as an expert witness, publish articles, and teach or lecture. The Agreement should provide that any fees generated through such activities belong to Physician rather than Employer.

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
July 23, 1993
Page 9

Schedule 2 to Agreement

    1.  As we understand the plan, the incentive compensation is
to be based on patient visits instead of cash collections.  We have
tried to reach Bill Barnett, Esquire, the Employer's attorney, to
clarify our understanding of how the incentive compensation is to
be calculated.  We believe there are some ambiguities which should
be understood before any agreements are signed.

    2.  We have concern that the manner in which the incentive
compensation is derived gives rise to a degree of risk in the
context of the anti-kickback laws which are discussed below.

Schedule 3 to Agreement  (The letters set forth below correspond to
the lettered paragraphs in Schedule 3.)

    B.  Benefit Plans

        1.  We suggest you satisfy yourselves that the total
number of vacation days, sick days, holidays, leave for continuing
medical education, is adequate.

        2.  We suggest you familiarize yourself with the plans
currently maintained by Employer.

        3.  The following items are not addressed in Schedule 3:
who bears the cost of (i) a physician's travel to and attendance at
medical meetings/conventions, (ii) license renewal fees, and (iii)
pagers/mobile phones?  It seems that each of the foregoing should
be expenses borne by the Employer.

                    STATE AND FEDERAL LAW IMPLICATIONS

    Heretofore have been our "technical" comments with respect to
the forms of the respective agreements.  When considering the
formation of a contract in the health law arena, one dare not
restrict the focus to the contractual terms.  Of equal importance
is the need to give due consideration to federal and state anti-
kickback laws.

    Structuring arrangement between hospitals and physicians is
especially challenging in light of the laws as they now exist.
Types of arrangements which would fall within the Safe Harbors to
the anti-kickback statutes, are very narrow.  While it has been
recognized that integrated delivery systems are the way of the
future, the stringency with which certain laws are now written has
the potential to impede the development of such systems.

    The federal anti-kickback statute prohibits the knowing and
willful offer, payment, solicitation or receipt of any remuneration

                                              **FLAPP 041621**

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
July 23, 1993
Page 10

(including kickbacks, bribes or rebates) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring (or inducing the referral of) any individual to a person with the furnishing or arranging for the furnishing of any item or service for which payment may be made, in whole or in part, under Medicare/Medicaid or other government health care programs. 42 U.S.C. §1320a-7b(b) (the "Federal Statute"). The Federal Statute has been interpreted broadly. Moreover, the office of the Department of Health and Human Services' Inspector General (the "OIG") has recently taken an aggressive approach in its enforcement.

Generally, any situation whereby one appears to be receiving some form of remuneration perceived as arising out of the referral of a patient (for Medicare/Medicaid services) is suspect under the Federal Statute. In 1992, the Patient-Self Referral Act (the "State Act") was enacted in Florida. The State Act has a provision which essentially parallels the anti-kickback provision of the Federal Statute.

Regulations have been promulgated which set forth exceptions to the Federal Statute (the "Safe Harbors"). In addition to the Safe Harbors, the Federal Statute sets forth four exceptions that remain outside its purview. One of the exceptions is a bona fide employer/employee relationship. Such an arrangement, despite its being "suspect," will not, if otherwise bona fide, violate the Federal Statute.

The proposed arrangement contemplates an employer/employee relationship. On its face, therefore, it would appear to be a protected arrangement. The fact that the P.A. sold its assets to North Ridge immediately prior to the commencement of the employment relationship, however, may impact the ability to rely on this exception to the Federal Statute.

In the past several months, there has been much attention focused on the application of the Federal Statute to certain types of situations involving the acquisition of physician practices. Of particular interest have been situations in which the end result was common ownership or control of both hospital and physician practice by a single entity, with the physicians from such practice continuing to treat patients and being affiliated with the acquiring entity.

The OIG is concerned that the remuneration paid in connection with, or as a result of, the acquisition of a physician practice, could serve to interfere with the physician's judgment. The thought is that such interference will result in the delivery of unnecessary or more costly care to Medicare or Medicaid beneficiaries by inducing the physician to utilize the affiliated

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
July 23, 1993
Page 11

hospital rather than another hospital or less costly facility which may provide more appropriate care.  In a review of physician practice acquisitions, two issues are paramount:  (i) the total amount paid for the physician practice, including the nature and type of items for which the physician receives payment, and (ii) the amount and manner in which the physician is subsequently compensated for providing services to patients.  Conceivably, if "one purpose" of the payments received in connection with the acquisition is to induce the referral of future Medicare/Medicaid business, such transaction could violate the Federal Statute.

The contemplated transaction can be bifurcated.  The P.A. will receive compensation for the assets sold to North Ridge.  We are told these assets are being evaluated and appraised by an independent third party.  The purchase price for such assets should, theoretically, therefore, be at fair market value.

The other aspect of the transaction involves the compensation each of the P.A.'s physicians will receive for rendering professional services as an employee of North Ridge.  Again, this compensation should be fair market value.

In addition to a provision for base compensation, the contract provides an incentive compensation mechanism that, depending on the number of patient visits, will move up and down or even lead to termination of employment.  From a fraud and abuse perspective, these aspects of the arrangement give us great concern.  First, incentive compensation, by its very nature, suggests payment for a referral stream.  The suggestion becomes stronger when, as is the case here, a physician will be penalized in the form of reduced compensation if patient visits decline.  If this were not enough, the suggestion is further strenghthened by the right of the Employer here to terminate a physician's employment if patient visits decline beyond a specified percent.  Second, as previously noted, under certain circumstances, the sale of assets juxtaposed with the creation of an employer-employee relationship might taint the latter relationship's right to exemption from the Federal Statute.  In the instant case, the taint might arise if the incentive compensation were deemed in payment for assets so that the physican could be deemed to have received in excess of fair market value.

We dislike pointing up negatives without making alternative suggestions; however, in the compensation area it is difficult.  In another situation with which we are familiar, the parties, agreeing to trust each other, merely contracted for (i) a re-negotiation of compensation on an annual basis and (ii) employer's having the discretion to pay annual bonuses which remained undefined in the agreement.

Babcock, Gozansky, Dolchin, Copen, M.D., P.A.
July 23, 1993
Page 12

If the desire is to bring a finality to this matter, we have a suggestion. You should now ask for a conference between you and your counsel, on one hand, and the hospital and its counsel, on the other. In arranging such a conference, we would suggest you build in time for us to meet with you prior to such meeting for the purpose of discussing the points raised in this letter.

In the meantime, please feel free to call me or Marilyn Drivas if you have questions about the contents of this letter.

Best regards.

Sincerely,

Stanley

Stanley W. Rosenkranz

SWR:jp:119134

FLAPP 041624

SHEAR, NEWMAN, HAHN & ROSENKRANZ
PROFESSIONAL ASSOCIATION