IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 97-6590-CIV-JORDAN/BROWN

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* SAL A. BARBERA, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| AMISUB (NORTH RIDGE HOSPITAL), INC., d/b/a NORTH RIDGE MEDICAL CENTER, *et al.*, | ) ) ) ) |
| Defendants. | ) ) |

### UNITED STATES' REPLY BRIEF IN SUPPORT OF REVISED MOTION TO COMPEL

The Government's main arguments in support of its motion to compel were set forth in its original motion. Rather than repeat them here, the Government wishes merely to take issue with a few of the points raised in Tenet's opposition brief. In particular, the Government believes that Tenet's brief mischaracterizes certain facts related to the issue of "waiver by implication," and that it ignores the evidence of fraud presented in the Government's motion.

I.  TENET HAS IMPLICITLY INVOKED ADVICE OF COUNSEL AS A DEFENSE

Tenet's assurances that it will not raise "advice of counsel" as a defense in this case are disingenuous. In fact, it already has. Tenet states that when this case goes to trial, the defendants will not "offer any . . . testimony that Defendants believed the contracts were legal," but that they "do intend to hold the Government to its burden to prove a knowing violation of Stark." Tenet's Brief, p. 8. At the same time, it characterizes the Stark Statute as "complex and ever-changing,"

and suggests that the lack of timely regulatory guidance concerning the statute might have fostered innocent misinterpretation of it. Tenet Brief, pp. 13-14. This echoes Tenet's statement to this Court in its February 26, 2002 memorandum opposing the Government's summary judgment motion that "in light of Stark's history and the uncertainty surrounding the interpretation of its complex and vague provisions (discussed below), a violation of the Stark Act under the circumstances presented cannot be used as a predicate for a False Claims Act action." Tenet's February 26, 2002 Brief, p. 4.

Tenet is trying to have its cake and eat it, too. It now offers to refrain from expressly stating that its employees believed that the contracts at issue were legal, but it will still deny that they knew or should have known that they were illegal. It now offers to refrain from expressly arguing that its employees innocently misinterpreted the Stark Statute, but it continues to insist that the statute's requirements were subject to innocent misinterpretation. It now offers to refrain from arguing that its employees acted reasonably because they relied on advice of counsel, but it continues to offer testimony that its employees relied on the advice of counsel, and it defies the Government to prove that these employees acted unreasonably. In other words, it hopes to present its "advice of counsel" defense in an indirect way, rather than explicitly, in order to avoid disclosing evidence that would undermine the defense.

As a factual matter, Tenet's employees have injected the advice of counsel defense into their deposition testimony every chance they got. Tenet's suggestion that its employees' references to attorney-client communications were "extorted under cross-examination" (Tenet Brief, p. 10) is blatantly untrue, as demonstrated by the following examples from the Government's motion:

> Q: What is your understanding of the Stark – what the Stark Statute – what the terms of the Statute are?
>
> A: Well, obviously, I rely on legal counsel any time we're looking at anything relating to physician agreements...

Steigman Deposition (Ex. 2 of Government's Brief), p. 88.

> Q: Do you recall Mr. Heinemann raising concerns with you about the legality of the Lauderdale Clinical Services contracts?
>
> A: Mr. Heinemann and myself really didn't discuss the legal issues. If he had any legal concerns he would go to counsel that represented TPS.

Id. at 487-88.

> Q: During the time that you were dealing with physician practice acquisitions, was that one of your goals, to make sure all arrangements entered into were legal and ethical?
>
> A: Yes.
>
> Q: And how did you make sure that that was the case?
>
> A: **All of our agreements, first of all, went through our attorneys** and we always made sure that we met the law and any transactions that we do we always wanted to make sure were done in an ethical manner.

Id. at 696 (emphasis supplied).

> Q: When you first arrived at Tenet... **did anyone ever say to you that they thought there might be a legal issue with regard to the Lauderdale Clinical Services employment contracts?**
>
> A: Did anybody from the standpoint of a consultant or – would you just define "anybody." I'm sorry.
>
> Q: As broadly as – I mean anybody.
>
> A: There was – in the TPS staff there were some people that were concerned as to the legality. And **when people would do that, I would ask them, again, to put it in writing, and then I would forward it to Legal. I used Legal a lot.**

Heinemann deposition (Ex. 6 of Government Brief), p. 58. (Emphasis supplied.)

In fact, when one of Tenet's employees neglected to mention Tenet counsel in her deposition testimony, Tenet's attorney went back on cross-examination to correct the record:

> Q (by Tenet attorney Robert Krakow): You – in an answer to a question of Mr. Wiseman you say that you don't recall having Stark resources available to you when you arrived at your job in 1997. By that statement I assume you were excluding the availability of legal counsel?
>
> A: As I recall, the question he asked was if there were any resources in the Tenet Physician Services office at the time that I joined. And my response was no. And you're correct, we did have legal counsel as a resource. I was referring to paper resources or reference materials.

Bowman deposition (Ex. 7 of Government's Brief), pp. 356-57.

In short, Tenet's employees consistently, and without prompting by the Government, invoked advice of counsel when they were asked about their understanding of the Stark Statute or about the legality of the contracts at issue. Combined with Tenet's (1) insistence that the Government cannot prevail on its False Claims Act claims unless these employees knew that the contracts violated the Stark Statute, and (2) complaints about the ambiguity of the statute, this amounts to a classic use of attorney-client communications as both a sword and a shield. According to Tenet, the Government must "prove a knowing violation of Stark," but it is not permitted to explore the subject in discovery because its employees' understanding of Stark and of the legality of the contracts was based entirely on privileged communications.

Tenet's assertion that it has not expressly invoked "advice of counsel" as an affirmative defense (Tenet Brief, p. 6) misses the point that its actions constitute a classic example of the well-established legal doctrine of "waiver by implication." It is simply unfair to allow Tenet's witnesses to justify their actions by invoking their conversations with lawyers, and then force the

Government to demonstrate that these witnesses acted unreasonably, without allowing the Government to discover exactly what guidance these witnesses sought and received.[1]

II.   THE GOVERNMENT HAS IDENTIFIED SUBSTANTIAL EVIDENCE
      THAT TENET'S CONDUCT IMPLICATED THE CRIME-FRAUD EXCEPTION

Tenet's brief mocks the Government for "lack[ing] any evidence of a knowing violation of Stark," and characterizes the Government's motion as a desperate "Hail Mary pass" to find some. Tenet Brief, p. 3. Tenet's argument regarding the crime-fraud exception is premised on this supposed lack of evidence. Id., p. 13. This remarkable demonstration of wishful thinking appears to be based on the assumption that if Tenet refuses to acknowledge the evidence presented in the Government's motion, it will cease to exist.

In fact, the Government has identified a great deal of evidence that Tenet knew that it was violating the Stark Statute and that its attorneys were directly and personally involved in this unlawful conduct. Some of this evidence was discussed in the Government's motion to compel. For example, the Government's motion discussed a February 1997 memorandum by a Tenet executive named Tony Bennett to his supervisor that explained accurately and in detail why the contracts at issue violated Stark Statute. Mr. Bennett has testified that he met with two senior Tenet attorneys for several hours to discuss his memo, and that he was led to believe that they would address his concerns. Government Brief, Ex. 5. Mr. Bennett's supervisor also testified that he referred Mr. Bennett's memo to a senior Tenet attorney and relied on her to address them. Government Brief, Ex. 6, pp. 163-64.

---

[1] If the Court denies the Government's motion based on Tenet's assurances that it does not intend to make arguments at trial that are inconsistent with its assertion of attorney-client privilege, then the Government anticipates filing a motion in limine to clarify what arguments and testimony the defendants will be precluded from raising at trial.

Tenet's brief does not dispute the substance of this evidence, but characterizes it as an innocent instance of company counsel giving appropriate legal advice to a confused employee. The evidence does not support this characterization. Mr. Bennett's memo warning that the contracts at issue violated the Stark Statute was clear, specific, and legally and factually correct. The fact that Tenet subsequently terminated or renegotiated all of these contracts indicates that Tenet counsel recognized that Mr. Bennett's concerns were valid. In fact, this Court's February 19, 2003 Order effectively ruled that the Government has already made a prima facie showing that at least some of Mr. Bennett's concerns were valid.

Don Steigman, the North Ridge CEO who approved the contracts at issue, testified that the contracts were personally approved by Tenet counsel. Government Brief, pp. 11-12. Mr. Bennett's testimony shows that Tenet's attorneys were expressly warned that the contracts were illegal in early 1997, but it is undisputed that they allowed the company to continue billing Medicare unlawfully long after that, and they never disclosed the Stark violations to the Government.

In short, the undisputed evidence shows that (1) Tenet counsel personally approved the unlawful contracts at issue, and (2) when Tony Bennett began voicing concerns that the contracts were illegal, senior Tenet lawyers met with him, assured him that they would address his concerns, and then allowed the company to continue billing the Government unlawfully without making any disclosure to the Government. This is exactly the type of conduct that the crime-fraud exception was designed to expose.

Exhibit 1 of the Government's opening brief consists of entries in Tenet's privilege log that confirm that Tenet counsel looked closely at the legality of the contracts at issue in this case.

A March 1997 memo entitled "Legal Concerns Related to LCS Practices" was directed to Tony Bennett and his supervisor, and appears to relate directly to his February 1997 memo. A January 1996 memo entitled "North Ridge JCAHO; Stark II Corrective Action" suggests that Tenet knew about Stark violations at North Ridge that were never reported to the Government. The other documents identified in Exhibit 1 of the Government's motion also appear to address the legality of the contracts at issue in this case. The fact that Tenet counsel allowed blatant Stark violations to continue after examining them repeatedly is deeply disturbing.

Tenet's brief suggests that the Government's evidence simply reflects the kind of model compliance program that "every hospital in the country should have." Tenet Brief, p. 14. In fact, a "compliance program" that functions as a "Black Hole," sucking in evidence of unlawful conduct and then preventing the light of that evidence from ever escaping the Legal Department (while allowing the unlawful conduct to continue) is not an appropriate model for other hospitals to emulate. The crime-fraud exception was specifically designed to prevent parties from misusing the attorney-client privilege to protect or facilitate such conduct.

## CONCLUSION

For the foregoing reasons, the Government respectfully asks the Court to grant the Government's revised motion to compel.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

MARCOS DANIEL JIMENEZ
United States Attorney for the
Southern District of Florida

ANA MARIA MARTINEZ
Assistant United States Attorney
99 N.E. 4th Street
Miami, Florida 33132
Fla. Bar No. 0735167
Tel: 305 961 9431
Fax: 304 536 4101

Dated: 8/18/03

MICHAEL F. HERTZ
MICHAEL D. GRANSTON
DAVID B. WISEMAN, A5500647
DAVID T. COHEN, A5500682
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, DC 20044
Tel: (202) 514-0132
Fax: (202) 514-0280

Attorneys for United States of America

## CERTIFICATE OF SERVICE

I hereby certify that copies of the United States' Revised Motion to Compel, along with the supporting memorandum, exhibits, and proposed order, were served by mail this 18th day of August, 2003 to the following counsel:

Robert B. Krakow
Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue
Suite 1100
Dallas, Texas 75201

Allan Sullivan, Esq.
Sullivan Rivero & Chase, P.A.
201 S. Biscayne Boulevard
Miami, Florida 33131

Gary E. Sherman
Law Offices of Gary E. Sherman
440 South Andrews Avenue
Fort Lauderdale, Florida 33301

_____
Ana Maria Martinez